UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Teleplus Consulting, Inc.,

Plaintiff,

v. Case No. 02-CV-212 (JRT/SRN)

Conseco Services, LLC.,

Defendant.

COPY

*****************************************************

DEPOSITION OF
JAMES BREAKEY

VOLUME II

*****************************************************

DATE TAKEN: 11/26/02 REPORTED BY: KELLY HERRICK

THE DEPOSITION OF JAMES BREAKEY, is taken on the 26th day of November, 2002, at Lockridge Grindal Nauen, 100 Washington Avenue South, Suite 2200, Minneapolis, Minnesota, commencing at the hour of 9:13 a.m., pursuant to Notice of Taking Deposition.

* * *

(Exhibit 207 was marked.)

JAMES BREAKEY

called as a witness, being first duly sworn, was examined and testified as follows:

***

EXAMINATION (Continuing)

BY MR. SANDBERG:

Q Mr. Breakey, we had gotten partway through in our earlier meeting, so my goal today is to try to finish up the depo with you and we'll continue pretty much as we did in the first part with questions and various documents for you to look at, okay?

I want to start by having you look at what's been marked as Exhibit 207. I'll ask you if you can identify this for the record, please.

A Yeah, this is the letter that was ghost written by Teleplus for me to, sort of, I guess I would refer to it as a last-ditch effort to get AT&T back in

didn't enter into a contract that said that.

BY MR. SANDBERG:

Q All right. I didn't pose that question to you, sir. I asked, given your current understanding, how could one ever determine whether or not Teleplus had made that condition come true?

MR. CATTANACH: Same objections.

THE WITNESS: I guess we wouldn't be able to.

MR. SANDBERG: Can I have you mark another exhibit, please.

(Exhibit 214 was marked.)

(A recess was taken.)

BY MR. SANDBERG:

Q Mr. Breakey, so I don't forget to pose the question, let me just pause for a second.

You had said a few minutes ago that Mr. Maybin was consulting with you and keeping you up to date on contract negotiations with AT&T on a daily basis; is that correct?

A Yes.

Q And in what form did that consultation take place?

A Generally, phone calls.

Q Were there any E-mails between the two of you?

A I do not recall.

Q All right. Looking at Exhibit 214, please, which I hope you have in front of you.
A Um-hmm.
Q Can you identify this document for us, please?
A It appears to be an E-mail from myself forwarded to Dave Steen that lays out an E-mail -- forwards an E-mail that I sent to Steve Van Dorselear.
Q So we're -- having been some period of time, could you remind me who Mr. Van Dorselear is, please?
A Steve Van Dorselear is -- I don't remember his exact title but it was something like senior vice president or executive vice president of sales. He had sales for part of the company or for one division of AT&T.
Q Who prepared the letter that's the body of this E-mail, please?
A I'm not absolutely certain. I believe I did.
Q Why?
A If I'm not mistaken, this was a period of time when we were attempting to make headway on a particular worksheet that was creating our position or attempting to find middle ground on a MARC, an appropriate MARC.
Q And why did you send this particular letter to Mr. Van Dorselear?

A I believe we sent him the letter, as I recall, to express our concern over some moving target numbers on their side.

Q Who is the "we" in that answer, please?

A Well, the "we" was, most certainly, Conseco, who specifically was involved, presumably Mike Sanderson, myself, and at this point in time, probably presumably still Teleplus.

Q Did anyone request you to send this letter to Mr. Van Dorselear?

A I do not recall.

Q Did you discuss this letter with anyone at Teleplus before sending it?

A I'm guessing I did but I do not know.

Q Do you know who you discussed it with, if you did?

A It would have been either Bill and/or Dave.

Q But you don't actually recall if you did discuss it first?

A I do not specifically recall.

Q Are the statements made in this letter all true?

A I don't see anything that I certainly would not have believed to have been true at that time.

Q Is there anything there you see that you know now to be untrue?

A I don't recall if we laid off an additional 1,000

employees, we may have; we certainly have since then. And I do not believe our major medical division was sold, although, I'm not certain of that.

Q So, why would those statements have been made in the letter?

A It was our intent to do that at that time.

Q To layoff the 1,000 employees?

A Yeah.

Q And to sell off the division?

A Sell off -- yeah, we've sold off numerous divisions since then. I'm not sure if those two were -- those are both insurance side divisions.

Q Do you know what happened in response to this letter that you're looking at, Exhibit 214?

A I don't recall specifically.

Q Do you recall getting a response from Mr. Van Dorselear on the problems you had raised in your letter?

A I do not recall.

MR. SANDBERG: Can you mark that, please.

(Exhibit 215 was marked.)

BY MR. SANDBERG:

Q Calling your attention to what's been marked now Exhibit 215. I'll ask if you could take a minute to

look at that and then see if you can identify it for us and tell us what it is.
A This is based on the draft letter to Ken Sichau which was ghost written, I believe, by Bill Hansen. These are Mike Sanderson's and my comments on it.
Q Back and forth comments on how the letter should be modified and redrafted?
A Correct.
Q This is the letter you said you never sent; is that correct?
A Yeah, yes.
Q So, if you weren't going to send it, why were you going back and forth with editing and suggestions with Teleplus?
A It had not been decided yet at this time not to send it.
Q And what changed your mind between the times you were going back actively editing this document to decide not to use it at all?
A We were, at that point -- we, at that point, did not have input from our chief operating officer and our corporate CIO, Richard Maybin, and we were still at that point onboard and listening to -- or following the Teleplus strategy of continuing to strong-arm AT&T.

[redacted]

did any, in addition to that, of our own.
Q Do you know whether Conseco had given Teleplus any base figures to work with for those projections?
A Certainly -- yeah, I'm certain that we gave them a number of customers, probably contact information, although I don't recall.
Q Do you recall what sort of revenues Teleplus was projecting for an affiliate program?
A Oh, I don't remember the exact numbers. They were significant. In the millions of dollars.
Q Do you have any recollection how profitable for Conseco an affiliate program might be?
A Well, the -- based on the Teleplus analysis, very, very profitable.
Q Did Teleplus present an affiliate program proposal to Conseco?
A A Teleplus proposal or a carrier-based proposal?
Q I'm sorry, a fair question. A carrier proposal.
A Not one to our knowledge that was -- that a carrier had agreed to.
Q And on what basis do you distinguish this "carrier had not agreed to" caveat?
A I don't believe we were ever presented a proposal where they said "And the carrier is willing -- has a contract and is willing to sign on the bottom line."

Q Okay. Has Conseco entered into an affiliate program with any wireless carrier?
A No.
Q Anywhere in the country?
A No, not to my knowledge.
Q For any kind of wireless service offered to agents or customers?
A I believe that on the insurance side, as I believe has always been the case, agents can participate in their wireless program, but with -- but certainly not with the characteristics of the affiliate program and not customers, to my knowledge.
Q After you decided to terminate Teleplus's work on the affiliate program, was any further work towards an affiliate program done by Conseco?
A No.
Q Why not?
A We spoke to Verizon. They made it clear that while they had -- while our salesperson had had high hopes, at some point, that, in fact, there was little chance of ever getting internal approval for such a program.
We are now at this point ten months into paying higher rates than we already had a contract negotiated for in January; we needed to get a

wireless program in place, so we simply put together a traditional wireless program and went forward with it.

Q With what carrier, please?

A Verizon.

Q Who at Verizon told you there was little chance of internal progress?

A I don't recall the name of our sales rep at that time. I can get that name for you. It was a woman.

Q It was your salesperson --

A Our sales representative.

Q Where is she located? At the time where was she headquartered?

A I believe she was a Minneapolis resource -- or a Twin Cities resource.

Q Does Conseco have any plans for doing an affiliate program in the future at this point?

A No.

Q Given, as you described it, the potential for significant revenues and profitability, why has Conseco not pursued an affiliate program?

A We look at the program and we don't understand, after thinking about it, what value it has to the carrier, and as significant business people, we realize there has to be value to both sides, so it

makes sense to us that the carriers are not interested in entering into such an agreement with us and so we haven't -- I mean, if we thought we could actually make millions and millions of dollars on it, we'd be all over it. We don't think that the carriers are interested in doing it.

Q What's the missing piece in your current analysis? What's -- what has convinced you that there's not a reason for carriers to take up the program?

A I think conversations with them that -- where they've told us they're not interested in, the fact that we did get one done in ten months, and to my knowledge, I know of nobody else like us that's doing one, although, I could be wrong about that.

The combination of these things say: If it's such a great idea, somebody would be doing it. From our standpoint, the carriers aren't interested in working with us on it, clearly, over that ten-month period of time.

Q So am I understanding correctly that there's no -- there's no reluctance within Conseco to consider an affiliate program today, it's a carrier reluctance to do anything with you?

A We don't believe it's a viable product and, therefore, we aren't pursuing it.

Q Okay. So you're also not presently interested in pursuing it either, even if the carriers might?
A If the carriers changed their position on it, we'd change our position on it, probably.
Q So it really is a carrier interest issue at the present, as you understand it?
A Yeah. I mean, there is no such program, so this is all kind of hypothetical. There's never been such a program presented to us, so if there was, I guess then we would decide.
Q Okay. Are you familiar with AT&T's concept-six contract?
A No, I'm not.
Q Have you ever heard that phrase before?
A Yes, I have.
Q When did you first hear that phrase?
A We had a concept-six -- I believe we had a concept-six contract as part of our AT&T contract.
Q When you say "had," what time frame are you talking about?
A I believe in 2000, 2001, we had a -- and probably prior to that we had a concept-six contract.
Q What was that concept-six contract for?
A I do not know.
Q Do you know where it was?

A No.
Q Do you know what kind of services were contained within it?
A I do not recall.
Q Voice versus data?
A I don't recall.
Q Do you know where in Conseco that concept-six contract was either negotiated or approved?
A No, I don't know.
Q How does -- to the extent you know, how does the concept-six contract relate to the AT&T agreement we discussed earlier today that was entered into in 2001?
A I believe that the 2000 -- the September 2001 contract superseded the -- or replaced the concept-six contract. I believe that to be the case.
Q It's your understanding, at least, that that was folded in?
A I think so.
Q Do you know why you had a concept-six contract alongside another AT&T contract in 2000?
A No, I do not.
Q Do you know how the prices in the concept-six contract compared to the larger AT&T contract prices

in 2000?

A No, I do not. I have technical people that know all of this.

Q It's a good thing to have.

Do you recall being involved in any internal discussions within Conseco prior to Conseco entering into the concept-six contract?

A No.

Q You mentioned that you have technical people who actually -- who are involved in these more precise issues. If I wanted to find out about the history or background or parts of the concept-six contract, where would I go?

A My presumption is that our technical people, our telecom -- technical, telecom people may have the answers to that.

Q Is there a person that you have in mind when you give that answer?

A I would imagine we could do some research and Bob Tolley could come up with the answer or Kevin Wirthwein from the Conseco side.

Q Do you recall, during Teleplus's work on the AT&T contract in 2001, discussions with Teleplus about the concept-six contract?

A The only conversations I recall is the fact that it

had an earlier termination date so it provided us some minimal leverage on the fact that we could take that volume elsewhere earlier than the rest of the contract.

Q Do you recall any discussions about the effects of the concept-six contract when you were talking with Teleplus?

A I don't know what you mean by "effects."

Q Do you recall any discussions, for example, regarding a shortfall on the concept-six contract?

A No.

Q Do you recall any discussions on whether Teleplus was to work on the concept-six contract as part of their AT&T work for Conseco?

A It was our intent in our contract negotiations, I believe, to consolidate the contracts, if that made sense.

Q That was, at least, intended that they should work on that as well?

A I believe it was on the table, if you will.

Q And it was something you wished them to proceed with, you weren't trying to keep them from doing it?

A No.

Q So, other than your belief that the concept-six contract was in some fashion folded in to the new

contract tariff, do you know what really happened to either the volumes or the commitment levels that were in the concept-six contract?
A I have no specifics on that.
Q Did anyone at Conseco negotiate with AT&T over replacing the concept-six contract?
A I guess you'd have to get a lot more specific. I have no idea of time frame or --
Q To the best of your knowledge, did anyone, besides Teleplus, work with AT&T on replacing the concept-six contract?
A When?
Q During the time when you were renegotiating your AT&T contracts.
A Okay. Actually, and I could have answered earlier as I think about it, I have no knowledge of that. I don't know. Sometimes we have left-hand/right-hand issues, but not to my knowledge.
Q If the prices in the concept-six contract had been higher than the prices received by Conseco in its new contract tariff with AT&T, would replacing the concept-six tariff have benefited Conseco?
MR. CATTANACH: Objection: Foundation; calls for speculation. Answer, if you know.
THE WITNESS: I'll state the question

back to you to see if I understand it.
You mean, if the price is higher and it's superseded by a contract but the price is lower --
BY MR. SANDBERG:
Q Yes, sir.
A -- does that save money?
Q Is that a benefit to Conseco?
A As a hypothetical, yeah, I would imagine it is.
Q If there were minimum volume commitments under the concept-six contract which were removed as part of the new contract tariff with AT&T, would that have been a benefit to Conseco?
MR. CATTANACH: Objection: Lacks foundation; calls for speculation; calls for a legal conclusion. You can answer, subject to the objections.
THE WITNESS: If there was a -- if there was a minimum that no longer existed following that?
BY MR. SANDBERG:
Q Yes, sir.
A Well, actually, it depends on the context. The simple answer is yes. As you think about it, the whole context of the new contract and where you're leaving and where you're going to would have to be considered to determine that.

Q So you would have to know what the minimums in the new contract came out to be?
A And how those related to the old one.
Q So you would need to look at the preexisting AT&T large agreement, the preexisting contract-six agreement and the final contract tariff?
MR. CATTANACH: Objection: Lacks foundation; calls for speculation.
THE WITNESS: To understand what phenomena is occurring, presumably.
BY MR. SANDBERG:
Q And those would be sufficient to understand what had happened with minimums?
MR. CATTANACH: Objection: Lacks foundation; calls for speculation; calls for a legal conclusion.
THE WITNESS: I don't know if it would be or not.
MR. SANDBERG: Let me go off the record just for two minutes.
(Discussion off the record.)
BY MR. SANDBERG:
Q Mr. Breakey, you've mentioned at several points in today's questions and answers, Richard Maybin. For which of the Conseco entities does Mr. Maybin

actually work?

MR. CATTANACH: Objection: Foundation.
You can answer, if you know.

THE WITNESS: I believe he works for
Conseco, Inc.

BY MR. SANDBERG:

Q And do you know what his job title is at Conseco, Inc.?

A Richard fills two roles. One is he's the CIO for Conseco Insurance Group and I believe he's the senior vice president, and he also fills the role of corporate CIO, so a governance over IT for all of Conseco.

Q For Conseco, Inc.?

A For Conseco, Inc.

Q Do you know how long Mr. Maybin has been in that job?

A He was in that role when they acquired us in June of '98, so, at a minimum, four years, I believe for a year or two before that.

Q So he predates your being acquired into the Conseco family?

A Yes.

Q Have you worked -- I'm sorry. Are you a direct report to Mr. Maybin?

A No.
Q Who is in between?
A We do not have a reporting relationship.
Q I'm sorry, I apologize. What, in the corporate structure, is the hierarchical relationship between you and Mr. Maybin?
A There is no hierarchical relationship. He provides -- I report to the president and CEO of Conseco Finance. He reports to the president and CEO of Conseco Insurance Group and then has an additional role where he reports to the CEO of Conseco, Inc.
Q Conseco Finance is also a subsidiary of Conseco Inc., question?
A Yes.
Q So what's the intersection, if any, between Mr. Maybin's responsibilities and yours?
A Mr. Maybin and I have similar responsibilities in his role for CIG, for Conseco Insurance Group, and my role for Conseco Finance. He has, in addition to that, a governance or leadership role over all of IT for the corporation.
Q And is -- why, then, Mr. Maybin's involvement in the telecommunications activities for which you have responsibility?

A All of this -- all of the contracts being contemplated had -- were being negotiated for all of Conseco, not just Conseco Finance.
Q So it is his responsibility for the insurance group technology issues?
A I'd say in his role as corporate CIO it is his responsibility for the entire company, it's his ultimate responsibility.
Q So that information officer role at Conseco, Inc. does include telecommunications?
A Oh, yes.
Q I'm just trying to integrate a couple of the answers you've given me.
Despite the fact that in his role as corporate CIO he has a responsibility for telecommunications, you don't have any reporting obligations to him for telecommunications?
A I don't have a direct reporting relationship with him.
Q Okay.
A I understand and recognize his role as the senior technology person in the corporation.
Q Okay.
A And why he -- well, he doesn't have a direct hiring and firing responsibility for me. We do work

together and I accept his leadership role on all technology issues.
Q Is it fair to say that in his insurance-group role that you're peers?
A Yes.
Q What determines when Mr. Maybin gets directly involved in a telecommunications issue?
MR. CATTANACH: Objection: Foundation.
THE WITNESS: I couldn't answer that.
BY MR. SANDBERG:
Q If there is a pattern you've discerned over the years, for example.
A When it becomes important or challenging or some, he believes, interjection is required, then he gets involved.
Q Where is he located physically?
A Carmel, Indiana.
Q He's in Carmel, okay. Now, we've had some discussions earlier today about Mr. Breakey's -- I'm sorry -- Mr. Maybin's involvement in the AT&T negotiations in 2001. What was it that prompted Mr. Maybin's involvement in that particular telecommunications issue?
MR. CATTANACH: Objection: Foundation.
THE WITNESS: Essentially -- I mean, the

fact that it would have a significant impact on the entire organization caused him to be interested throughout him taking a much stronger role was based purely on the fact that we weren't getting the job done.

BY MR. SANDBERG:

Q Was Mr. Maybin involved in your initial decision to retain Teleplus?

A He was aware of it and was open to it, yes.

Q How did he become aware of it?

A I made him aware of it.

Q You told him?

A Sure.

Q And what -- what other information did you pass on to him after Teleplus was retained as to how Teleplus was doing for you?

A I don't recall specifically.

Q Do you recall if there were periodic E-mails from you to him?

A I don't recall.

Q Do you recall if you spoke with him on the telephone from time to time?

A We spoke on the telephone probably weekly, so one can assume the topic came up.

Q Do you know whether Mr. Maybin had been involved

with AT&T prior to the 2001 negotiations as in earlier AT&T/Conseco contracts?
A I do not know.
Q Do you know if he had any contacts within AT&T with whom he had worked before?
A He knew people within AT&T, yeah.
Q And do you know how he had come to know those people at AT&T?
A Yeah. As I think we discussed earlier in the deposition, he sat on their -- the name escapes me, but the board of senior level IT people that is chaired by the CEO of AT&T or that they use to get input from clients.
Q Is that something he was doing before you became part of the Conseco family?
A I do not know when that started.
Q Was that in place when you became part of Conseco?
A I do not know exactly when that -- when that organization started.
Q It is the case that AT&T paid Mr. Maybin's way to various sporting events; is it not?
MR. CATTANACH: Objection: Foundation.
THE WITNESS: I do not know.
BY MR. SANDBERG:
Q Have you ever known of Mr. Maybin being invited at