Exhibit A

**Bill Hansen**

**From:** Bill Hansen [billhansen@telepIusconsulting.com]
**Sent:** Thursday, February 01, 2001 4:50 PM
**To:** mike_w_sanderson@consecofinance.com
**Subject:** Teleplus Agreement

Mike,
We believe it was a very good meeting, thank you for pulling it together. And thank you for lunch, we appreciate it.

I am assuming it is your intent to get Curt to turn around a finished agreement some time this afternoon or early tomorrow morning. Please remember we need a couple of hours to route it passed our attorney and through our contract administrator for a final letterhead product. Then we can have David Steen sign off and I will run it over. We need it to get done no later than noon tomorrow to give you opportunity to route it through your organization first part of next week.

Next week, I will come over and begin the information gathering process.
1. We'll need copies of the existing contracts, (AT&T, MCI WorldCom and the Verizon initial offer).
2. We'll need the last three months of billing for all services included in the negotiations.
3. We need to evaluate traffic by schedule. We will look for traffic patterns and discuss plans for future traffic.

I need to have this process complete by 2/12, to stay on schedule.

David's timeline is dependent on all the dominos dropping in order.
1. Contract finished and signed by us this week, 2/2.
2. Information gathered and sorted by 2/9. Contract signed by Conseco, 2/9.
3. Strategy formed and presented to Conseco by 2/16.
4. Negotiations initiated by 2/23.
5. First round offers in by 3/9
6. Second (and hopefully final) offer by 3/23.
7. Contracts ready for Conseco signatures by 3/30.

Please remember, these dates are tentative. In order to achieve these dates we will need teamwork. I hope to hear from you soon.

Bill Hansen
952.829.1111
612.554.4566 Cell#

EXHIBIT NO. 202
6-23-03
James M. Trapskin

Exhibit B

**Dave Steen**

**From:** Wghphoneguy@aol.com
**Sent:** Thursday, February 15, 2001 10:05 PM
**To:** "daniel_j_rosenbaum@consecofinance.com;mike_w_sanderson"@consecofinance.com
**Cc:** "bill.hansen@teleplusconsulting.com;steen"@teleplusconsulting.com
**Subject:** Project Tasks and Timeline

Hello Dan and Mike,
To the best of our knowledge, the chain of tasks / events will occur in this chronological order and at these approximate times. Part of the negotiation is staying in control of the timeframe. Conseco will also be a big factor in keeping this project on track. David and I will drag them, you may have to push them.

1. Kevin Worthwein is sending the consolidated AT&T billing discs. They should be at Teleplus 2/16 or 2/19. We will open and complete our review ASAP and return the discs. Dan is collecting some information to complete the package. It should also be available on the same schedule.

2. A data specialist and I will work with the information and present our results to David by 2/21. He will have an understanding of your organization, your traffic, and your requirements. I will provide you with a copy of our notes to insure accuracy and intent.

3. David will formulate his strategy and present it to Conseco on or about 2/23. We'll tune it, if needed, and be ready to proceed.

4. Conseco will start the process by calling vendor meetings at the St. Paul facility as soon as possible. Hopefully by 3/2. It may possibly be 3/9, by completion of the first round of meetings (weather, travel, etc.).

5. At these meetings, Jim Breakey will instruct his vendors to work with Teleplus. He will be prepared by David Steen for the meetings.

6. We will push for first round of offers in by 3/16.

7. Second, and hopefully final round by 3/23. This may go until 3/30 with escalation managed by Teleplus.

8. Prepared contracts available by 4/6 for Conseco signature.

Please be advised, these dates are as aggressive as we can hope for. We will be in communications on a daily basis. You will be in the midst of the action and will understand any deviation and it's cause.

Please call with any questions or comments. It is great working with you. Our focus is on saving you money and with continued teamwork it will happen, big.

Thanks,
Bill Hansen
952.829.1257 office
612.554.4566 cell

Exhibit C

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| TELEPLUS CONSULTING, INC., | : | |
| | : | Case Number |
| Plaintiff, | : | 02-CV-212 |
| | : | (JRT/SRN) |
| v. | : | |
| | : | |
| CONSECO SERVICES, LLC. | : | |
| | : | Pages 1 - 102 |
| Defendant. | : | |

Deposition of LAURA CARLISLE, held at the offices of AT&T, 3033 Chain Bridge Road, Oakton, Virginia, commenced at approximately 12:15 p.m., on Wednesday, May 29, 2002, before Elizabeth Hudson Telson, a Notary Public in and for the Commonwealth of Virginia.

COPY

Q. How long have you been employed by AT&T?

A. Twenty-four years.

Q. What is your job title?

A. My current job title is Sales Center Vice-President.

Q. Sales Center Vice-President?

A. Yes.

Q. How long have you had that title?

A. Since October 15th of this year; I'm sorry, October 15th of 2001 to be correct.

Q. Prior to that time, what was your position?

A. I was a District Sales Manager.

Q. As it relates to Conseco, does your change in title mean any difference in your job responsibilities?

A. At the time of this matter, I was Acting Sales Center Vice-President, so I was working in the same capacity that I do today. I did not have the title change at that time.

Q. How long had you had the position of

that -- we can break it down into parts if you like.

A. In the context of this particular situation, you are asking me to evaluate Teleplus' performance?

Q. Yes; that would be one way of looking at it.

A. I will tell you that I was surprised at Teleplus' engagement in this particular matter, considering AT&T's position with regard to the contract and our negotiating position being very, very strong. We had almost two years remaining on the AT&T contract at that time.

The shortfall penalties were substantial, and Conseco was not only in shortfall on their One Net contract, they were also in shortfall on a Concept Six contract. In our estimates, it was over $6 million.

We felt that they were covered under a business downturn clause that was within their current contract. Obviously, Teleplus being in the negotiations was to address the, Conseco's

rates relative to the marketplace -- in other words, seeking for a rate reduction on Conseco's part -- but we felt that their positioning, their bargaining position was very weak considering the number of things AT&T had in their favor. We were under no obligation to give Conseco a rate reduction at that time.

Does that answer your question?

Q. Yes, it does.

What I am trying to do right now is see if I can get rid of that beep. I just wanted to have you finish your answer. I'm sorry, I can't. If a call comes in, it will beep.

Let me ask you this: In terms of how Teleplus approached the negotiation process, at least from where you sat, did it strike you that they had a realistic assessment of the relative negotiating positions of AT&T and Conseco?

A. I think they had counted on a number of things that were unrealistic. In this particular situation, to be totally honest, the only people that AT&T were going to negotiate with were

Conseco representatives and at an executive, at a very high executive level.

Q. Why was that?

Could you explain that, please.

A. Simply because of the leverage that we had in the contract that backed up our position.

I would also factor into account our understanding of our competitive position within not only the industry, but within Conseco's business as well.

Q. In terms of the negotiating style of Teleplus, how would you characterize that?

A. Typical of what I have experienced in the past with consultants of this nature.

Q. Could you characterize it in terms of were they looking for win/win.

Was it confrontational?

If you can, give us just a little more insight into your assessment of the style they used.

A. Yes.

It was very confrontational. There was

slowly, but I will try to be efficient too --
talks about the desire to amend the original
agreement.

Then if you look on the start of the third line, it says (reading) With respect to billing disputes, transitional support, pricing adjustments, technology upgrades, and the provision of new services (end reading).

Do you agree that, that was an accurate reflection of what they were trying to accomplish?

A. Yes.

Q. If we look under Roman numeral one, we have got waive.

Do you see that?

A. Yes.

Q. (Reading) AT&T hereby waives any and all shortfall (end reading).

Do you see that?

A. Yes, I do.

Q. Just so we are clear for the record, there was no shortfall that had been billed at that time because of a bill being generated to

do is, if you could please, is compare paragraph 12 of Exhibit 108 to paragraph 12 that is part of Exhibit 101 and let me know whether or not those are the same or different provisions.

MR. SANDBERG: Objection; foundation.

THE WITNESS: They are not identical, no.

BY MR. CATTANACH:

Q. Let me ask you this question Ms. Carlisle: In your opinion and based on your experience in this negotiating process, if Teleplus had come in with a more realistic or a win/win approach and less confrontational, would the agreement have been reached between Conseco and AT&T more quickly?

MR. SANDBERG: Objection to the form of the question; objection, asked and answered.

THE WITNESS: No, I don't believe so.

BY MR. CATTANACH:

Q. Just so we are clear, at some point in time, did you get the sense that Conseco was willing to adopt a more win/win approach?

VOLUME II

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

TELEPLUS CONSULTING, INC., :
Plaintiff, :
v. : Civil File No.
CONSECO SERVICES, LLC, : 02-CV-212 (JRT/SRN)
Defendant. :
: 99 - 233

\- - - - -

Deposition of Laura Carlisle

Washington, D.C.

Thursday, August 7, 2003

COPY

Reported by: Marian E. Cummings, Notary Public

Job No.: 154300

Conseco and AT&T?

A That's correct.

Q What happened to that short fall?

A It was waived.

Q And how was it that AT&T came to waive that short fall, please?

A It was mutually agreed upon.

Q And what did AT&T get in return for waiving that 6 or so million dollars?

A We received a new contract commitment from Conseco.

Q When you say a new contract commitment, what are you referring to, please?

A It means that we extended the contractual relationship between AT&T and Conseco.

Q And it was AT&T's conclusion that it was worth more than $6 million?

A Yes, it was.

Q So did AT&T ever bill Conseco for a short fall?

A Not to my knowledge.

Q And Conseco obviously did not pay AT&T for a

# Exhibit D

AT&T

Michael Humes
Global Account Manager

11595 N. Meridian Street
Suite 501
Carmel, IN 46032
317-816-9525

March 23, 2001

Bill Hansen
Teleplus Consulting
8000 West 78th Steet
Edina, MN 55439

Dear Bill,

This letter is to summarize the Conseco contract situation, the solution to the shortfall, and proposed contract improvements for Conseco and AT&T.

We must preface the offer with some facts about our current state. Conseco agreed to the current contract just a year ago. The parties involved from Conseco took great care in analyzing and comparing our offer. Conseco's diligence paid off with great savings from the previous contract, which had been closed only 15 months earlier. The rates received were among the best at that time. Regardless, the parties' impressions of the current contract have no bearing on the outcome of our efforts to re-negotiate terms now.

The proposal that AT&T is offering adjusts commitments to avoid future shortfall penalties, improves rates for new voice traffic and current Concept 6 traffic which moves to OneNet, and provides improved data price performance with an optional increased commitment.

**Current Facts**
**Onenet**
10 months into a 36 month contract

| | |
|---|---|
| Current Commitment | $34.35M |
| Data Commitment | $.935M |
| International Commitment | $150K |
| Projected Run Rate | $29.2M |
| Projected Shortfall | $5.15M |

**Concept 6**

| | |
|---|---|
| Estimated usage in year 4 | 12,811,204 Minutes of Use (MOU) 14 cpm |
| Year 3 and 4 commitment | 24,000,000 MOU |
| Year 3 Actuals | 10,188,088 MOU 19 cpm |
| Year 3 Shortfall | $1,381,191 |
| Year 4 estimated shortfall based on projected MOU | $1,118,880 – $615,084 |

AT&T is prepared to offer the following

- Refile Contract Tariff 13673 and terminate Concept 6 Contract Tariff 8470 without liability
- Add the Concept 6 traffic to the OneNet
- Reduce the bundled MARC to $27.759M (including the former Concept 6 traffic)
- Reduce Data MARC to $8.2M

**Rates and Discounts**

Discounts will be structured as follows.

Stepped discount tapers (Back to Dollar One)

| Monthly Volume | Domestic Discount | International Discount |
|---|---|---|
| $0 – $1.5M | 35% | 15% |
| $1.5 - $4M | 44% | 24% |
| > $4M | %0 | 0% |

An Interstate Outbound supplemental discount will be applied after application of the base discount in the following manner:

| Net Interstate Outbound Monthly Revenue | Discount |
|---|---|
| $0 - $85,000 | 0% |
| $85,000 - $300,000 | 19% |

An Interstate Inbound supplemental discount will be applied after application of the base discount in the following manner:

| Net Interstate Inbound Monthly Revenue | Discount |
|---|---|
| $0 - $525,000 | 0% |
| $525,000 - $1,500,000 | 19% |

The rates that are created by that structure are as follows:

If volumes are below $1.5M in a month, the effective Interstate rates will be as follows:

| | | |
|---|---|---|
| Sched | A | $.0858 |
| | B | $.0462 |
| | C | $.0410 |
| M800 | | $.0462 |
| Rdyln | | $.0858 |

If Interstate Outbound and Inbound usage grow above their current monthly gross run rates of $85,000 and $525,000 respectively, these new MOUs will be priced at the following rates:

| | | |
|---|---|---|
| Sched | A | $.0599 |
| | B | $.0322 |
| | C | $.0286 |
| M800 | | $.0322 |
| Rdyln | | $.0599 |

Existing MOUs from the current monthly run rate will continue to be priced the same as today at the following rates:

| | | |
|---|---|---|
| Sched | A | $.0739 |
| | B | $.0397 |
| | C | $.0352 |
| M800 | | $.0397 |
| Rdyln | | $.0739 |

Finally, AT&T will provide Conseco the ability to raise the MARC to $30.759M upon 60 days written notice. In exchange AT&T will waive all T1.5 AC, ACF, and M-24 charges for all services in the CT. Currently, this waiver applies to Frame circuits only. This would save Conseco over $550,000 based on current inventory.

We recommend that we meet as soon as possible to review and discuss this proposal with you.

Sincerely

Michael W. Humes
AT&T - Global Account Manager

**Bill Hansen**

---

**From:** Humes, Michael W, BMSLS <mhumes@att.com>
**To:** Bill Hansen <billhansen@teleplusconsulting.com>
**Sent:** Monday, March 26, 2001 10:57 AM
**Attach:** Offer March 23 .doc
**Subject:** Offer Correction

Bill,
As we discussed today we erred in our description of the supplemental discounts by saying they were calculated on Gross dollars. Attached is a correction reflecting that the supplemental discounts for both Outbound and Inbound are calculated on Net dollars.

<<Offer March 23 .doc>>

Thanks
Mike

Exhibit E

(3)

Mike W Sanderson
04/03/2001 03:26 PM

To: steen@teleplusconsulting.com, billhansen@teleplusconsulting.com
cc:
Subject: FW: ECAC

------------ Forwarded by Mike W Sanderson/BSYS/HQ/GTFC on 04/03/2001 03:27 PM ------------

Jim Breakey
04/03/2001 03:13 PM

To: Mike W Sanderson/BSYS/HQ/GTFC@GTFC, Curt Beckerleg/HQ/GTFC@GTFC
cc:
Subject: FW: ECAC

FYI..
I'll be talking to Richard later.
Jim

---------------- Forwarded by Jim Breakey/HQ/GTFC on 04/03/2001 03:13 PM ----------------

From: Richard Maybin/Carmel/Conseco@Exchange on 04/03/2001 02:50 PM
To: Gary W Brown/Carmel/Conseco@Exchange, Jim Breakey/HQ/GTFC@GTFC
cc:
Subject: FW: ECAC

Jim and Gary --

FYI. I just got this and am on my way to meetings for rest of the day. Will review when I get a chance.

Richard Maybin
(317) 817-3552

-----Original Message-----
From: Carlisle, Laura A, BMSLS [mailto:lcarlisle@att.com]
Sent: Tuesday, April 03, 2001 11:52 AM
To: Maybin, Richard
Cc: Humes, Michael; Francis, Richard D, BMSLS; Andres, Timothy; Hoppe, Robin P (Robin), BMSLS; Staple, Andrew E (Andy), BMSLS
Subject: RE: ECAC

#206 (Francis) dnb 9-3-03

Richard,

I am sorry that our first communication has to be under these circumstances. I am replacing Richard Higgins as Sales Center Vice President. Rich retired from AT&T on March 31st. I am fully aware of the situation facing Conseco and AT&T. However, we seem to have a misunderstanding with regard to

Confidential

CONSECO 101886

Exhibit 105

negotiations.

We presented a new offer to Teleplus on 3/23. Our offer included a waiver of the contract shortfall, a decrease in the contract commitment, and an one year extension of the contract term. Upon receipt of our offer, Teleplus scheduled a conference call with our negotiating team on 3/26 and abruptly cancelled it that same day. Teleplus did not communicate the reason for the cancellation, nor did they reschedule the call. Teleplus did contact Richard Francis, our Executive Negotiator, yesterday. Rick reiterated AT&T's position and communicated the financial value of our current offer.

Teleplus has been demanding a price reduction, but has been unwilling to make any concession or commitment regarding the additional revenues that AT&T requires to keep our business whole. Teleplus' demands on Conseco's behalf are based on assertions related to Conseco's current contract that as Mike detailed in his last correspondence are simply not true. Nonetheless, in an attempt to prompt discussion around the rate reduction issue, we structured the discount tiers in the new offer such that incremental volumes are priced lower than Conseco's current rates. Please do not penalize Mike and his team for upholding AT&T policy. They do not have the authority to offer Conseco a rate reduction without a commitment for additional revenues to offset the revenue decline.

We are extremely anxious to continue these discussions with Conseco and/or Teleplus, but rather than truly negotiate with AT&T on Conseco's behalf, Teleplus currently seems more willing to make threats to pursue groundless legal action.

I understand that you do not want to meet with AT&T until after these issues have been resolved, but I do hope to have the opportunity to met you very soon. If our offer has not been clearly communicated to Conseco via Teleplus, please let me know as soon as possible.

Sincerely,
Laura Carlisle
Sales Center Vice President
317-816-9555 (voice)
317-816-9504 (fax)
lcarlisle@att.com

11595 ... 501 ... Indiana 46032

-----Original Message-----
From: Maybin, Richard [mailto:Richard_Maybin@Conseco.com]
Sent: Friday, March 30, 2001 4:21 PM
To: Carlisle, Laura A, BMSLS
Cc: Brown, Gary W; Breakey, Jim
Subject: FW: ECAC

Laura --

Confidential

Exhibit F

(1)

**Bill Hansen**

**From:** Francis, Richard D, BMSLS [rfrancis@att.com]
**ent:** Wednesday, April 25, 2001 8:36 AM
**o:** Bill Hansen; dave steen; Mike_W_Sanderson@consecofinance.com; Curt Beckerleg (E-mail); Curtis_Pelarski@consecofinance.com; Carlisle, Laura A, BMSLS
**Cc:** Jim Breakey (E-mail)
**Subject:** RE: Conseco / AT&T- 4/24 meeting notes

Conseco 4-23 minutes RDF.doc

All

Attached is a slight revision to the minutes as to how AT&T has developed the new deal for Conseco.

We'll be getting you the numbers and deal structure as soon as we get approval.

Rick

Richard Francis
Phone- 919-870-1781
Fax-919-870-8611
Pager-888-858-7243 pin 128050
AT&T
Global Markets
Director - Business Contract Development

:&T Proprietary - Use Only Pursuant to AT&T Instructions

#204
(Francis)
dnb 9.3.03

**<u>Conseco / AT&T</u>**
4/23/01

Laura Carlisle – AT&T
Rick Francis – AT&T
Curt Beckerleg – Conseco
Mike Sanderson – Conseco
Curt Pelarski – Conseco
Dave Steen – Teleplus Consulting
Bill Hansen – Teleplus Consulting

<u>Meeting Minutes - Revised</u>

AT&T presented their plan for the Conseco offer. Early in the discussion AT&T indicated that Conseco could get to $0.030 for schedules B, C, and Megacom 800 by increasing their (reduced) minimum annual revenue commitment (MARC) by $1.8MM Net Revenue. The group discussed the formula for setting the MARC.

The next several hours were spent setting the MARC. After much discussion we agreed in principal on the following formula.

1. AT&T will take Conseco's 2/01 traffic annualized as a baseline with the addition of the traffic from the PICC changes transferred from AT&T since Conseco will return these to AT&T.
2. AT&T will apply the new Gross rates that produce the $.030 and $.0550 net rates
3. AT&T will reduce that amount by the estimated impact of the 4/21/01 announcements (1,000 additional layoffs, 2,000 offshore).
4. AT&T will then set the new baseline MARC at 90% of that number plus the $1.8MM Net additional revenue requirement expresses as Gross for MARC purposes.
5. AT&T will structure a rate plan that delivers $0.030 cpm in Schedules B, Megacom 800 and C, and $0.055 in Schedule A and Readyline 800.

<u>Action Items</u>

1. Dave Steen and Rick Francis will iron out the details on the plan.

- Service Level Agreements
- Feature rates on new features
- Billing Guarantee / Billing Support
- Resetting the Business Downturn clause.

2. Laura Carlisle will push the plan through the AT&T approval process.
3. All parties will attempt to have a finished product for Conseco by 4/27.

Exhibit G

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

Civil File No. 02-CV-212 (JRT/SRN)

----------------------------------X

Teleplus Consulting, Inc., :

Plaintiff, :

vs. :

Conseco Services, L.L.C., :

Defendant. :

----------------------------------X

Raleigh, North Carolina

Wednesday, September 3, 2003

DEPOSITION OF RICHARD DONALD FRANCIS,

a witness herein, called for examination by counsel for the Plaintiff, in the above-entitled matter, pursuant to notice, the witness being duly sworn by DARLENE M. BRYANT, Registered Professional Reporter and Notary Public in and for the State of North Carolina, taken at the offices of Office Suites Plus, 3737 Glenwood Avenue, Suite 100, Raleigh, North Carolina, at 9:06 a.m., September 3, 2003, and the proceedings being taken down by Stenotype by DARLENE M. BRYANT and transcribed under her direction.

Q. Why would a client facing a shortfall view it as no big deal?
A. I have no idea, but some do. I mean, it's the -- I guess it's a personality thing with the people that you're dealing with.
Q. Does AT&T actually enforce the shortfalls?
A. We have, uh-huh.
Q. Okay. In your personal experience?
A. Yes.
Q. On clients who had hit a shortfall and ceased being AT&T customer?
A. That's happened from time to time, yes.
Q. On clients who had had a shortfall and have continued to be an AT&T client?
A. Yes.
Q. Both?
A. Both situations, yeah.
Q. Okay. In your experience, how long -- to the extent you can form an answer to this question, how long does a contract renegotiate for an existing customer tend to take?
A. Okay. In my frame of reference, meaning what I've been doing in the last five years, it's taken anywhere from two weeks to very close to a year.
Q. So, kind of variable?

Q. Now, I do need you to pull out Exhibit 203, please. And we talked about this, but now I'll have you do a little bit of math, because I want to make sure I'm not --
A. Sure.
Q. I'd like to know the -- I need to know the price per minute that Conseco was actually paying for switched to switched.
A. As of 203?
Q. Agreed?
A. Okay. Anybody got a calculator? I don't have one.
Q. I believe I can get you one.
A. Okay. Thanks.
(Pause.)
A. Switched to switched?
Q. Yes, sir, please.
A. That 0551.
Q. Cents per minute?
A. Cents per minute.
Q. And how about dedicated to dedicated?
A. .0301, rounding.
Q. Okay. And looking at Exhibit Number 204, those are the prices that AT&T had committed to getting to as a result of the April 23rd discussions;

is that correct?

MR. CATTANACH: Objection; foundation, misstates prior testimony.

THE WITNESS: Based on that memo, it was -- if I remember correctly, I felt that we could get there, and stated that in the minutes, yes.

BY MR. SANDBERG: (RESUMED.)

Q. And, in fact, that's what happened, isn't it?

A. In fact, yeah, it appears that it is.

Q. Okay.

A. Will I need this anymore?

Q. Not for me.

A. Okay. Thank you.

Q. You can't ask attorneys questions like, ever need it again, because that's just beyond their --

A. For now.

Q. Exactly.

MR. SANDBERG: Ms. Thiel, I'm putting Number 207 in front of the witness, and I don't believe, but I could be wrong, I don't believe this has a corresponding number from Ms. Carlisle.

A. Okay.

Q. Mr. Francis, can you take a look at Number 207, please?

A. Uh-huh.

will not interrupt any further.

BY MR. SANDBERG: (RESUMED.)

Q. What did you do, if anything, once you received Exhibit Number 217, please?

A. I believe that we analyzed the deal, looked at the -- the pricedown and the revenue, and I think right around that time came up with the kind of one-page deal construct sheet.

Q. Uh-huh.

A. Which was kind of the offer to Conseco; not kind of, it was the offer to Conseco.

Q. All right. I'm going to use Pages 352 and 353 to the next exhibit, please.

(Pause.)

Q. Mr. Francis, we've put in front of you a two-page Exhibit Number 218, could you identify this document for us, please?

A. Yes. This is an email from Laura Carlisle, dated Thursday, May 10th, 2001, at 9:52 a.m.; addressed to Larry Ewing; copying myself, Mike Humes, Tim Andres and Robin Hoppe.

(The document referred to was marked Francis Exhibit Number 218 for identification.)

BY MR. SANDBERG: (RESUMED.)

actions.

Q. All right. Do you recall, generally speaking, that the negotiations with Teleplus were contentious during your involvement?

MR. SANDBERG: Object to the form of the question.

THE WITNESS: The negotiations were difficult. There was a lot of detail back and forth and some issues that we were having difficulty resolving.

BY MR. CATTANACH: (RESUMED.)

Q. Now, you left in roughly June, correct?

A. Correct.

Q. If I recall correctly, and we can get it, but the contract was not actually finalized until September of that year. Is that your recollection as well?

A. Well, based on this -- this last email that we went over where he's thanking us for that, yeah, that would be my assumption.

Q. And the -- as I recall, you got your first call in March, for these negotiations, right?

A. Correct.

Q. Do you recall one of the points that AT&T would often bring out to its customers when

Exhibit H

ATT 328

**Francis, Richard D, RTSLS**

| | |
|---|---|
| **'om:** | Andres, Timothy C (Tim), RTSLS |
| **Sent:** | Tuesday, April 24, 2001 7:09 PM |
| **To:** | Gaynor, Moses W, RTSLS |
| **Cc:** | Carlisle, Laura A, RTSLS; Humes, Michael W, RTSLS; Francis, Richard D, RTSLS |
| **Subject:** | Proposed Conseco Offer |

Moses:

Attached are the latest NPV for Conseco, the current CSO Data Pricing Tool and the PricerX Output Report showing the proposed rates.

<Conseco3-01NPVv4svdwithConcept6.xls><ConsecoPricerX3&55.txt><ConsecoCurrent3-14-01csodatapricingtool.xls>

Laura and Rick met with the client and their consultant on Monday, and developed a deal that will be outlined below. The NPV reflects that deal, and it is the tool that needs to be reviewed with Steve VanDorselaer (SVD). Laura will be presenting the offer as well through Robin Hoppe.

1) Laura and Rick offered $.03 on Sch. B, M800 and Sch. C and $.055 on Sch A and Readyline. This equates to a $1.83M pricedown. There will be no pricedown on any data element. We will continue to use the existing special Intrastate rates for 5 states, but there will be no additional improvement here as well. This will be a new 36-month OneNet bundle.

2) New MARC - Voice list run rate - $16,485,060
Concept 6 run rate with proposed Sch. B list rates - $691,805
Data list run rates - $8,631,060

This totals $25,807,925, and 90% of this is $23,227,132

3) Customer must make up $1.83M. Assume it is all in voice which is discounted 44%. That means we need to add $3,267,857 to the above 90% MARC. The MARC we offer the customer is $26.5M.

4) On the NPV, we show net new revenue replacement coming from 3 areas - Local, VPN and E-1's to India. Due to the long implementation lead time for the Local and the India E-1's, the net new revenue for this year will not entirely compensate for the pricedown. This is what must be sold to SVD. This customer has called K. Sichau twice, and SVD is well aware of this client and their requests. As I said earlier, Laura will be presenting this to R. Hoppe and SVD as well.

5) Additional items that Rick, Laura, Mike and I agree on that we want to add to the new CT to help promote revenue growth:

- Increase PRI discount from 50% to 75%
- Reduce ANI rate from $.01 to $.0075
- Insert Tier II Outbound and Inbound India rates
- Half Channel discount of 68% with a 45% Supplemental discount for India circuits
- Have a special Intelligent Call Processing rate of $.01/dip
- They currently have a special Call Prompter rate of $.05 per announcement played. We would like to reduce this to $.03 and keep the usage rate at $.006/6 sec
- Special Transfer Connect rates of:
  **Per Call Option**
  Courtesy Transfer - $.024
  Consult & Transfer - $.032
  Conference and Transfer - $.04
  **Per Redirect Option**
  Courtesy Transfer - $.15 ($.16)
  Consult & Transfer - $.20 ($.24)
  Conference and Transfer - $.25 ($.28)

# 217 (Francis) dnb 9.3.03

On the above Transfer Connect rates, the rates for the Per Call Option are within my envelope. I need your help

ATT 329

on

the Redirect Option. My envelope is in red.

aura has made it very clear to Conseco that we expect signed commitments for VPN and Local services for AT&T to ..nplement this offer. This customer is purchasing a services company called exlServices, and we are doing the research to see what present or future impact this might have on our offer.

Moses, let's get together as early as possible on Wednesday morning to review this deal as we have committed to work quickly to the customer. Thanks and take care.

Timothy Andres
AT&T - Director of Business Development
317-816-9508
317-816-9514 (FAX)
tandres@att.com

AT&T PROPRIETARY RESTRICTIVE - USE PURSUANT TO COMPANY INSTRUCTIONS

# Exhibit I

5

**Bill Hansen**

**From:** Mike_W_Sanderson@consecofinance.com
**Sent:** Monday, April 30, 2001 12:49 PM
**To:** steen@teleplusconsulting.com; billhansen@teleplusconsulting.com
**Subject:** Conseco Deal Summary

Conseco Deal Construct.doc

Latest deal from AT&T. My opinion is that this continues to over committ us and plays to AT&T's entitlement attitude.

---------------------- Forwarded by Mike W Sanderson/BSYS/HQ/GTFC on 04/30/2001 12:46 PM ---------------------------

"Carlisle, Laura A, BMSLS" <lcarlisle@att.com> on 04/30/2001 12:21:27 PM

To: "Van Dorselaer, Steven T, BMSLS" <vandorselaer@att.com>
cc: "Hoppe, Robin P (Robin), BMSLS" <rhoppe@att.com>, "Staple, Andrew E (Andy), BMSLS" <astaple@att.com>, "Ewing, Larry M, BMSLS" <lewing@att.com>, "Humes, Michael" <mhumes@att.com>, "Andres, Timothy" <tandres@att.com>, "Francis, Richard D, BMSLS" <rfrancis@att.com>, Mike_W_Sanderson@consecofinance.com, Jim_Breakey@consecofinance.com
Subject: Conseco Deal Summary

Steve,

Attached is the Conseco Deal Summary as discussed earlier this morning. Larry Ewing has reviewed and approved it. Please let me know if you have questions.

<<Conseco Deal Construct.doc>>

Thanks,
Laura Carlisle
Sales Center Vice President
317-816-9555 (voice)
317-816-9504 (fax)
lcarlisle@att.com

(See attached file: Conseco Deal Construct.doc)

#208 (Francis) [illegible] 9.3.03

# Conseco Deal Construct
# 4/30/01

**Contract Parameters and Requirements**

1. New OneNet MARC: $26.1M Annual Gross commitment
2. Term: New 3 year term
3. Order Parameters:
   The refile must be made in conjunction with the following orders for new service. Commit the following:
   - 900 new DSL or Business Dial user commitment. This is an increase of 400 users above the unsigned Business Dial contract in Conseco's hands currently. Revenue commitment included in OneNet MARC.
   - $500,000 annual commitment in AT&T Local services via separate national contract. Revenue commitment not included in OneNet MARC.
   - 6 new E1 facilities to India ordered immediately with annual commit of $1,000,000. Revenue commitment included in OneNet MARC.
4. Megacom 800 Interstate rates reduced to $0.030 per minute.
   Dedicated Outbound Interstate rates reduced to $0.030 per minute.
   Readyline 800 Interstate rates reduced to $0.055 per minute.
   Switched Outbound Interstate rates reduced to $0.055 per minute.
5. Rates will not be made effective until the August 1st usage or September billing cycle.
6. Conseco will offer AT&T Right of First Refusal on all new opportunities until 6/30/2002.

**Replacement Revenue Summary**

| | | Annual Value | In Year 2001 |
|---|---|---|---|
| 1. | (6) PRI T1.5 Circuits with M800 and Transfer Connect Service | $ 276,000 | $ 161,000 |
| 2. | (6) E1 Facilities to India | $ 1,152,000 | $ 480,000 |
| 3. | Local Service | $ 500,000 | $ 125,000 |
| 4. | DSL / Business Dial Opportunity | $ 500,000 | $ 250,000 |
| **TOTAL Revenue Replacement** | | **$2,428,000** | **$ 1,016,000** |

**Pricedown Impact**

| | | Annual Value | In Year 2001 |
|---|---|---|---|
| 1. | Megacom 800 and Ded outbound @ $0.030 CPM | $2,330,000 | $ 777,000 |
| 2. | Switched Inbound and outbound @ $0.055 CPM | $ 216,000 | $ 72,000 |
| **TOTAL Pricedown Impact** | | **$2,546,000** | **$ 849,000** |
| **TOTAL Net Impact** | | **($118,000)** | **$167,000** |

Exhibit J

ATT 27

# Conseco Deal Construct
## ~~4/30/01~~5/3/01

**Contract Parameters and Requirements**

1. New OneNet MARC: ~~$26.1~~ 23.0 M Annual Gross commitment
2. Term: New 3 year term
3. ~~Order Parameters:~~
   ~~The refile must be made in conjunction with the following orders for new service. Commit the following:~~
   - ~~900 new DSL or Business Dial user commitment. This is an increase of 400 users above the unsigned Business Dial contract in Conseco's hands currently. Revenue commitment included in OneNet MARC.~~
   - ~~$500,000 annual commitment in AT&T Local services via separate national contract. Revenue commitment not included in OneNet MARC.~~
   - ~~6 new E1 facilities to India ordered immediately with annual commit of $1,000,000. Revenue commitment included in OneNet MARC.~~
4. Megacom 800 Interstate rates reduced to $0.035~~0~~ per minute.
   Dedicated Outbound Interstate rates reduced to $0.035~~0~~ per minute.
   Readyline 800 Interstate rates reduced to $0.060~~55~~ per minute.
   Switched Outbound Interstate rates reduced to $0.060~~55~~ per minute.
5. Rates will not be made effective until the ~~May~~~~August~~ August 1st usage or ~~June~~ ~~September~~ September billing cycle.

~~6. Conseco will offer AT&T Right of First Refusal on all new opportunities until 6/30/2002.~~

6. Conseco will offer AT&T Right of First Refusal on all new opportunities until 6/30/2002
7. AT&T will provide a credit in months 15 and 27 of $ 880,000 if Conseco bills $27M or greater in the first 12 months of the contract and then $27M or greater in the second twelve months of the contract.

**Replacement Revenue Summary**

| | | Annual Value | In Year 2001 |
|---|---|---|---|
| 1. | ~~(6) PRI T1.5 Circuits with M800 and Transfer Connect Service~~ | ~~$ 276,000~~ | ~~$ 161,000~~ |
| 2. | ~~(6) E1 Facilities to India~~ | ~~$ 1,152,000~~ | ~~$ 480,000~~ |
| 3. | ~~Local Service~~ | ~~$ 500,000~~ | ~~$ 125,000~~ |
| 4. | ~~DSL / Business Dial Opportunity~~ | ~~$ 500,000~~ | ~~$ 250,000~~ |
| | **~~TOTAL Revenue Replacement~~** | **~~$2,428,000~~** | **~~$ 1,016,000~~** |

**The Conseco Business Downturn Clause does not mandate revenue replacement. Extension to new three-year contract provides positive revenue position. ~~However,~~ Conseco will ~~make every reasonable effort to~~ award new opportunities to AT&T whenever AT&T provides a ~~market competitive~~ solution based on right of first refusal.**

**~~Pricedown Impact~~**

| | | Annual Value | ~~In Year 2001~~ |
|---|---|---|---|
| 1. | ~~Megacom 800 and Ded outbound @ $0.030 CPM~~ | ~~$2,330,000~~ | ~~$ 777,000~~ |
| 2. | ~~Switched Inbound and outbound @ $0.055 CPM~~ | ~~$ 216,000~~ | ~~$ 72,000~~ |
| | **~~TOTAL Pricedown Impact~~** | **~~$2,546,000~~** | **~~$ 849,000~~** |
| | **~~TOTAL Net Impact~~** | **~~($118,000)~~** | **~~$167,000~~** |

➢ AT&T will provide ~~best possible~~ Service Level Agreements.

# 211 (Francis) dnb 9.3.03

ATT 28

- AT&T will provide ~~best possible~~ Feature Pricing on Transfer Connect and Network based IVR.
- AT&T will provide a Billing Guarantee Clause (120 day maximum liability for Outbound direct dial services; exceptions being International, Credit Card and Third Party billing.
- AT&T will assign a Billing Coordinator to resolve ongoing issues at a cost to the customer of $160,000 annually.

~~AT&T will provide a new tariff with a new Business Downturn clause and a Technology clause that allows for an adjusted MARC due to network optimization resulting from a technology change.~~

Exhibit K

ATT 98

# Conseco/AT&T Deal Sheet
# 7/1/01

**Contract Parameters and Requirements**

1. New OneNet MARC: $77M Gross contract commitment

   Conseco agrees to increase this amount by $2.5M if our Major Medical Division is not sold. We would ask the business downturn language be renewed and further defined to protect against ongoing contention should Conseco be forced further downsize our business.

2. Term: New 3 year term

3. Megacom 800 Interstate rates reduced to $0.030 per minute.
   Dedicated Outbound Interstate rates reduced to $0.030 per minute.
   Readyline 800 Interstate rates reduced to $0.055 per minute.
   Switched Outbound Interstate rates reduced to $0.055 per minute.

   All rates stabilized. Annual market review.

4. Rates will be made effective as of July 1st.

5. Conseco will offer AT&T Right of First Refusal on not less than 80% of new opportunities until 6/30/02 for services AT&T offers at rates and levels of service equal to or better than competitive offers.

6. All AT&T services will count against the MARC.

7. AT&T will schedule, no later than 8/31/01, an executive briefing to discuss opportunities to work together in ways which will increase AT&T's revenue while reducing Conseco's expenses.

- AT&T will provide best possible Service Level Agreements.
- AT&T will provide best possible Feature Pricing on Transfer Connect and Network based IVR.
- AT&T will provide a Billing Guarantee Clause (120 day maximum liability for Outbound direct dial services; exceptions being International, Credit Card and Third Party billing.
- AT&T will assign a Billing Coordinator to resolve ongoing issues at no cost to the customer.
- AT&T will provide a new tariff with a new Business Downturn clause and a Technology clause that allows for an adjusted MARC due to network optimization resulting from a technology change.

#215
(Francis)
dnb 9.3.03

ATT 10J

## Other Considerations

**Challenge: "AT&T over committed me on purpose last time."**

**Response:** we have documentation that Conseco offered to include voice and data winback from Worldcom during the last contract negotiation. After AT&T established the contract price points, Conseco withdrew the winback opportunity and would not accept a high price point. AT&T presented a list of pending sales opportunities that would close that gap. Conseco refused to commit to any of those opportunities. At that point in 2000, Conseco's revenue growth rate was xx%. Conseco chose to bet on sustaining that growth rate in order to make their contract commitment. Conseco is also in shortfall on their Worldcom contract. Did Worldcom take advantage of them, too?

**Challenge: "We didn't get the best deal last time"**

**Response:** Conseco received the best price point for similarly sized revenue commitments in that six month period measuring Global strata customers. Conseco's price points cannot be compared to Growth market price points as our Growth market cost structures are significantly different than those in Global markets. Larry Ewing will provide the list of contracts, price points, and commitment levels, or this six month period.

**Challenge: "We are not getting good service from AT&T and that costs Conseco money."**

**Response:** AT&T has addressed all issues presented in Conseco's letter to Ken Sichau. Of the 31 issues presented in the original letter, 14 have been completely resolved and closed with Conseco's concurrence, 8 are closed but pending Conseco's concurrence and the remaining 8 are expected to be resolved with the current bill cycle.

## Shortfalls

Concept 6 - $1.4M billable immediately. Contract is in third year of four year term. We are trying to validate a November 30th as the termination date. Next year's shortfall is estimated at $1.1M.
OneNet - $5.3M billable immediately. Contract runs expires on 5/31/03. Two more years to run. Projected shortfall over the term $15.9M

Total estimate shortfall for both contract is $18.4M.

## Sales Opportunities

**Business Dial Contract** - we proposed AT&T Business Dial services to replace Conseco's UUNET services. There are significant cost savings according to information that we've received from Conseco. We have been told that we are the vendor of choice and they will sign the contract after the OneNet issues are resolved. Value is estimated at $350,000 per year.

**AT&T Local Services** - we responded to Conseco's RFP for Local services in February and Conseco has not moved forward with AT&T Local in areas supported by our footprint. Estimated annual value is $588,235.

**DS3 Tempe to St. Paul** - Conseco has ongoing service issues with their current WorldCom DS3 circuit. We have put a $23K/month proposal on the table and been told we will get the business once the contract issues are resolved. Valued at $276,000 per year. WorldCom circuit is $35K per month.

**4 T1.5s to Sunnyvale** - Conseco ordered an initial 6 T1.5 circuits from AT&T. Due to Pac Bell facility shortage, we can only deliver 5 in Conseco's required timeframe. Conseco cancelled the order for the sixth circuit. Conseco has ordered 4 T1.5 circuits from QWEST as they do not have a facility shortage. We want Conseco to roll those circuits to AT&T once the Pac Bell issue is resolved. We are still evaluating "line of sight" for digital radio. Valued at $186,000 per year.

**Accuring upgrade in Carmel** - Conseco is running out of capacity on the OC3 Accuring in Carmel and needs to upgrade to OC12. We have a pending proposal and told that Conseco will approve once the contract issue is settled. Valued at $120,000 per year.

**EXL Services Winback potential** - EXL Services is being purchased by Conseco and is currently a low share, Growth market account. OCC revenue has not been disclosed by Conseco.

# 216
(Francis)
dab 9.3.03

ATT 103

## Potential Concessions:

**\C, ACF, M24 backbilling** - Last contract changed the waiver of AC, ACF, and M24 for all services to being limited to ,nly those connected to Frame Relay Service. We have discovered that the waiver was not implemented correctly by CAM and that ALL AC, ACF, and M24 charges are being waived. Estimated backbilling to correct is close to $600,000. We could offer to eliminate the backbilling and give them a full waiver in the new contract as a concession. Backbilling and three year waiver has an estimated value of $1.7M.

**Custom Transfer Connect Rates -** pricedown impact is minimal

- Courtesy Transfer at $0.024 per call
- Consult and Transfer at $0.032 per call
- Conference and Transfer at $0.04 per call
- Courtesy Transfer at $0.16 per redirection attempt
- Consult and Transfer at $0.24 per redirection attempt
- Conference and Transfer at $0.28 per redirection attempt

Exhibit L

(7)

**Bill Hansen**

**From:** Mike_W_Sanderson@consecofinance.com
**Sent:** Thursday, July 12, 2001 11:48 AM
**To:** billhansen@teleplusconsulting.com; steen@teleplusconsulting.com
**Subject:** AT&T Counter Proposal

ATT Deal
Sheet 7-11.doc

Attached is the latest AT&T proposal. Please call me to discuss as soon asap.

Thanks,

Mike
---------------------- Forwarded by Mike W Sanderson/BSYS/HQ/GTFC on 07/12/2001 11:46 AM ---------------------------

Jim Breakey
07/12/2001 09:44 AM

To: Mike W Sanderson/BSYS/HQ/GTFC@GTFC
cc:
Subject: AT&T Counter Proposal

Mike,
Please distribute.
Jim
---------------------- Forwarded by Jim Breakey/HQ/GTFC on 07/12/2001 09:43 AM ---------------------------

"Ewing, Larry M, BMSLS" <lewing@att.com> on 07/11/2001 05:02:42 PM

To: Jim_Breakey@consecofinance.com, "Van Dorselaer, Steven T, BMSLS" <vandorselaer@att.com>
cc: "Carlisle, Laura A, BMSLS" <lcarlisle@att.com>
Subject: AT&T Counter Proposal

Jim,

Steve ask me to forward the attached response to Conseco's proposed offer structure forwarded from your office. Although he was out of the office today he wanted to make sure you received AT&T's counter proposal. To assist in identifying where agreements as well as differences reside, we have edited your document with changes we would require.

Steve will follow up to discuss this alternative tomorrow. If I can be of

# 210
(Francis)
dnb 9.3.03

assistance please feel free to contact directly.

Larry Ewing
918-560.5424

<<ATT Deal Sheet 7-11.doc>>

(See attached file: ATT Deal Sheet 7-11.doc)

# Conseco/AT&T Deal Sheet

~~7/1/01~~7/10/01

**Contract Parameters and Requirements**

1. New OneNet MARC: $~~77~~85M Gross ~~contract~~ commitment over the last three years of the contract

   $25M Gross annual commitment for each year

Conseco will agree to 95% exclusivity for all future opportunities for service that will retire the commitment, as defined later in this offer. Exclusivity will not require Conseco to violate any existing agreements, but would require future business to be awarded to AT&T. Conseco will agree no existing contracts with another carrier will be renewed and extended and upon their expiration will move the service to AT&T.

~~Conseco agrees to increase this amount by $2.5M if our Major Medical Division is not sold. We would ask the business downturn language be renewed and further defined to protect against ongoing contention should Conseco be forced further downsize our business.~~

Business downturn language in the existing contract will remain. The current shortfall experienced by Conseco was caused by many factors, one of which was the movement of traffic provided by AT&T to another common carrier. In consideration for pricing provided on the missed commitment and the movement of traffic, a one-time assessment of $750,000 payable by 9/1/2001.

2. Term: ~~New 3 year term~~Extension of existing agreement by 12 months

3. **Megacom 800 Interstate rates reduced to $0.030 per minute.**
   **Dedicated Outbound Interstate rates reduced to $0.030 per minute.**
   **Readyline 800 Interstate rates reduced to $0.055 per minute.**
   **Switched Outbound Interstate rates reduced to $0.055 per minute.**

   **All rates stabilized. Annual market review.**

4. ~~Rates will be made effective as of July 1st.~~ Rates will be effective September 1 based upon contract acceptance prior to August 1st.

5. Conseco will offer AT&T Right of First Refusal during the term of the agreement ~~on not less than 80% of~~ on new opportunities ~~until 6/30/02~~ for services AT&T offers at rates and levels of service equal to or better than competitive offers. Bona fide offers to be considered must be from an existing supplier to Conseco with at least 15% share of existing expenditures. Lack of acceptance of any AT&T offer under this section will not relieve Conseco of any commitment under section 1.

6. ~~All AT&T services will count against the MARC.~~

   Include the following services as eligible for retirement of the MAC
   (Service will be "MAC eligible" as individual contracts are consummated)
   - VPN
   - Local Services
   - Separate data contracts - Circuit Term plans

Web Hosting

7. AT&T will schedule, no later than 8/31/01, an executive briefing to discuss opportunities to work together in ways which will increase AT&T's revenue while reducing Conseco's expenses.

8. Special Conditions:

New Business Awards

Conseco would agree to order the proposed VPN

Conseco would agree to order local service identified in AT&T's February RFP response

Conseco agrees to convert $450,000 in voice traffic from another supplier

- AT&T will provide best possible all Service Level Agreements available under tariff 1,2, and 4.

- AT&T will provide best possible Feature Pricing on Transfer Connect and Network based IVR.
- AT&T will continue to provide the a Billing Guarantee Clause (120 day maximum liability for Outbound direct dial services; exceptions being International, Credit Card and Third Party billing currently available for AT&T ONENET service. And provided to Conseco.
- AT&T will provide assign a Billing Support Coordinator via the Field Sales Center to resolve ongoing issues at no cost to the customer.
- AT&T will provide a new tariff with a new Business Downturn clause and a Technology clause that allows for an adjusted MARC due to network optimization resulting from a technology change.

Exhibit M

Carlisle Depo Ex 10?5

Mike W Sanderson
04/03/2001 03:26 PM

To: steen@teleplusconsulting.com, billhansen@teleplusconsulting.com
cc:
Subject: FW: ECAC

---------------- Forwarded by Mike W Sanderson/BSYS/HQ/GTFC on 04/03/2001 03:27 PM

Jim Breakey
04/03/2001 03:13 PM

To: Mike W Sanderson/BSYS/HQ/GTFC@GTFC, Curt Beckerleg/HQ/GTFC@GTFC
cc:
Subject: FW: ECAC

FYI..
I'll be talking to Richard later.
Jim

---------------- Forwarded by Jim Breakey/HQ/GTFC on 04/03/2001 03:13 PM ----------------

From: Richard Maybin/Carmel/Conseco@Exchange on 04/03/2001 02:50 PM
To: Gary W Brown/Carmel/Conseco@Exchange, Jim Breakey/HQ/GTFC@GTFC
cc:
Subject: FW: ECAC

Jim and Gary --

FYI. I just got this and am on my way to meetings for rest of the day. Will review when I get a chance.

Richard Maybin
(317) 817-3552

-----Original Message-----
From: Carlisle, Laura A, BMSLS [mailto:lcarlisle@att.com]
Sent: Tuesday, April 03, 2001 11:52 AM
To: Maybin, Richard
Cc: Humes, Michael; Francis, Richard D, BMSLS; Andres, Timothy; Hoppe, Robin P (Robin), BMSLS; Staple, Andrew E (Andy), BMSLS
Subject: RE: ECAC

Richard,

I am sorry that our first communication has to be under these circumstances. I am replacing Richard Higgins as Sales Center Vice President. Rich retired from AT&T on March 31st. I am fully aware of the situation facing Conseco and AT&T. However, we seem to have a misunderstanding with regard to

Confidential

negotiations.

We presented a new offer to Teleplus on 3/23. Our offer included a waiver of the contract shortfall, a decrease in the contract commitment, and an one year extension of the contract term. Upon receipt of our offer, Teleplus scheduled a conference call with our negotiating team on 3/26 and abruptly cancelled it that same day. Teleplus did not communicate the reason for the cancellation, nor did they reschedule the call. Teleplus did contact Richard Francis, our Executive Negotiator, yesterday. Rick reiterated AT&T's position and communicated the financial value of our current offer.

Teleplus has been demanding a price reduction, but has been unwilling to make any concession or commitment regarding the additional revenues that AT&T requires to keep our business whole. Teleplus' demands on Conseco's behalf are based on assertions related to Conseco's current contract that as Mike detailed in his last correspondence are simply not true. Nonetheless, in an attempt to prompt discussion around the rate reduction issue, we structured the discount tiers in the new offer such that incremental volumes are priced lower than Conseco's current rates. Please do not penalize Mike and his team for upholding AT&T policy. They do not have the authority to offer Conseco a rate reduction without a commitment for additional revenues to offset the revenue decline.

We are extremely anxious to continue these discussions with Conseco and/or Teleplus, but rather than truly negotiate with AT&T on Conseco's behalf, Teleplus currently seems more willing to make threats to pursue groundless legal action.

I understand that you do not want to meet with AT&T until after these issues have been resolved, but I do hope to have the opportunity to met you very soon. If our offer has not been clearly communicated to Conseco via Teleplus, please let me know as soon as possible.

Sincerely,

Laura Carlisle
Sales Center Vice President
317-816-9555 (voice)
317-816-9504 (fax)
lcarlisle@att.com

11595 ... Indiana 46032

-----Original Message-----
From: Maybin, Richard [mailto:Richard_Maybin@Conseco.com]
Sent: Friday, March 30, 2001 4:21 PM
To: Carlisle, Laura A, BMSLS
Cc: Brown, Gary W; Breakey, Jim
Subject: FW: ECAC

Laura --

Jim Breakey asked that I forward the following eMail to you since Mike Humes will be out of the office next week.

Richard Maybin
(317) 817-3552

-----Original Message-----
From: Maybin, Richard
Sent: Friday, March 30, 2001 12:37 PM
To: 'Humes, Michael W, BMSLS'
Subject: RE: ECAC

Mike --

Your unwillingness to work with TelePlus reinforces my decision to engage them. I am confident with Jim Breakey's ability to represent Conseco's interest in the negotiation.

I do not know how to make it any clearer - I want you to work with them.

I am not attending ECAC and I am not interested in scheduling a meeting Mr. Van Dorselaer given the current state of our relationship.

Richard Maybin

-----Original Message-----
From: Humes, Michael W, BMSLS [ mailto:mhumes@att.com <mailto:mhumes@att.com> ]
Sent: Tuesday, March 27, 2001 11:24 AM
To: Maybin, Richard
Subject: RE: ECAC

Richard,

Thanks for your reply. I can understand why you might be upset based on what Teleplus has been telling Conseco. However, we feel that we have not been given the opportunity to share our perspective directly with Conseco. I had hoped that a meeting with Mr. Van Dorselaer would have allowed us to come face-to-face on the issue.

As you know , we have regularly re-negotiated Conseco's contract very early

in the term. Our last contract refile was only 15 months into the contract

term. In those negotiations, we worked with the Conseco team to achieve improved pricing and significant savings. To offset the revenue reduction to AT&T, the Conseco team had initially put the data network winback on the table, but removed it late in the negotiations. Rather than commit to the data network winback, the Conseco team agreed to a higher contract

Confidential

22

commitment based upon Conseco's revenue run-rate. Conseco received the rate reduction, but AT&T did not receive the offsetting revenue increase.

As voice rates go Conseco's last contract included aggressive rates and were among the best for similarly situated customers. The deal was created and negotiated by the Conseco team which took great care to analyze and compare our offer. They were not confused or unaware of the marketplace and were not led to believe that they were getting something that they were not.

These contracts and price bundles cannot be fully understood based solely on the rates and commitments listed in a tariff. There can be many things that go into the business case for a deal that are not apparent or may be offset by other contracts . Therefore, Teleplus quoting low rates and commitments out of context has little meaning and will not give a true picture .

Since the issue of the last contract rates being less than fair was raised, we looked at other deals filed from April through August 2000 in the same category as Conseco for revenue commitment. There were 14 other deals filed. Five of those had rates slightly below Conseco's and nine had rates higher, Conseco's rates were better that 75% of similar deals done all the way through August. The average was about .042 for dedicated to switched rates. These contracts include OneNet or VTNS, comparing other type contracts or promotional offers would not be a fair comparison. .

I would appreciate an opportunity to discuss these issues further and the current offer that has been presented to Teleplus. Please let me know if we can schedule time to do so, perhaps, with Mr. Van Dorselaer and myself. I also hope that you will reconsider attending the ECAC meeting, as that would also be an excellent opportunity for you to meet Mr. Van Dorselaer.

Thanks,
Mike

-----Original Message-----
From: Maybin, Richard [ mailto:Richard_Maybin@Conseco.com <mailto:Richard_Maybin@Conseco.com> ]
Sent: Friday, March 23, 2001 4:29 PM
To: Humes, Michael W, BMSLS
Subject: RE: ECAC

Mike --

Confidential

It is hard for me to get exited about ECAC or the meeting with Van Dorselaer.

I am upset. You traded on our business relationship to let us believe that we were getting good rates while charging comparable clients far less on a smaller base revenue commitment.

I think our best short term course is to focus our energies on developing a deal that is fair to Conseco.

Richard Maybin
(317) 817-3552

-----Original Message-----
From: Humes, Michael W, BMSLS [ mailto:mhumes@att.com
<mailto:mhumes@att.com>
< mailto:mhumes@att.com <mailto:mhumes@att.com> > ]
Sent: Monday, March 19, 2001 2:24 PM
To: Richard Maybin
Subject: ECAC

Richard,
How are you? I am writing to ask a couple of quick questions.

I was wondering if you were planning to attend the next ECAC on April 4 & 5?

Also, I would like to see if you would be able to make time on April 11 sometime between 10:00 and 2:30 to meet with the new President of Global Services, Steve Van Dorselaer. Steve will be in town that day and was hoping

to meet you while he is here.

If you could let me know I would appreciate it.

Thanks
Mike

Confidential

Exhibit N

10/04/01 THU 13:46 FAX 6128291244

EXHIBIT NO. 204
6-23-03
James M. Trapskin

002

# Teleplus Consulting, Inc.

Suite 180 · 8000 West 78th Street
Edina, Minnesota 55439-2535

952.829.1111
800.297.4115
Fax: 952.829.1244
E-mail: info@teleplusconsulting.com
URL: http://www.teleplusconsulting.com

## CONSULTING SERVICES AGREEMENT

This Consulting Services Agreement ("Agreement") is entered into on the earliest date written below between Teleplus Consulting, Inc. ("Teleplus") and Conseco Services LLC ("Client").

WHEREAS Client desires to have Teleplus analyze its interexchange telecommunications services needs and to make recommendations regarding possible AT&T, Concert, WorldCom, Sprint or Verizon contract options, and

WHEREAS Teleplus is capable of and willing to undertake that analysis and make recommendations to Client,

NOW THEREFORE, Teleplus and Client agree as follows:

1. Scope of Service. Teleplus will review and analyze Client's interexchange voice, data and wireless telecommunications services and will review the presently available contract tariffs offered by AT&T, Concert, WorldCom, Verizon and Sprint or filed by AT&T, Concert, WorldCom, Verizon and Sprint with the Federal Communications Commission.

SCHEDULE A:

Teleplus will assume responsibility for all contract negotiations with the service providers, and make recommendations to Client as to the presently available contract tariff(s) or other options which Teleplus believes will provide Client with appropriate services and facilities at minimum costs.

SCHEDULE B:

In addition, Teleplus will analyze the presently available contract tariff(s) or other options that Teleplus believes would help Client establish an effective affiliate/affinity program for the constituency of Client. Teleplus agrees to provide management services to help run an affiliate/affinity program.

2. Compensation. Client will be obliged to pay compensation to Teleplus under the following conditions:

i. Teleplus presents recommended contract tariff(s) or other options to Client; and

EXHIBIT A



003

ii. Client initiates service, within 12 months of the date on which Teleplus presents its recommendation to Client, under the contract tariff(s) or other options recommended by Teleplus (the "New Tariff(s)"), or under the affiliate/affinity program recommended by Teleplus, or Client initiates service from any carrier within such 12 month period under pricing or other terms substantially similar to the New Tariff(s) or the affiliate/affinity program recommended by Teleplus.

Upon occurrence of (i) and (ii) above as full and complete compensation for Teleplus services under this Agreement:

SCHEDULE A:
Client will pay Teleplus based on a percentage of savings consisting of thirty percent (30%) of the savings or credits, subject to a total cap of $200,000 per year on the first $2,000,000 dollars of actual annual savings, and two percent (2%) of all additional monthly savings or credits calculated based on the net difference in clients contract rates of January 1, 2001 for voice and data, and the New Tariff rates negotiated by Teleplus on behalf of the client.

SCHEDULE B:
If Client accepts the recommended affiliate/affinity program, related to Client's wireless and ISP services, Client will pay to Teleplus, thirty percent (30%) of the credits and/or additional discounts Client received from the carrier(s) arising from the telecommunications services (none of which are encompassed in Schedule A) to members of the affiliate/affinity group, as long as Client receives such credits and/or additional discounts from the carrier(s) to the extent they are a result of Teleplus recommendations under this agreement. There shall be no cap on the amount of these payments and such payments shall continue as long as such credits and/or additional discounts are earned and a New Tariff is in place.

Client will pay Teleplus its compensation monthly within 30 days of the receipt of its bill from its service provider. Client will remain obligated to pay Teleplus its full compensation as provided above even if Client upgrades to another carrier service option or changes to another carrier service option or changes to another carrier during the period of New Tariff(s). If Client makes such an upgrade or carrier change, Client will immediately pay Teleplus the full remaining amount of the compensation, based upon Client's then-effective level of services and traffic under New Tariff(s) and the affiliate/affinity program(s) for the remaining period of the New Tariff(s)(e.g. If the original term of the New Tariff was 36 months and the upgrade or carrier change was made in the 24th month of the term, then Teleplus would be compensated immediately on the basis of the compensation for the last full month that the New Tariff was in

effect multiplied by the remaining 12 months of the original New Tariff term).

3. Confidentiality. Both parties agree to hold all proprietary information about the other party in confidence, both during the period of Teleplus' work and thereafter, except as a party may be obliged to disclose that information to a court of law or administrative body with proper authority over the matter, or as may be needed by a party to enforce the terms of this Agreement.

4. Relationship of the Parties. It is understood and agreed that Teleplus is an independent contractor and that no Federal, State, or local income taxes, nor payroll tax of any kind, will be withheld or paid by Client on behalf of Teleplus. Teleplus does not have the power or authority to bind Client with respect to any third party, unless such authority is specifically given by Client in a separate writing.

5. Warranties and Representations. Each party warrants and represents that it has full power and authority to enter into this Agreement and to perform its obligations hereunder. Teleplus warrants that its review will extend to all AT&T, Concert, WorldCom, Sprint and Verizon contract tariffs which are available as of the date of this Agreement for public inspection, and makes no warranty that those carriers may not subsequently file a more advantageous contract tariff which is not included in Teleplus' review, or that the contract tariff(s) recommended to Client constitute the best choice for Client compared to all other telecommunications services options available from all carriers. In no event shall Teleplus be liable for any damages related to lost profits, business interruption, or any other consequential or indirect damages.

6. Other Provisions. This Agreement is governed by the laws of the State of Minnesota. Client agrees that, if Teleplus is compelled to undertake court action to collect its compensation due under this Agreement, Client will be responsible for payment of Teleplus' costs of collection, including reasonable attorneys fees and costs.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

| TELEPLUS CONSULTING, INC. | Conseco Services LLC. |
| --- | --- |
| By David E. Steen | By James R. Rosabrey |
| Name Printed | Name Printed |
| [signature] | [signature] |
| Signature | Signature |
| Its CEO | Its SR. VP. & CIO |
| Date 2/12/01 | Date 2/12/2001 |

Reviewed by: [signature]

Exhibit O

EXHIBIT NO. 201
6-23-03
James M. Trapskin

Teleplus Consulting, Inc

Suite 250 • 6889 Rowland Road • Eden Prairie, MN 55344-3380 • 952.829.1000 • 800.297.4115 • Fax: 952.829.1040
E-mail: info@teleplusconsulting.com • Web: www. teleplusconsulting.com

# CONSULTING SERVICES AGREEMENT

This Consulting Services Agreement ("Agreement") is entered into on the earliest date written below between Teleplus Consulting, Inc. ("Teleplus") and ADC Telecommunications, Inc. ("Client").

WHEREAS Client desires to have Teleplus analyze its interexchange telecommunications services needs and to make recommendations and lead negotiations regarding possible AT&T, WorldCom or Sprint contract tariff options, and

WHEREAS Teleplus is capable of and willing to undertake that effort,

NOW THEREFORE, Teleplus and Client agree as follows:

1. Scope of Service. Teleplus will:

   a) Collect and analyze information regarding ADC's telecommunications network, traffic patterns, performance specifications and related contract terms and conditions as necessary to accurately reflect ADC's opportunity in a strategic renegotiation.

   b) Create carrier specific demand set inventories detailing ADC's average monthly telecommunication traffic profile.

   c) Develop a pre-planned renegotiation strategy to leverage competition and secure maximum results, then review and obtain ADC approval of that strategy.

   d) Implement and administer a strategic renegotiation for telecommunications services with up to three of ADC's current telecommunications carriers; specifically AT&T, WorldCom and Sprint, at all times representing ADC in such negotiations.

   e) Solicit favorable price concessions and terms and conditions from ADC's carrier(s).

   f) Evaluate carrier(s) renegotiation responses including modeling carrier responses to evaluate alternatives and benefits by service and in total.

   g) Obtain new or amended contracts or addendums from carrier(s) as necessary for ADC to execute, subject to internal ADC review and acceptance prior to execution.

   h) Assist ADC in securing up to three final executable carrier contracts with the chosen telecommunication service provider(s). ADC has sole right to select the provider(s) of choice.

CONFIDENTIAL



TH

2. Compensation. Client will be obliged to pay compensation to Teleplus under the following conditions:

a) Teleplus presents recommended contract tariff(s) or other options to Client; and

b) Client initiates service, within 12 months of the date on which Teleplus presents its recommendation to Client, under the contract tariff(s) or other options recommended by Teleplus (the "New Tariff(s)"), or Client initiates service from any carrier within such 12 month period under pricing or other terms substantially similar to the New Tariff(s).

Upon the occurrence of (a) and (b) above, Client will pay to Teleplus, as full and complete compensation for Teleplus' services under this Agreement, thirty percent (30%) of the savings between:

The total price of Client's existing interexchange telecommunications services, or Client's pre-existing written offers(s) from the carriers(s), whichever is less, and the total price of the New Tariff(s) subscribed to by Client for the period of 12 months after Client first initiates service under the New Tariff(s). If Client continues for an additional 12 months (months 13-24) under these same tariffs the percentage of compensation to Teleplus shall be 25% during that period. If Client continues for an additional 12 months (months 25-36) under these same tariffs the percentage of compensation will be 20%. If at any time during this 36 month period Client engages Teleplus for similar services, and if those services result in additional savings to Client, the percentage of savings paid to Teleplus on those additional benefits shall begin again at 30% and be subject to this sliding scale. In no event will a percentage of savings be paid to Teleplus beyond 36 months from the month in which savings begin.

Teleplus will monitor Client's billings and prepare and present a monthly billing for compensation. Client will pay Teleplus its compensation monthly within 30 days of the receipt of its bill from Teleplus. Client will remain obligated to pay Teleplus its full compensation even if Client upgrades to another carrier service option or changes to another carrier service option or changes to another carrier during the period of 36 months (or such other period as the New Tariff may have) after Client first initiates service under the New Tariff. If Client makes such an upgrade or carrier change, Client will continue to pay Teleplus the remaining amount of the compensation on a monthly basis, based upon Client's then-effective level of services and traffic.

3. Confidentiality. Both parties agree to hold all proprietary information about the other party in confidence, both during the period of Teleplus' work and thereafter, except as a party may be obliged to disclose that information to a court of law or administrative body with proper authority over the matter, or as may be needed by a party to enforce the terms of this Agreement. If an ADC Non-Disclosure Agreement was signed by Teleplus, the terms of that Agreement will supercede this clause.

CONFIDENTIAL





TH

4. Relationship of the Parties. It is understood and agreed that Teleplus is an independent contractor and that no Federal, State, or local income taxes, nor payroll tax of any kind, will be withheld or paid by Client on behalf of Teleplus. Teleplus does not have the power or authority to bind Client with respect to any third party, unless such authority is specifically given by Client in a separate writing.

5. Warranties and Representations. Each party warrants and represents that it has full power and authority to enter into this Agreement and to perform its obligations hereunder. Teleplus warrants that its review will extend to all AT&T, WorldCom and Sprint contract tariffs which are available as of the date of this Agreement for public inspection, and makes no warranty that those carriers may not subsequently file a more advantageous contract tariff which is not included in Teleplus' review, or that the contract tariff(s) recommended to Client constitute the best choice for Client compared to all other telecommunications services options available from all carriers. In no event shall Teleplus be liable for any damages related to lost profits, business interruption, or any other consequential or indirect damages.

6. Other Provisions. This Agreement is governed by the laws of the State of Minnesota. Client agrees that, if Teleplus is compelled to undertake court action to collect its compensation due under this Agreement, Client will be responsible for payment of Teleplus' costs of collection, including reasonable attorney's fees and costs.

7. Time is of the essence. The parties agree that time is of the essence in undertaking and completing this scope of work. Client and Teleplus agree that they will both apply resources as necessary to complete this effort within a target timeframe of 60 days from the date of this Agreement for Client's WorldCom contract. In the event that this specific effort is not completed within the 60 day target timeframe, the parties agree to meet and revise this Agreement as mutually agreeable, up to and including complete termination of the Agreement. Timing for completion of negotiations and execution of new contracts or amendments with other of ADC's service providers will be based on a mutually agreed to strategy resulting from this engagement and recommendations made by Teleplus.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

| TELEPLUS CONSULTING, INC. | ADC Telecommunications, Inc. |
| --- | --- |
| By Timothy S. Hanson<br>Name Printed | By Kamalesh Dwivedi<br>Name Printed |
| [signature]<br>Signature | [signature] 11/15/02<br>Signature |
| Its President | Its CIO |
| Date 11/14/2002 | Date 15 Nov 2002 |

CONFIDENTIAL



T0002095

# Exhibit P

June 5, 2001

AT&T
Kenneth Sichau
President of AT&T Business Services Sales
23A02
55 Corporate Drive
Bridgewater, NJ 08807

Dear Ken,
I cannot begin to express the level of frustration we are feeling toward AT&T. When we talked, over two months ago, you assured me your team would need a couple of weeks to pull together a new contract we could both live with. That effort has gone nowhere.

In mid May, both teams arrived at a compromise price and we all went to work setting a realistic MARC. We ran business models and service projections addressing business downturn issues and new initiatives. We identified over $1.1MM in new business opportunities and we placed these orders with AT&T. Our best calculations reached $26MM annually when calculated at the new pricing. On 6/4, Steve Van Dorselaer called me to say he is now unwilling to re-price the contract, and with the new business, Conseco can now meet the original $34MM commitment.

This situation is receiving top exposure in our organization. With our current contract and AT&T's series of rate hikes, we are paying 60% more than the marketplace and our competition.

We have lost all confidence and trust in the current AT&T team. We are done dealing with them. Effective immediately, I want the account serviced out of the Minneapolis / St. Paul area. Conseco Finance generates the majority of the traffic and service requirements. We have responsibility and accountability for this function and we need this account managed out of Minnesota.

Please have local representation contact me as soon as possible. I would like to have you come to St. Paul within the next two weeks to formally introduce the new team. At that time you and I need to work together to resolve this issue. I can't overemphasize how important this is. Please get back to me as soon as possible with your timeframe and plan. We need to work together to get this fixed before the damage to our relationship is irreconcilable

Sincerely,

James R. Breakey
Senior Vice President and CIO
Technology Services
Conseco Finance Corp.
651.293.5505

Confidential

Exhibit Q

**Bill Hansen**

**From:** Bill Hansen
**Sent:** Tuesday, September 18, 2001 2:19 PM
**To:** Mike_W_Sanderson@consecofinance. com (E-mail)
**Subject:** Conseco Refile

Hello Mike,
This showed up on the radar screen. We're reading it now and although the discussion is moot, we'll get together on it later.
Bill
Teleplus Consulting, Inc.
952 829 1000

218 KH
EXHIBIT
Breakey 11/04/0



T0178

**Bill Hansen**

**From:** Bill Hansen
**Sent:** Tuesday, September 18, 2001 3:15 PM
**To:** Mike_W_Sanderson@consecofinance. com (E-mail)
**Subject:** Conseco Deal

Here it is.

Refile Conseco 13673.doc

Exhibit R

For AT&T Administrative Use Only

**Attachment No.** 13673
**Original Effective Date:** April 8, 2000
**Amended Effective Date:** September 11, 2001

As a result of the FCC Detariffing Order, this document is now being referred to as a "Service Order Attachment-Voice/Data Services "Attachment" and AT&T Tariffs are now being referred to as their successor the AT&T Business Service Guide at http://att.com/serviceguide/business ("Service Guide"). This document replaces and supersedes the previously filed version of the Contract Tariff.

**1. Services/Offers Provided:** AT&T will provide the following Services/Offers to the Customer under this Attachment pursuant to AT&T Business Service Guide located at http://www.att.com/serviceguide/business (the "Service Guide") as amended from time to time. The Rates, Discounts and other provisions stated in this Attachment are in lieu of the comparable provision stated in the Service Guide.

A. AT&T Software Defined Network (SDN) OneNet Services

B. AT&T Concert Virtual Network Service (Concert VNS) and Concert Inbound Service (Concert IS)

C. AT&T Toll Free Services

D. AT&T Private Line Services

The International AT&T Private Line Services to Canada and Mexico consist of IOCs and associated components which include Office Functions, Office Connections and Channel Options.

E. AT&T Frame Relay Service (FRS)

F. AT&T International Satellite Service

G. AT&T Local Channel Services

H. AT&T Audio and Video TeleConference Services

The Customer must identify with each order for AT&T Audio and Video TeleConference Services that such services are to be provided under this Attachment.

**2. Attachment Term; Renewal Option** - The term of this Attachment is four years. No renewal option is available for this Attachment.

#203
(Francis)
[illegible] 9.3.03

T1748

3. **Minimum Commitments/Charges**

A. **Minimum Revenue Commitment (MRC) –** The MRC for Years 2 through 4 of the Attachment Term for the AT&T Services provided under this Attachment is $80,000,000.

If, at the end of the Attachment Term, the Customer has failed to satisfy the MRC, the Customer will be billed a shortfall charge in an amount equal to the difference between the MRC and the total of the actual MARC-eligible charges incurred, less any Minimum Annual Revenue Commitment (MARC) shortfall charge(s) paid by the Customer for Years 2 through 4, as specified in Section 3.B., below.

B. **Minimum Annual Revenue Commitment -** The Minimum Annual Revenue Commitment (MARC) for AT&T Services provided under this Attachment is as follows:

| Attachment TERM YEAR | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 |
|---|---|---|---|---|
| MARC | $34,350,000 | $25,000,000 | $25,000,000 | $25,000,000 |
| DELETED | DELETED | DELETED | DELETED | DELETED |
| DELETED | DELETED | DELETED | DELETED | DELETED |
| DELETED | | | | |

The MRC and the MARC will be satisfied by the "MARC-eligible charges" which are the total of the following charges:

(1) Gross Monthly Usage Charges (GMUC) as specified in the SDN OneNet Discount Plan (OneNet) in the Service Guide, as amended from time to time (including undiscounted recurring charges for AT&T SDN OneNet Services Optional Features, AT&T Toll Free Services Optional Features and AT&T Advanced Toll Free Service) and Concert Inbound Service GMUCs for the services provided under this Attachment;

(2) the undiscounted recurring charges incurred by the Customer for Digital Service Volume Pricing Plan (DSVPP) eligible Service Components;

(3) the undiscounted recurring charges incurred by the Customer for the following AT&T International Private Line services: International Full Channel Service-Overseas-Overseas Cable Digital Channels, Voice Grade Private Line Service-Overseas Half Channels, International ACCUNET Digital Services-Half Channels;

(4) the undiscounted recurring charges for AT&T International Satellite Service consisting of: AT&T International Satellite Shared Earth Station Service-Half Channel;

(5) the GMUCs for the AT&T Audio and Video TeleConference Services consisting of the following: Audio-Teleconference Bridge-Dial-Out Conference-Domestic and International, Meet-Me Bridge Arrangement Options 2 and 3-Domestic and International, AT&T Event TeleConference Service-Domestic and International (including charges for AT&T Audio and Video TeleConference Services Optional Features as agreed to by AT&T and the Customer);

(6) DELETED

(7) Alternative Data Communications Capabilities, which have been ordered under a separate contract between the Customer and AT&T and which have been mutually designated in writing by the parties prior to or during the term of this Attachment.

(8) the undiscounted recurring charges incurred by the Customer for AT&T ACCU-Ring Network Access Service which have been ordered under a separate contract between the Customer and AT&T, excluding Special Construction Charges and Individual Case Basis contracts; and

(9) Other AT&T Services which have been mutually designated in writing by the parties prior to or during the term of this Attachment

For AT&T Administrative Use Only

**Attachment No.** 13673
**Original Effective Date:** April 8, 2000
**Amended Effective Date:** September 11, 2001

C. **SubMARC-I** - DELETED

D. **SubMARC-D** - DELETED

If, on any anniversary of the TSD, the Customer has failed to satisfy the MARC for the preceding year, the Customer will be billed a shortfall charge in an amount equal to the greater of the difference between the MARC and the total of the actual MARC-eligible charges incurred for that year.

4. **Amendment Price** - AT&T reserves the right to increase from time to time the rates for the Services Provided under this Attachment, regardless of any provisions in this Attachment that would otherwise stabilize rates or limit rate increases, relating to charges imposed on AT&T stemming from an order, rule or regulation of the Federal Communications Commission or a court of competent jurisdiction, concerning: (i) payphone use charges, and (ii) presubscribed interexchange carrier charges ("PICCs"). AT&T will make rate adjustments under this provision as necessary.

A. The Amendment Price for the AT&T Services provided under this Attachment is the same as the undiscounted Recurring and Nonrecurring Rates and Charges specified in the Service Guide, as amended from time to time, except for those Rates specified in Section 7., following.

5. **Discounts** - The following discounts are the only discounts for the Services Provided under this Attachment. No other discounts apply.

A. **AT&T SDN OneNet Services/AT&T Toll Free Services** - The Customer will receive the following discounts, each month, in lieu of those provided by the OneNet Discount Option Plan. These discounts will be applied in the same manner as the OneNet Discount Option Plan as specified in the Service Guide, as amended from time to time.

| For Gross Monthly <u>Usage Charges of</u>: | Discount applied to Domestic SDN OneNet and Domestic & International Toll Free <u>Services GMUCs</u> | Discount applied to International SDN OneNet Usage & Concert VNS GMUCs <u>(U.S. to foreign)</u> |
|---|---|---|
| Between $0 and $2,750,000 | 44.3% | 25.0% |
| DELETED | DELETED | DELETED |
| over $2,750,000 | 00.0% | 00.0% |

B. **AT&T SDN OneNet International Services/ AT&T Concert VNS (U.S. to Foreign)** - The Customer will receive an 8.5% discount, each month, in lieu of the discount specified for the AT&T SDN OneNet International GMUCs before any other discount has been applied. This discount will be applied in the same manner as specified in the Service Guide, as amended from time to time.

C. **AT&T Concert VNS**

1. The Customer will receive a 38.0% discount, each month, on AT&T Concert VNS (foreign to U.S.) and AT&T Concert Inbound Service (U.S. to foreign and foreign to U.S.) usage charges. This discount is in lieu of any other discounts for the same services.

D. **AT&T Private Line, AT&T Local Channel Services and AT&T Frame Relay Service** - The Customer will receive the following discounts, each month, in lieu of any other discounts. These discounts will be applied to the undiscounted recurring charges for Digital Services Volume Pricing Plan (DSVPP)-eligible service components in service under this Attachment. These discounts will be applied in the same manner as the DSVPP discounts as specified in the Service Guide, as amended from time to time.

1. **AT&T Frame Relay Services** - The Customer will receive a discount of 50.0%, each month.

For AT&T Administrative Use Only

**Attachment No.** 13673
**Original Effective Date:** April 8, 2000
**Amended Effective Date:** September 11, 2001

**2. AT&T Private Line and AT&T Local Channel Services**

| Service Components | Discount |
|---|---|
| *ASDS 64 kbps and below | 35.0% |
| *ASDS 128 kbps and above | 50.0% |
| DELETED | DELETED |
| *ACCUNET T1.5 Service | 65.0% |
| DELETED | DELETED |
| *ACCUNET T45 Service | 60.0% |
| ACCUNET Fractional T45 Services | 65.0% |
| International ACCUNET 2.048 Mbps Service-Mexico | 49.0% |
| *ACCUNET SONET T155 Service | 54.0% |
| SONET OC12 Service | 54.0% |
| AT&T VGLCs and AT&T DDLCs at speeds of 9.6 kbps | 23.0% |
| AT&T DDLCs at speeds of 56/64 kbps | 23.0% |
| AT&T ACCUNET GDA at speeds of 9.6/56/64 kbps | 27.0% |
| AT&T Terrestrial 1.544 Mbps Local Channel Service (excluding the components in Section 5.E., following) | 34.0% |
| AT&T Terrestrial 45 Mbps Local Channels | 15.0% |

* Includes AT&T Canada and Mexico Services as specified in the Service Guide

**E. AT&T AVA/UTA Terrestrial 1.544 Mbps Local Channel -** The Customer will receive the following discount, each month, on the Monthly Recurring Charges for AT&T Terrestrial 1.544 Mbps Local Channels which are in lieu of the discounts specified in Section 5.D.2., preceding.

| Service Components | Discount |
|---|---|
| Access Value Arrangement (AVA) with the Universal Terrestrial 1.544 Mbps Local Channels Access Arrangement AVA/UTA | 40.0% |

**F. AT&T International Satellite and International AT&T Private Line Services -** The Customer will receive the following discounts, each month, which are lieu of any other discounts.

| Service Components | Discount |
|---|---|
| Voice Grade Private Line Service-Overseas Half Channel | 35.0% |
| International ACCUNET Digital Services-Half Channel | 68.0% |
| International Satellite Shared Earth Station Service-Half Channel | 60.0% |
| International Full Channel Service-Overseas-Overseas Cable Digital Channel | 52.0% |

**G. Additional International Discounts -** If the Customer's International Private Line and Canada/Mexico Private Line Services undiscounted recurring charges are at least $100,000 per month, the Customer will receive an additional 3% discount on the total undiscounted recurring charges on amounts between $100,000 and $250,000 for the following services:

Service Components
International Full Channel Service-Overseas
International Voice Grade Private Line Service-Overseas Half Channel
International ACCUNET Digital Services-Half Channel
ACCUNET T1.5 Service-Canada/Mexico
ACCUNET T45 Service-Canada/Mexico
International ACCUNET 2.048 Mbps Mexico
AT&T SONET T155 Service-Canada/Mexico
ASDS-Canada/Mexico 64 kbps and below
ASDS-Canada/Mexico 128 kbps and above
DELETED
DELETED

For AT&T Administrative Use Only

**Attachment No.** 13673
**Original Effective Date:** April 8, 2000
**Amended Effective Date:** September 11, 2001

No Additional Discount will apply if the Customer's total International Private Line and Canada/Mexico Private Line Services undiscounted recurring charges exceed $250,000 in any month.

**H. AT&T Audio and Video TeleConference Services** - None.

**6. Classifications, Practices and Regulations**

**A.** Except as otherwise provided in this Attachment, the rates and regulations that apply to the Services Provided specified in Section 1., preceding, are as set forth in the applicable section of the Service Guide that are referenced in Section 1., preceding, as amended from time to time.

**B. Monitoring Conditions** - None.

**C. Promotions, Credits and Waivers** - The Customer is ineligible for any promotions, credits or waivers for the Services Provided under this Attachment, which are filed or which may be filed in the Service Guide specified in Section 1., preceding.

The following credits and waivers will be applied to the Customer's bill subject to the following limitations: (1) all credits and waivers apply only to the Services Provided under this Attachment and as specified below; (2) any waiver not applied by the end of the Attachment will be null and void; (3) installation and monthly charge waivers apply only to new service components (unless otherwise specified below) and do not apply to service components disconnected and reconnected after the CISD; (4) the service components must remain in service for a minimum retention period of 12 months (unless otherwise specified below); and (5) the credits/waivers under this section do not apply to Network Protection Service (NPC). If any of the installed service components are disconnected prior to the end of the minimum retention period, AT&T will bill the Customer for the amount of the charges that had been waived, or the amount of the credit that had been applied equal to installation charges, under this section for each service component disconnected. Any such bill must be paid by the Customer within 30 days.

The following charges, as specified in the Service Guide listed in Section 1., preceding, as amended from time to time, are waived.

**1. Nonrecurring Charges**

(a) The SDN OneNet Service Establishment Charge, not to exceed $10,000 over the Attachment Term.
(b) The Installation Charge for Primary Rate Interface (PRI) Office Functions.
(c) The Installation Charges for DSVPP-eligible service components and associated Functions Connections, and those Local Channels specified in Section 5.E., preceding. If ACCUNET SONET T155 Service and SONET OC12 Service IOC and Multiplexing Office Function service components are not in service for 12 months, the Customer will also be billed the termination charge as specified in the Service Guide, as amended from time to time.

T1752

For AT&T Administrative Use Only

**Attachment No.** 13673
**Original Effective Date:** April 8, 2000
**Amended Effective Date:** September 11, 2001

(d) AT&T will waive the Set-up Charge for each called station established on the conference with the assistance of an operator.
(e) AT&T will waive the nonrecurring Charge for each Meet-Me Bridge arrangement.

**2. Recurring Charges**

(a) 50% of the PRI Office Function recurring Monthly Charge.
(b) The recurring Monthly Charges for the following AT&T Data Services associated with the AT&T Terrestrial 1.544 Mbps and 9.6/56/64 kbps ACCUNET GDA Local Channel Services provided under this Attachment, provided such service components are associated directly with the new and existing Services provided under this Attachment: (1) ACCUNET T1.5/ASDS Access Connections, (2) associated Access Coordination Functions (3) ACCUNET T1.5 M-24 Multiplexing Office Functions. There is no minimum retention period associated with this waiver.
(c) Alternate Destination Routing (ADR): The $20.00 per Toll Free number Monthly Charge. There is no minimum retention period associated with this waiver.
(d) The recurring Monthly Charges for the following new and existing service components: (1) ACCUNET T45 Access Connections; (2) ACCUNET T45 M-28 Multiplexing Office Functions; and (3) Access Coordination Functions associated with AT&T Terrestrial 45 Mbps Local Channels provided under this Attachment. There is no minimum retention period associated with this waiver.
(e) AT&T will waive a percentage of the discounted Monthly Recurring Charges for each International services as specified below for the Countries listed: The minimum retention period is 18 months.

| Country | Service | Discount |
|---|---|---|
| India | International ACCUNET Digital Services – Half Channel | 45% |
| India | International Satellite Shared Earth Station Service | 23% |

**3. Recurring, Nonrecurring and Usage Charges**

(a) Under the Routing Plan Option: The $25.00 per Toll Free number Monthly Charge is waived. The customer is responsible for the $25.00 nonrecurring Installation Charge, for each installation or change per Toll Free number.

**4. Credits**

(a) AT&T will apply a credit equal to the installation charges, as specified in The Service Guide, as amended from time to time, for the installation of new AT&T Terrestrial 1.544 Mbps Local Channels subscribed to under an AVP, AVA, AVA/UTA.

(b) AT&T will apply a credit equal to the installation charges, as specified in the Service Guide, as amended from time to time, for the installation of new AT&T Terrestrial 45 Mbps Local Channels subscribed to under an AVP.

(c) AT&T will apply a credit against charges billed under this Attachment equal to the installation charges incurred by the Customer for AT&T Regional Frame Relay Service DSVPP-eligible service components during the Attachment Term.

(d) AT&T will apply a credit equal to the sum of any MARC shortfall charges incurred and paid by the Customer for each of Years 2, 3 and/or 4 of the Attachment Term, provided the Customer has satisfied the MRC at the end of the Attachment Term. The credit, if any, will be applied to the Customer's AT&T SDN OneNet Services bill (as a credit or reimbursement, as applicable). This provision will survive expiration of the term.

**D. Discontinuance** - In lieu of any Discontinuance With or Without Liability provisions that are specified in the Service Guide referenced in Section 1., preceding, the following provisions shall apply.

For AT&T Administrative Use Only

**Attachment No.** 13673
**Original Effective Date:** April 8, 2000
**Amended Effective Date:** September 11, 2001

The Customer may discontinue this Attachment prior to the end of the Attachment Term, provided the Customer: (1) is current in payment to AT&T for its existing telecommunication services; and (2) replaces this Attachment with other domestic and/or international telecommunications Services (excluding Wireless or Broadband Service) provided by AT&T having: (i) an equal or greater new Minimum Annual Revenue Commitment (MARC), and (ii) a new term equal to or greater than the remaining term of this Attachment. If the Customer is terminating more than one Attachment per this provision, the new MARC must be equal to or greater than the sum of all the MARCs in the Attachments that are being discontinued. However, if the Customer discontinues during Year 1 of the Attachment Term, the Customer will be billed a Shortfall Charge equal to: the difference between (1) the prorated MARC for Year 1 of the Attachment Term and (2) the total of the actual MARC-eligible charges incurred for that year. This Shortfall Charge will only be billed if the amount in (2) is less than the amount in (1). If the Customer discontinues during Years 2 through 4 of the Attachment Term, the Customer will be billed a Shortfall Charge equal to: the difference between (1) the prorated MRC and (2) the total of the actual MRC-eligible charges incurred from the beginning of Year 2 through the time of discontinuance. This Shortfall Charge will only be billed if the amount in (2) is less than the amount in (1).

If the Customer discontinues this Attachment for any reason other than specified above, prior to the expiration of the Attachment Term, a Termination Charge will apply. If the Customer discontinues during Year 1 of the Attachment Term, the Termination Charge will be an amount equal to the sum of (1) 35% of the unsatisfied MARC for Year 1 of the Attachment Term and (2) 35% of the unsatisfied MRC. If the Customer discontinues during Years 2 through 4 of the Attachment Term, the Termination Charge will be an amount equal to 35% of the unsatisfied MRC at the time of discontinuance.

**E. Other Requirements** - Not Applicable.

**F. Availability** - This Attachment is available only to Customers who: (1) concurrently order this Attachment only once, either by the Customer or any Affiliate of the Customer, which is any entity that owns a controlling interest in either the Customer or an Affiliate of the Customer, or any entity in which a controlling interest is owned by either the Customer or an Affiliate of the Customer; and (2) order service within 30 days after the amended effective date of this Attachment for initial installation of the Services Provided under this Attachment within 30 days after the date ordered.

For AT&T Administrative Use Only

**Attachment No. 13673**
**Original Effective Date:** April 8, 2000
**Amended Effective Date:** September 11, 2001

7. **Rates**

**A. SDN OneNet Rate Schedules** - The rates listed below apply for all Mileages & Bands and for all rate periods. These rates are stabilized for the Attachment Term.

| Rates Schedules | Initial 18 Seconds or Fraction | Each Additional 6 Seconds or Fraction |
|---|---|---|
| A, A-PV | $0.0297 | $0.0099 |
| B(a), B-PV(a), B(b), B-PV(b) | $0.0162 | $0.0054 |
| C(a), C(b), C-PV | $0.0162 | $0.0054 |
| E | $0.0306 | $0.0102 |
| G | $0.1071 | $0.0357 |
| H1 | $0.0396 | $0.0132 |
| H2 | $0.0555 | $0.0185 |
| K | $0.0366 | $0.0122 |
| L | $0.1278 | $0.0426 |
| P | $0.2442 | $0.0814 |

DELETED

**B. AT&T Toll Free Service Rate Schedules**

1. The rates listed below apply for all Service Areas and for all rate periods. These rates are stabilized for the Attachment Term.

| | Per Hour of Use |
|---|---|
| AT&T Toll Free MEGACOM Service-Domestic | $3.24 |
| AT&T Toll Free READYLINE Service-Domestic | $5.94 |
| AT&T Toll-Free Multimedia Service | $7.92 |

DELETED

2. **Toll Free Call Prompter** - The following usage charge will apply during the Attachment Term.

**Usage**
- Per announcement played $.050

3. **AT&T 800 Transfer Connect**

- Are stabilized for the Attachment Term.

**Usage Charges**

| | Per Completed Call | Per Redirection Attempt |
|---|---|---|
| Courtesy Transfer | $0.024 | $0.1600 |
| Consult & Transfer | $0.032 | $0.2400 |
| Conference & Transfer | $0.040 | $0.2800 |

**C. AT&T Toll Free MEGACOM Service-International** - The following rates are stabilized for the Attachment Term.

1. **Rate Schedule for AT&T Toll Free MEGACOM Service-Canada**

| | RATES | |
|---|---|---|
| DAY RATE Mon-Fri | EVENING RATE Mon-Fri/Sat-Sun | NIGHT RATE Mon-Sun |

For AT&T Administrative Use Only

**Attachment No.** 13673
**Original Effective Date:** April 8, 2000
**Amended Effective Date:** September 11, 2001

| | 8AM-6PM | | 6PM-12Mid/8AM-12Mid | | 12Mid-8AM | |
|---|---|---|---|---|---|---|
| Rate Step | Initial 30 Secs or Frac't | Each Add'l 1 Sec or Frac't | Initial 30 Secs or Frac't | Each Add'l 1 Sec or Frac't | Initial 30 Secs or Frac't | Each Add'l 1 Sec or Frac't |
| 1-6 | $0.1860 | $0.0062 | $0.1860 | $0.0062 | $0.1860 | $0.0062 |

**D. AT&T Toll Free READYLINE Service-International** - The following rates are stabilized for the Attachment Term.

**1. Rate Schedule for AT&T Toll Free READYLINE Service-Canada**

| | RATES | | | | | |
|---|---|---|---|---|---|---|
| | DAY RATE Mon-Fri 8AM-6PM | | EVENING RATE Mon-Fri/Sat-Sun 6PM-12Mid/8AM-12Mid | | NIGHT RATE Mon-Sun 12Mid-8AM | |
| Rate Step | Initial 30 Secs or Frac't | Each Add'l 1 Sec or Frac't | Initial 30 Secs or Frac't | Each Add'l 1 Sec or Frac't | Initial 30 Secs or Frac't | Each Add'l 1 Sec or Frac't |
| 1-6 | $0.1950 | $0.0065 | $0.1950 | $0.0065 | $0.1950 | $0.0065 |

**E. International Calling Capability** - Following are the AT&T SDN OneNet International Calling Capability Usage Rates to the Countries listed below, applicable under this Attachment. These rates are stabilized for the Attachment Term.

**1. U.S. Mainland Usage Rates** - The following schedules are used to rate calls between stations in the U.S. Mainland and stations in the country/area specified below. Rates apply for all days of the week including holidays. Unless otherwise specified, the Initial Period (IP) is 18 seconds, or fraction thereof, and the Additional Period (AP) is 6 seconds, or fraction thereof.

**(a) Canada Rate Schedule** - This schedule applies to Customer Dialed calls to stations in Canada using dedicated access.

| | RATES | | | |
|---|---|---|---|---|
| | PEAK 8AM-6PM | | OFF-PEAK 6PM-8AM | |
| Rate Mileage | Initial 18 Seconds or Fraction | Each Add'l 6 Seconds or Fraction | Initial 18 Seconds or Fraction | Each Add'l 6 Seconds or Fraction |
| 1-18 | $0.0747 | $0.0249 | $0.0747 | $0.0249 |
| 19-80 | $0.0747 | $0.0249 | $0.0747 | $0.0249 |
| 81-140 | $0.0747 | $0.0249 | $0.0747 | $0.0249 |
| 141-220 | $0.0747 | $0.0249 | $0.0747 | $0.0249 |
| 221-345 | $0.0747 | $0.0249 | $0.0747 | $0.0249 |
| 346-630 | $0.0747 | $0.0249 | $0.0747 | $0.0249 |
| 631-1200 | $0.0747 | $0.0249 | $0.0747 | $0.0249 |
| 1201-1610 | $0.0747 | $0.0249 | $0.0747 | $0.0249 |
| 1611-4000 | $0.0747 | $0.0249 | $0.0747 | $0.0249 |

**(b) Mexico Rate Schedules** - These schedules apply to Customer Dialed calls to stations in Mexico using dedicated access.

**I. Mexico Schedule 1 Rates** - The following rates are for calls to the point of connection at the international boundary.

| RATES | |
|---|---|
| PEAK | OFF-PEAK |

For AT&T Administrative Use Only

**Attachment No.** 13673
**Original Effective Date:** April 8, 2000
**Amended Effective Date:** September 11, 2001

| | 7AM-7PM | | 7PM-7AM | |
|---|---|---|---|---|
| Rate Mileage | Initial 18 Seconds or Fraction | Each Add'l 6 Seconds or Fraction | Initial 18 Seconds or Fraction | Each Add'l 6 Seconds or Fraction |
| 1-10 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 11-22 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 23-55 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 56-124 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 125-292 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 293-430 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 431-925 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 926-3000 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |

**II. Mexico Schedule 2 Rates** - The following rates apply to the Customer Dialed Stations (DS) calls (as defined in the Service Guide) between the point of connection at the International boundary and the locations in Mexico. The Initial Period is 1 minute, or fraction thereof, and the Additional Period is 1 minute, or fraction thereof.

| | | RATES | | | |
|---|---|---|---|---|---|
| | | PEAK RATE | | OFF-PEAK RATE | |
| RATE TABLE | CLASS OF SERVICE | IP | AP | IP | AP |
| 1 | DS | $0.36 | $0.36 | $0.27 | $0.27 |
| 2 | DS | $0.36 | $0.36 | $0.27 | $0.27 |
| 3 | DS | $0.36 | $0.36 | $0.27 | $0.27 |
| 4 | DS | $0.55 | $0.55 | $0.39 | $0.39 |
| 5 | DS | $0.59 | $0.59 | $0.42 | $0.42 |
| 6 | DS | $0.65 | $0.65 | $0.46 | $0.46 |
| 7 | DS | $0.69 | $0.69 | $0.52 | $0.52 |
| 8 | DS | $0.69 | $0.69 | $0.52 | $0.52 |

**(c) Other Countries Rates** - Dial Station using dedicated access. The Peak and Off-Peak time periods for the countries listed below are as specified in the Service Guide.

| | Initial Period | | Add'l Period | |
|---|---|---|---|---|
| Country | Peak | Off-Peak | Peak | Off-Peak |
| India | $0.4653 | $0.4653 | $0.1551 | $0.1551 |



T1757

For AT&T Administrative Use Only

**Attachment No.** 13673
**Original Effective Date:** April 8, 2000
**Amended Effective Date:** September 11, 2001

**(d) Canada Rate Schedule** - This schedule applies to Customer Dialed calls to stations in Canada using switched access.

| | RATES | | | |
|---|---|---|---|---|
| | PEAK 8AM-6PM | | OFF-PEAK 6PM-8AM | |
| Rate Mileage | Initial 18 Seconds or Fraction | Each Add'l 6 Seconds or Fraction | Initial 18 Seconds or Fraction | Each Add'l 6 Seconds or Fraction |
| 1-18 | $0.0912 | $0.0304 | $0.0912 | $0.0304 |
| 19-80 | $0.0912 | $0.0304 | $0.0912 | $0.0304 |
| 81-140 | $0.0912 | $0.0304 | $0.0912 | $0.0304 |
| 141-220 | $0.0912 | $0.0304 | $0.0912 | $0.0304 |
| 221-345 | $0.0912 | $0.0304 | $0.0912 | $0.0304 |
| 346-630 | $0.0912 | $0.0304 | $0.0912 | $0.0304 |
| 631-1200 | $0.0912 | $0.0304 | $0.0912 | $0.0304 |
| 1201-1610 | $0.0912 | $0.0304 | $0.0912 | $0.0304 |
| 1611-4000 | $0.0912 | $0.0304 | $0.0912 | $0.0304 |

**(e) Mexico Rate Schedules** - These schedules apply to Customer Dialed calls to station in Mexico using switched access.

**I. Mexico Schedule 1 Rates** - The following rates are for calls to the point of connection at the international boundary.

| | RATES | | | |
|---|---|---|---|---|
| | PEAK 7AM-7PM | | OFF-PEAK 7PM-7AM | |
| Rate Mileage | Initial 18 Seconds or Fraction | Each Add'l 6 Seconds or Fraction | Initial 18 Seconds or Fraction | Each Add'l 6 Seconds or Fraction |
| 1-10 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 11-22 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 23-55 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 56-124 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 125-292 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 293-430 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 431-925 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |
| 926-3000 | $0.0000 | $0.0000 | $0.0000 | $0.0000 |

**II. Mexico Schedule 2 Rates** - The following rates apply to the Customer Dialed Stations (DS) calls (as defined in the Service Guide) between the point of connection at the international boundary and the locations in Mexico. The Initial Period is 1 minute, or fraction thereof, and the Additional Period is 1 minute, or fraction thereof.

| | | RATES | | | |
|---|---|---|---|---|---|
| | | PEAK RATE | | OFF-PEAK RATE | |
| RATE TABLE | CLASS OF SERVICE | IP | AP | IP | AP |
| 1 | DS | $0.36 | $0.36 | $0.27 | $0.27 |
| 2 | DS | $0.36 | $0.36 | $0.27 | $0.27 |
| 3 | DS | $0.36 | $0.36 | $0.27 | $0.27 |
| 4 | DS | $0.55 | $0.55 | $0.39 | $0.39 |
| 5 | DS | $0.59 | $0.59 | $0.42 | $0.42 |
| 6 | DS | $0.65 | $0.65 | $0.46 | $0.46 |
| 7 | DS | $0.69 | $0.69 | $0.52 | $0.52 |
| 8 | DS | $0.69 | $0.69 | $0.52 | $0.52 |

For AT&T Administrative Use Only

**Attachment No.** 13673
**Original Effective Date:** April 8, 2000
**Amended Effective Date:** September 11, 2001

(f) **Other Countries Rates** - Dial Station using switched access. The Peak and Off-Peak time periods for the countries listed below are as specified in the Service Guide.

| Country | Initial Period Peak | Initial Period Off-Peak | Add'l Period Peak | Add'l Period Off-Peak |
|---|---|---|---|---|
| India | $0.4812 | $0.4812 | $0.1604 | $0.1604 |

**F. AT&T Audio and Video TeleConference Services**

1. **AT&T Event TeleConference Service** - The following rates are stabilized for the Attachment Term.

| Call Type Dial In/Dial Out | Price Per Port Minute of use |
|---|---|
| Domestic | $0.58 |

| Call Type Dial In/Dial Out | Price Per Port Minute of use |
|---|---|
| International | $0.50 |

| Call Type Meet-Me Bridge | Price Per Port Minute of use |
|---|---|
| Arrangement Option 3 | $0.50 |

For AT&T Administrative Use Only

**Attachment No.** 13673
**Original Effective Date:** April 8, 2000
**Amended Effective Date:** September 11, 2001

2. **AT&T Audio-Teleconference Bridge Service** - The following rates are stabilized for the Attachment Term.

| Call Type | Per Minute Usage Charge |
|---|---|
| **AT&T Dial-Out/Operator Assisted Conference Calls** | |
| Bridge Port Usage Charge | $0.18 |
| Conference Leg Usage Charge | $0.10 |
| **Meet-Me/Operator Assisted Bridge Arrangement Option 2/Toll Free** | |
| Bridge Port Usage Charge | $0.18 |
| Conference Leg Usage Charge | $0.10 |
| **Meet-Me/Automated Access Bridge Arrangement Option 2/Toll Free** | |
| Bridge Port Usage Charge | $0.14 |
| Conference Leg Usage Charge | $0.10 |
| **Meet-Me/Automated Access Bridge Arrangement Option 2/Toll Free-Reservationless** | |
| Bridge Port Usage Charge | $0.14 |
| Conference Leg Usage Charge | $0.10 |
| **Meet-Me/Operator Assisted Bridge Arrangement Option 3/Caller Paid** | |
| Bridge Port Usage Charge | $0.18 |
| **Meet-Me/Automated Access Bridge Arrangement Option 3/Caller Paid** | |
| Bridge Port Usage Charge | $0.14 |
| **Meet-Me/Automated Access Bridge Arrangement Option 3/Caller Paid-Reservationless** | |
| Bridge Port Usage Charge | $0.14 |