# Exhibit S

CONSECO.

CONSECO FINANCE CORP.
900 Landmark Towers, 345 St. Peter Street
Saint Paul, Minnesota 55102-1640
651-293-4806 fax 651-265-5001

October 26, 2001

Mr. David E. Steen
Teleplus Consulting, Inc.
Suite 250
6889 Rowland Road
Eden Prairie, MN 55344-3380

Dave:

I was surprised to receive Teleplus Consulting's request for compensation dated October 1, 2001, because no amount is owed by Conseco Services, LLC under the terms of the Consulting Services Agreement dated February 12, 2001 (the "Agreement"). First, Teleplus did not fulfill its obligation of assuming responsibility for all contract negotiations with service providers. Second, Conseco's new agreement with AT&T is on terms different from those recommended by Teleplus.

We analyzed the recommendations made by Teleplus, and, of the seven terms critical to the final contract with AT&T, only voice rates were found to be "substantially similar" to the terms laid out in the public tariff and private contract between Conseco and AT&T. On top of that, the voice rates are similar only because Teleplus compromised our negotiating position early in the process by proposing rates to AT&T that were higher than they should have been for a similarly situated customer.

The other terms critical to the contract – contract term, frame relay discounts, volume commitments, business downturn/technology optimization clauses, future business commitments and annual rate reviews – are all different from Teleplus's recommendations. Consequently, Conseco is under no obligation to compensate Teleplus Consulting, Inc.

With that said, while Conseco is not contractually obligation to pay Teleplus Consulting for work done, we do recognize that you put time and effort into the unsuccessful negotiations with AT&T and are willing to compensate you for your efforts. We believe a one-time fee of $50,000 is appropriate. This offer is available for your acceptance for ten business days.

Finally, this is notification that Teleplus is no longer authorized to represent Conseco in any contract negotiations and should immediately cease any such activities including discussions with wireless vendors.

Sincerely,

James R. Breakey
SVP/CIO
Conseco Finance
PS.

Teleplus
Consulting, Inc

Suite 250 • 6889 Rowland Road • Eden Prairie, MN 55344-3380 • 952.829.1000 • 800.297.4115 • Fax: 952.829.1040
E-mail: info@teleplusconsulting.com • Web: www. teleplusconsulting.com

INVOICE
#2453

INVOICE DATE: 10/01/2001
TERMS: NET 15 DAYS

CONSECO
Attn: James R. Breakey
345 St. Peter Street
Saint Paul, Minnesota 55102

CONSULTING FEE

| | |
|---|---|
| Consulting Services | $ 200,000.00 |
| | ---------------- |
| TOTAL DUE | $ 200,000.00 |
| | ========== |

Confidential

Exhibit T

# The Great Stall

I have just completed negotiating an interexchange carrier contract for voice and data services. The carrier was the incumbent, and the existing three-year contract was due to expire in January 2002. However, since the volume commitments would have been met by September, this negotiation began in March.

At the time, the prospects seemed good. Since no one was unhappy with the incumbent, rather than spending time and money on an RFP and bid process, it was decided to try to work out a satisfactory deal with the incumbent.

The opening phases went smoothly. It took us less than 30 days to agree on a rate for voice service and discounts for the frame relay service.

Then things got ugly. In putting together the original deal three years ago, we spent considerable time negotiating clauses, terms and conditions involving business divestiture, business downturn, technology change and other issues. So, I approached this round assuming that we'd simply re-use the existing contract—albeit with amended rates.



**Anyone who thinks patience is a virtue has never dealt with a carrier**

The carrier thought otherwise. We were presented with a brand new agreement, and we had to renegotiate every one of the clauses we had wrangled about three years earlier. That consumed another 60 contentious days, which were spent like this: We'd raise a concern and the carrier would take two to three weeks to reply. We'd take several days to respond to that reply, but we wouldn't hear back until another two or three weeks had passed.

And so it went, until, two months later, we finally reached an agreement. Then it took another two months to get the lower rates implemented, which, coincidentally or not, matched the date when we reached the commitment level in the original contract.

### Setting The Trap

While that farce was playing out, a similar scenario, but with a different carrier and client, was occurring. An initial offer was made in March for a contract expiring in December. The carrier offered a 25-percent discount, which we rapidly ramped up to 50 percent.

With the cheese set in the trap, a new contract arrived, which contained voice commitments that are unattainable, equipment purchases that are unattainable and a revenue commitment well beyond 90 percent of the spending level. And again we'd take days to respond to the carrier's offers and wait weeks to hear anything back.

Now I believe that "patience is a virtue," and I concede that "good things come to those who wait." But I'm also convinced that whoever came up with those adages never dealt with the carriers. In the two cases cited above, by extending the negotiations and delaying the implementation of the new contracts, the carriers gained almost $250,000 *per month* in revenue.

To be sure, if we had just acquiesced to all the onerous conditions in the carrier contracts, we could have enjoyed the savings earlier. But that gain would have come at great risk; indeed, the potential jeopardy during the course of the contract far exceeded the initial savings. As I've said before, people don't put cheese inside traps because they like mice.

### Perfecting The Art Of Delay

The carriers are effective stallers, because they've had plenty of practice. Their reaction time hasn't improved in the 30+ years I've been consulting, and lately they've taken their delay tactics to a whole new level.

Consider how they stonewalled the competitive local exchange carriers (CLECs). The fatal flaw in many CLEC business models was the reliance on the RBOCs, who have treated the CLECs with contempt. Virtually all the proposals CLECs made to the RBOCs for volume and term discounts elicited laughable (or cryable) responses—discounts too minor to matter, onerous contract terms and, sometimes, no response; the RBOC would simply ignore the proposal.

*[continued on p. 72]*



Use BCR's Acronym Directory at www.bcr.com/bcrmag

**Some limits on billing disputes are absurd**

*[continued from p. 74]*

And the RBOCs aren't alone. The IXC contracts increasingly contain clauses for "benchmarking" or "competitive renegotiation." In their simplest form, these allow a contract to be reopened on its anniversary date, which gives customers a chance to negotiate new rates if competitive conditions have resulted in lower rates being available.

For years, contracts with these clauses could be opened at any time provided a new agreement was entered into, and that new agreement produced a time and commitment equal to or greater than the original. However, as rates come down, it's tougher and tougher to equal or exceed existing commitment levels. Moreover, if you invoke that clause, you forego the opportunity of a truly open and competitive bid process, even though competitive environments usually result in lower prices.

And when the benchmarking clause is invoked, you can be certain that so, too, will the "great stall." It usually takes 90 days or more to reach a renegotiated agreement, as the carrier will seek to preserve its revenue stream as long as possible.

The "great stall" does not end once negotiations have concluded. This industry is notorious for billing problems, and stalling tactics are the norm once billing errors are uncovered and attempts are made to secure credits. The dance goes like this:

- The user discovers what they believe to be a billing error and raises the questions with the account executive.
- The account executive passes it to the carrier's accounting department; time passes.
- After about three months, the customer asks the account executive about the status of the credit. The account executive checks, only to find out that the clerk assigned to investigate the credit is no longer there, and the customer-provided documentation is lost.
- The customer is requested to provide, again, the documentation, which, by now, includes three more months of potential credits.
- The cycle repeats.

### Getting The Carrier's Attention

One of the constants over the years is that you need to get the carriers' attention in order to accomplish the desired results. For example, to complete contract negotiations, you need to set hard, specific dates for events to occur. Most carrier contracts reach their commitment levels in the third quarter of the third year of the contract. So, you should begin the renegotiation process at the beginning of the third year, and allow three months to complete negotiations. If negotiations can't be completed, you still have ample time to issue and analyze responses to an RFP.

However, the key is that the incumbent carrier believe that you are willing to issue that RFP. That often means going through the effort to prepare that RFP, if for no other reason than to show the incumbent that you are serious. The result is usually a successful negotiation with the lower rates implemented before even the contract termination date. Similarly, with benchmarking negotiations, begin the process early in order to eliminate any incentive for the carrier to delay implementation of new contract rates.

As to securing credits for billing errors, you need to make sure that your contract has strong clauses concerning billing dispute/resolution. This has to be done during the time the contract is being negotiated, and you should expect the carriers to resist, strongly.

The carriers increasingly are proposing dispute clauses that limit the time in which a bill can be disputed. Some I've seen recently are as short as 60 days, which is patently absurd. A dispute clause is almost mandatory and there's no substitute for sheer determination to remove any limitation that is less than statutory requirements.

Moreover, your approach to billing disputes should be that you will document a disputed amount and then take a "self credit"—i.e., you won't pay a disputed amount. You can bet that any documentation you submit to the carrier will go into the proverbial black hole, but you can also bet that once your "self credit" becomes large enough, it's going to draw someone's attention and get resolved. Note that you need to accrue any self credits to avoid budget problems if the disputed amount proves to be incorrect.

### Conclusion

None of these points I've made above are fun or pleasant, for either the customer or the carrier. However, think of carrier negotiations as being like the process described by the man who purchased a mule, that was supposed to be extremely gentle and responsive to its owner's commands.

After repeated unsuccessful attempts to convince and cajole the mule to pull a plow, the man complained to the seller. The seller picked up a two-by-four, walked over to the mule and struck him a single blow right between the eyes. The mule promptly walked over and stood beside the plow, waiting to be hooked up.

The new owner said "I thought the mule was gentle and that all I had to do was tell him what to do." To which the seller replied, "That's true, but first you have to get its attention." ◻

---

*Richard A. Kuehn is the president of RAK Associates, a telecom consulting firm in Cleveland, OH. Mr. Kuehn is a well-known telecommunications lecturer and writer, and he was one of the founders of the Society of Telecommunications Consultants.*

T0195

# Exhibit U

From: <steen@teleplusconsulting.com>
To: <cksandberg@locklaw.com>
Date: Tue, Oct 30, 2001 5:03 PM
Subject: FW: AT&T Contract

-----Original Message-----
From: Mike_W_Sanderson@consecofinance.com
[mailto:Mike_W_Sanderson@consecofinance.com]
Sent: Tuesday, April 03, 2001 5:24 PM
To: billhansen@teleplusconsulting.com; David Steen
Subject: AT&T Contract

---------------------- Forwarded by Mike W Sanderson/BSYS/HQ/GTFC on
04/03/2001 05:24 PM ---------------------------

Jim Breakey
04/03/2001 05:22 PM

To: Mike W Sanderson/BSYS/HQ/GTFC@GTFC, Curt Beckerleg/HQ/GTFC@GTFC,
Richard Maybin/Carmel/Conseco@Exchange
cc:
Subject: AT&T Contract

Please review and comment.

Laura,
I'm not sure why it has been so difficult to communicate to AT&T what we
are hoping to achieve but I'll try one more time.

First, Richard and I have agreed that I will take the lead on this
effort.
We have communicated this to you multiple times but you continue
attempting
to correspond with him. This time I am going to insist. I am your
internal Conseco contact. If you need to correspond with someone in
Conseco regarding these contract discussions you should be communicating
with me.

Second, we have contracted with Teleplus to assist us in these
discussions.
Why? The answer is simple. Last year we relied on our business
relationship and the word of your sales representative and came away
with a
contract which we were assured was among the best for a company our
size.
We discovered months ago that that was not the case. We now know that
many
contracts were written during the same time frame that had lower rates
at
far lower commitment levels. Frankly this both angered and embarrassed
both Richard and I and we have no intention of being in that position
again. We are therefore insisting that you work with Teleplus

throughout
the remainder of these discussions.

What we want to achieve is simple. Over the past three years we have written checks to AT&T exceeding $70 million. Although we have had a downturn in our business we will be a very large consumer of telecom services for years to come. We believe that it is in both of our companies
best interest to come up with a contract which provides us with the rates
and commitment levels that others have received. What's in it for AT&T? A
chance to do business with our company beyond the end of our current contract which expires in 2003. Lets get to work and get this thing done.
It's in both of our companies best interest.

It is my understanding that Richard Francis will be contacting us with an
updated offer today or tomorrow. We look forward to reviewing it.

Jim Breakey
SVP/CIO
Conseco Finance Corp.

**Dave Steen**

**From:** Mike_W_Sanderson@consecofinance.com
**Sent:** Tuesday, April 03, 2001 3:27 PM
**To:** steen@teleplusconsulting.com; billhansen@teleplusconsulting.com
**Subject:** FW: ECAC

---------------------- Forwarded by Mike W Sanderson/BSYS/HQ/GTFC on 04/03/2001 03:27 PM ---------------------------

Jim Breakey
04/03/2001 03:13 PM

To: Mike W Sanderson/BSYS/HQ/GTFC@GTFC, Curt Beckerleg/HQ/GTFC@GTFC
cc:
Subject: FW: ECAC

FYI..
I'll be talking to Richard later.
Jim
---------------------- Forwarded by Jim Breakey/HQ/GTFC on 04/03/2001 03:13 PM ---------------------------

From: Richard Maybin/Carmel/Conseco@Exchange on 04/03/2001 02:50 PM

To: Gary W Brown/Carmel/Conseco@Exchange, Jim Breakey/HQ/GTFC@GTFC
cc:
Subject: FW: ECAC

Jim and Gary --

FYI. I just got this and am on my way to meetings for rest of the day. Will review when I get a chance.

Richard Maybin
(317) 817-3552

-----Original Message-----
From: Carlisle, Laura A, BMSLS [mailto:lcarlisle@att.com]
Sent: Tuesday, April 03, 2001 11:52 AM
To: Maybin, Richard
Cc: Humes, Michael; Francis, Richard D, BMSLS; Andres, Timothy; Hoppe, Robin P (Robin), BMSLS; Staple, Andrew E (Andy), BMSLS
Subject: RE: ECAC

Richard,

I am sorry that our first communication has to be under these circumstances.
I am replacing Richard Higgins as Sales Center Vice President. Rich retired
from AT&T on March 31st. I am fully aware of the situation facing Conseco and AT&T. However, we seem to have a misunderstanding with regard to negotiations.

We presented a new offer to Teleplus on 3/23. Our offer included a waiver of the contract shortfall, a decrease in the contract commitment, and an one
year extension of the contract term. Upon receipt of our offer, Teleplus



T0075

scheduled a conference call with our negotiating team on 3/26 and abruptly cancelled it that same day. Teleplus did not communicate the reason for the
cancellation, nor did they reschedule the call. Teleplus did contact Richard Francis, our Executive Negotiator, yesterday. Rick reiterated AT&T's position and communicated the financial value of our current offer.

Teleplus has been demanding a price reduction, but has been unwilling to make any concession or commitment regarding the additional revenues that AT&T requires to keep our business whole. Teleplus' demands on Conseco's behalf are based on assertions related to Conseco's current contract that as
Mike detailed in his last correspondence are simply not true. Nonetheless, in an attempt to prompt discussion around the rate reduction issue, we structured the discount tiers in the new offer such that incremental volumes
are priced lower than Conseco's current rates. Please do not penalize Mike
and his team for upholding AT&T policy. They do not have the authority to offer Conseco a rate reduction without a commitment for additional revenues to offset the revenue decline.

We are extremely anxious to continue these discussions with Conseco and/or Teleplus, but rather than truly negotiate with AT&T on Conseco's behalf, Teleplus currently seems more willing to make threats to pursue groundless legal action.

I understand that you do not want to meet with AT&T until after these issues
have been resolved, but I do hope to have the opportunity to met you very soon. If our offer has not been clearly communicated to Conseco via Teleplus, please let me know as soon as possible.

Sincerely,
Laura Carlisle
Sales Center Vice President
317-816-9555 (voice)
317-816-9504 (fax)
lcarlisle@att.com

-----Original Message-----
From: Maybin, Richard [mailto:Richard_Maybin@Conseco.com]
Sent: Friday, March 30, 2001 4:21 PM
To: Carlisle, Laura A, BMSLS
Cc: Brown, Gary W; Breakey, Jim
Subject: FW: ECAC

Laura --

Jim Breakey asked that I forward the following eMail to you since Mike Humes
will be out of the office next week.

Richard Maybin
(317) 817-3552

-----Original Message-----
From: Maybin, Richard
Sent: Friday, March 30, 2001 12:37 PM
To: 'Humes, Michael W, BMSLS'
Subject: RE: ECAC

Mike --

Your unwillingness to work with TelePlus reinforces my decision to engage them. I am confident with Jim Breakey's ability to represent Conseco's interest in the negotiation.

I do not know how to make it any clearer - I want you to work with them.

I am not attending ECAC and I am not interested in scheduling a meeting Mr. Van Dorselaer given the current state of our relationship.

Richard Maybin

-----Original Message-----
From: Humes, Michael W, BMSLS [ mailto:mhumes@att.com <mailto:mhumes@att.com> ]
Sent: Tuesday, March 27, 2001 11:24 AM
To: Maybin, Richard
Subject: RE: ECAC

Richard,

Thanks for your reply. I can understand why you might be upset based on what Teleplus has been telling Conseco. However, we feel that we have not been given the opportunity to share ~~our perspective~~ directly with Conseco. I had hoped that a meeting with Mr. Van Dorselaer would have allowed us to come face-to-face on the issue.

As you know , we have regularly re-negotiated Conseco's contract very early

in the term. Our last contract refile was only 15 months into the contract

term. In those negotiations, we worked with the Conseco team to achieve improved pricing and significant savings. To offset the revenue reduction to AT&T, the Conseco team had initially put the data network winback on the table, but removed it late in the negotiations. Rather than commit to the data network winback, the Conseco team agreed to a higher contract commitment based upon Conseco's revenue run-rate. Conseco received the rate

reduction, but AT&T did not receive the offsetting revenue increase.

As voice rates go Conseco's last contract included aggressive rates and were

among the best for similarly situated customers. The deal was created and negotiated by the Conseco team which took great care to analyze and compare our offer. They were not confused or unaware of the marketplace and were not

led to believe that they were getting something that they were not.

These contracts and price bundles cannot be fully understood based solely on

the rates and commitments listed in a tariff. There can be many things that

go into the business case for a deal that are not apparent or may be offset

by other contracts . Therefore, Teleplus quoting low rates and commitments

out of context has little meaning and will not give a true picture .

;ince the issue of the last contract rates being less than fair was raised,

we looked at other deals filed from April through August 2000 in the same category as Conseco for revenue commitment. There were 14 other deals filed.

Five of those had rates slightly below Conseco's and nine had rates higher, Conseco's rates were better that 75% of similar deals done all the way through August. The average was about .042 for dedicated to switched rates. These contracts include OneNet or VTNS, comparing other type contracts or promotional offers would not be a fair comparison. .

I would appreciate an opportunity to discuss these issues further and the current offer that has been presented to Teleplus. Please let me know if we

can schedule time to do so, perhaps, with Mr. Van Dorselaer and myself. I

also hope that you will reconsider attending the ECAC meeting, as that would

also be an excellent opportunity for you to meet Mr. Van Dorselaer.

Thanks,
Mike
-----Original Message-----
From: Maybin, Richard [ mailto:Richard_Maybin@Conseco.com
<mailto:Richard_Maybin@Conseco.com> ]
Sent: Friday, March 23, 2001 4:29 PM
To: Humes, Michael W, BMSLS
Subject: RE: ECAC

Mike --

It is hard for me to get exited about ECAC or the meeting with Van Dorselaer.

I am upset. You traded on our business relationship to let us believe that we were getting good rates while charging comparable clients far less on a smaller base revenue commitment.

I think our best short term course is to focus our energies on developing a deal that is fair to Conseco.

Richard Maybin
(317) 817-3552

-----Original Message-----
From: Humes, Michael W, BMSLS [ mailto:mhumes@att.com
<mailto:mhumes@att.com>
< mailto:mhumes@att.com <mailto:mhumes@att.com> > ]
Sent: Monday, March 19, 2001 2:24 PM
To: Richard Maybin
Subject: ECAC

Richard,
How are you? I am writing to ask a couple of quick questions.

I was wondering if you were planning to attend the next ECAC on April 4 & 5?

Also, I would like to see if you would be able to make time on April 11 sometime between 10:00 and 2:30 to meet with the new President of Global Services, Steve Van Dorselaer. Steve will be in town that day and was hoping

to meet you while he is here.

If you could let me know I would appreciate it.

Thanks
Mike

**From:** <steen@teleplusconsulting.com>
**To:** <cksandberg@locklaw.com>
**Date:** 10/30/01 5:02PM
**Subject:** FW: AT&T Contract

-----Original Message-----
From: Mike_W_Sanderson@consecofinance.com
[mailto:Mike_W_Sanderson@consecofinance.com]
Sent: Monday, April 09, 2001 11:55 AM
To: David Steen
Subject: AT&T Contract

---------------------- Forwarded by Mike W Sanderson/BSYS/HQ/GTFC on
04/09/2001 11:52 AM ---------------------------

Jim Breakey
04/09/2001 09:23 AM

To: Mike W Sanderson/BSYS/HQ/GTFC@GTFC, Curt Beckerleg/HQ/GTFC@GTFC
cc:
Subject: AT&T Contract

Please review and comment. Jim

Hear are my thoughts on our next steps with AT&T. Please feel free to
challenge or build on my thinking.

First, I think it is time to meet face to face. At a minimum I would
think
that it should be a meeting between Rick Francis and I. I would like to
know everyone's thoughts on including Richard and Ken Foster.

I'm thinking that the meeting should begin with a recap of how we got to
where we are. This would be a brief and cordial oration on how much
money
we have spent over the past three years, how it was brought to our
attention (I think we should say or insinuate that it came from high up
in
our company) that our great new contract wasn't so great after all.
That
we are under significant pressure to get this resolved. etc. etc.

I think we should rap this up by expressing our extreme anger with the
way
the negotiations were handled and either insinuate or outright accuse
Mike
Humes of lying and not negotiating in good faith. (time to roll out the
business partner thing)

Next we should tell them that they clearly have us backed in a corner
which

is going to force us to take actions which are not good for us and are
not
good for AT&T.

Option 1: Allow a competitor to buy out our contract. This is bad for
us
because for the difficulty in switching vendors and clearly it is bad
for
AT&T in that they will receive 1/3 the revenue they anticipated for the
next two years and then zero from that point forward.

Option 2: Push the downturn clause to eliminate the penalties, grit and
bear the rates for 6 months/2 years and then move to another vendor.
(same
issues as above).

Option 3: Take legal action to try and get the contract voided. (I
would
only mention this in passing and maybe not at all.)

I think at this point we make it very clear that if we can come to
center
on rates (something below 3 cents) then we can move forward.

If they seem willing to discuss, we discuss. If not, we cut the meeting
short and call MCI.

Ideas??

# Exhibit V

**Amended Report of Timothy J. Nantell**

**TELEPLUS CONSULTING, INC,**
**V.**
**CONSECO SERVICES, LLC.**

**August 4, 2003**

## Qualifications

1. I am the Gelco Professor of Finance and Co-Director of the Center for the Financial Services Industry at the Carlson School of Management at the University of Minnesota. I joined the University of Minnesota in 1980, having been on the faculty at the University of Michigan from 1971 through 1980. I received my Ph.D. in Finance from the University of Wisconsin in 1971. I also was awarded the Masters of Business Administration in Finance from the University of Wisconsin. From 1987 through 1991 I served as Associate Dean of Faculty Affairs and as Acting Dean of the Carlson School of Management at the University of Minnesota. In those positions, I was responsible for developing and delivering an annual $25 million operating budget. I returned to my position as the Gelco Professor of Finance in 1992, and served as the Chair of the Finance Department at the Carlson School from 1995 to 1999. Prior to my current position, I served as the Faculty Director for MBA programs from 1999 to 2001 and Associate Dean for MBA Programs for 2001 to 2002.

2. I have published various books and articles and software programs in a variety of areas related to economics and finance and am also the author of numerous papers in the field. My research, teaching and consulting activities have included corporate valuations and financing for a variety of businesses. These activities have for some years been centered on issues regarding the valuation of securities, businesses and business opportunities. I have served as a consultant for small, medium and large firms on issues ranging from valuation issues, including the valuation of patents, to financing issues, to mergers and acquisitions. I have also provided executive education classes through the University as well as directly to private firms.

3. Attachment A lists the information considered in forming my opinion; Attachment B includes my qualifications, as outlined in my curriculum vita; Attachment C lists all cases in which I

have testified as an expert at trial or in deposition during the past four years; and Attachment D indicates my hourly compensation for this matter.

**Summary of Opinions**

4. I have been asked to identify the damages incurred by Conseco Services, LLC ("Conseco") as a result of the failure of Teleplus Consulting, Inc. ("Teleplus") to secure more favorable terms from Conseco's telecommunications carriers on a timely basis.

5. After reviewing a number of documents, examining the various claims and facts, based on my educational background, professional experience and my own independent analysis as described in detail below, and based on the information currently available, I have arrived at the following opinion: damages incurred by Conseco are $1,710,461. (See Table A.) The basis of this opinion is explained in more detail below.

6. I have also been asked to express an opinion with respect to the damages claimed by Teleplus as a result of the alleged failure by Conseco to meet certain contractual requirements of the Agreement. To date, Teleplus has provided no calculation of its claimed damages on which I might comment, nor sufficient information from which to form an independent opinion. It is my understanding that such information may be provided by Teleplus in the future, at which time I will proceed with that analysis separately.

7. My opinions, and this report, are preliminary in the sense that as additional information becomes available, and as current information is clarified, it will become necessary to perform additional analyses, which may cause changes in this report and in my opinions.

8. In addition, for purposes of exposition at trial or otherwise, I understand that I may be asked to prepare exhibits based on information presented in this report and any subsequent reports.

**Background**

9. Conseco is an Indiana limited liability company which provides management, employee and technology services to the insurance- and financial-related subsidiaries of Conseco, Inc.

10. Teleplus is a corporation which provides consulting services to business consumers of telecommunications services from common carriers.

11. On February 12, 2001, Teleplus and Conseco entered into an Agreement under which Teleplus committed to review Conseco's existing telecommunications services arrangements, assume responsibility for negotiations with carriers, and present recommendation to Conseco for more advantageous arrangements with carriers.

12. Conseco claims that Teleplus misrepresented its capabilities with respect to negotiating beneficial contracts with certain telecommunications carriers within eight weeks of February 12, 2001, the date an Agreement between Conseco and Teleplus was executed. Conseco believes that it would have been able to secure new contracts with lower telecommunications rates generally available in the market in 2001. Once it became clear to Conseco that Teleplus had misrepresented its capabilities, Conseco found it necessary to pursue other options to assist it in negotiating new benefical telecommunications rates.[1] However, because of Teleplus's misrepresentations, these new rates became effective months later than they otherwise would have become effective. This delay in obtaining reduced telecommunications charges is the basis of my damages calculation.

**Calculation of Damages Incurred by Conseco**

13. The Agreement between Teleplus and Conseco was executed on February 12, 2001, and the expectation was that Conseco would begin to enjoy the financial benefits of more advantageous arrangements with telecommunications carriers within approximately eight weeks. But for Teleplus's misrepresentations, Conseco found it necessary to pursue other options to assist it in negotiating new benefical telecommunications rates.

14. Once Conseco became aware that Teleplus had misrepresented its capabilities with respect to negotiating reduced rate contracts, Conseco, in order to mitigate its damages due to Teleplus's misrepresentations, engaged a third party to assist it in negotiating beneficial contracts with telecommunications carriers. With the assistance of this third party, Conseco

[1] Conseco believes that, but for Teleplus misrepresentations, it would have been possible to negotiate new contracts at the rates generally available in the marketplace in 2001 even without susbstantial assistance from any outside consultants. Under this belief, Conseco could have avoided most of the $87,594 in fees it paid to Gerry & Sapronov, LLP when it found it necessary to engage them as a third party to assist it in securing the new rates as expeditiously as possible.

was eventually able to negotiate new contracts, all of which became effective significantly later than eight weeks following the February 12, 2001 execution of the Agreement between Conseco and Teleplus.

15. As a result of the delay in the effective date of the new telecommunications contracts caused by the misrepresentations of Teleplus, Conseco was damaged starting roughly eight weeks after February 12, 2001. In addition, I have set the end of the damages period for each carrier at the date Conseco began to realize the financial benefits of the new arrangements set with the assistance of the third party.[2]

16. Damages consist of the amounts paid during the damages period over and above what the amounts paid would have been during that period absent the delay in the effective date for the new contracts.

17. Table B illustrates the calculation of Damages per Minute for services from AT&T. This Table summarizes AT&T charges to Conseco (after discounts), the total number of minutes, and the average cost per minute for each month of service.

18. The top half of Table B shows this information for the six month period beginning May 1, 2001 during which Conseco was delayed from enjoying the benefits of a new arrangement with AT&T. The bottom half of Table B shows the same information for the six month period beginning November 1, 2001 during which Conseco was enjoying the benefits of the new arrangement negotiated with AT&T in September of 2001, with the assistance of the third party consultant. Because there is some month-to-month variation in these numbers, an average for each six-month period is calculated.

19. The bottom line in Table B, Damages per Minute, shows the difference between the amount per minute actually paid by Conseco during the period of the delay minus the amount per minute paid during the subsequent period after the new rates established with the assistance of the third party were implemented. Total damages, which consist of the Damages per Minute times the number of minutes for which AT&T was paid during the damages period, are calculated in Line 1 of Table A.

---

[2] In the case of the MCI contract, I set the end of the damages period relative to the termination of Teleplus's services.

20. Table C illustrates the same information with regard to services received by Conseco from MCI.[3] The damages period extends from April 15, 2001 though November, 2001. The difference between the amount per minute actually paid by Conseco during the period of the delay minus the amount per minute that would have been paid but for Teleplus's misrepresentations is based on the difference between average rates after the new MCI contract was set in April 2002 and the average rates during the damages period. Total damages, which consist of the Damages per Minute times the number of minutes for which MCI was paid during the damages period, are calculated in Line 2 of Table A.

21. Table A summarizes the damages incurred by Conseco, which total $1,710.461.

22. My opinions, and this report, are preliminary in the sense that as additional information becomes available, or as current information is clarified, it will be necessary to perform additional analyses which may causes changes in this report and in my opinions.

J. Nantell

Timothy J. Nantell

August 4, 2003

[3] Conseco also requested that Teleplus renegotiate its contracts with Verizon. I have not been able to calculate the damages incurred by Conseco with respect to Teleplus's inability to deliver on its commitment with respect to the Verizon contracts because the search is still underway for the necessary backup documents. Conseco has recently filed bankruptcy and personnel turnover has been substantial, especially complicating the collection of documents in the case of the Verizon contracts. I will supplement this report when those documents are provided to me.

Table A

## Summary of Damages

| | Damages Period Minutes | Damages per Minute* | Total Damages |
|---|---|---|---|
| Extra Telecommunications Expense | | | |
| 1 AT&T | 105,911,646 | $0.015 | $1,638,698 |
| 2 MCI | 35,738,812 | $0.002 | $71,763 |
| 3 Total Damages | | | **$1,710,461** |

Notes:

1 From Table B
2 From Table C
3 Line 1 plus Line 2

* Rounded to three decimal points.

Table B

AT&T

| | Post-Discounted Charges | Duration (Minutes) | Average Cost per Minute |
|---|---|---|---|
| **Total For Network** | | | |
| 5/1/01-5/31/01 | $984,355 | 17,714,761 | $0.056 |
| 6/1/01-6/30/01 | $987,884 | 17,177,723 | $0.058 |
| 7/1/01-7/31/01 | $993,614 | 17,378,914 | $0.057 |
| 8/1/01-8/31/01 | $1,096,865 | 19,124,390 | $0.057 |
| 9/1/01-9/30/01 | $953,904 | 15,760,886 | $0.061 |
| 10/1/01-10/31/01 | $1,059,263 | 18,754,972 | $0.056 |
| **Damages Period Totals** | $6,075,885 | 105,911,646 | $0.057 |
| 11/1/01-11/30/01 | $708,326 | 16,301,108 | $0.043 |
| 12/1/01-12/31/01 | $642,577 | 14,797,016 | $0.043 |
| 1/1/02-1/31/02 | $826,263 | 20,014,399 | $0.041 |
| 2/1/02-2/28/02 | $703,267 | 16,956,769 | $0.041 |
| 3/1/02-3/31/02 | $715,157 | 17,284,674 | $0.041 |
| 4/1/02-4/30/02 | $725,055 | 17,775,928 | $0.041 |
| **New Rate Period Totals** | $4,320,646 | 103,129,894 | $0.042 |
| **Damages, per Minute** | | | **$0.015** |

**Source:** AT&T Billing Summaries
Damages Period begins May 1, 2001
Damages Period ends October 31, 2001

Table C

**MCI**

| | Post-Discounted Charges | Duration (Minutes) | Average Cost per Minute |
|---|---|---|---|
| **Voice Services Only** | | | |
| 4/15/01-5/14/01 | $243,982 | 4,580,062 | $0.053 |
| 5/15/01-6/14/01 | $257,287 | 4,895,905 | $0.053 |
| 6/15/01-7/14/01 | $242,121 | 4,642,917 | $0.052 |
| 7/15/01-8/14/01 | $267,117 | 5,093,672 | $0.052 |
| 8/15/01-9/14/01 | $268,014 | 4,976,253 | $0.054 |
| 9/15/01-10/14/01 | $215,195 | 4,008,751 | $0.054 |
| 10/15/01-11/14/01 | $261,671 | 5,021,733 | $0.052 |
| 11/15/01-11/30/12 | $130,647 | 2,519,519 | $0.052 |
| **Damages Period Totals** | $1,886,035 | 35,738,812 | $0.053 |
| 6/15/02-7/14/02 | $182,205 | 3,678,520 | $0.050 |
| 7/15/02-8/14/02 | $210,832 | 4,104,392 | $0.051 |
| 8/15/02-9/14/02 | $194,222 | 3,826,561 | $0.051 |
| 9/15/02-10/14/02 | $196,630 | 3,794,719 | $0.052 |
| 10/15/02-11/14/02 | $214,282 | 4,161,760 | $0.051 |
| 11/15/02-12/14/02 | $161,066 | 3,269,499 | $0.049 |
| **New Rate Period Totals** | $1,159,236 | 22,835,451 | $0.051 |
| **Damages, per Minute** | | | **$0.002** |

**Source:** MCI Summary of Charges and Usage Summary
Damages Period begins April 15, 2001
Damages Period ends November 30, 2001

# ATTACHMENT A

## TELEPLUS CONSULTING, INC.
## V.
## CONSECO SERVICES, LLC

### Documents Reviewed by Timothy J. Nantell

Court Documents

Complaint
Answer and Counterclaim
Answer to Counterclaim
Amended Answer
Amended Answer to Counterclaim

Other Documents:

Conseco - AT&T Agreements (CONSECO 101503-526, 101748-772)
Conseco - AT&T Billing Summaries, Monthly for May 2001 thru May 2002 (no bates numbers)

Conseco-MCI Agreement (T1366-1403)
Conseco-Worldcom Agreement (no bates numbers)
Conseco - MCI Bills, monthly, 4/15/01 through 12/14/02 (no bates numbers)

Conseco-Verizon Agreement (CONSECO 101722-747)

Gerry, Friend & Sapronov invoices (no bates numbers)

# ATTACHMENT B

## CURRICULUM VITA

**TIMOTHY JAMES NANTELL**

Gelco Professor of Finance
Carlson School of Management
University of Minnesota
Minneapolis, Minnesota 55455

Home Address: 41 Greenway Gables
Minneapolis, Minnesota 55403
Home Telephone: (612) 333-6312
Office Telephone: (612) 624-3558

**EDUCATION:**

College of St. Thomas, 1963-1965

University of Wisconsin, 1965-1967
Bachelor of Arts in Mathematics

University of Wisconsin, 1967-1971
Master of Business Administration in Finance
Ph.D. in Finance
Secondary: Quantitative Methods
Minor: Monetary Economics

**POSITIONS:**

Teaching Assistant, University of Wisconsin, 1968-1971

Assistant Professor, University of Michigan, 1971-1975

Visiting Professor of Finance, University of Wisconsin, Summer 1973

Associate Professor, University of Michigan, 1975-1980

Visiting Professor of Finance, University of Hawaii, Summer 1977

Associate Professor, University of Minnesota, 1980-1982

Full Professor, University of Minnesota, 1982-

Burlington Northern Faculty Fellow, 1983-1985

Visiting Professor of Finance, University of Lyon III, Lyon, France, 1983

Gelco Professor of Finance, University of Minnesota, 1983-1987

Chair, Department of Finance and Insurance, Carlson School of Management, University of Minnesota, 1986-1987

Associate Dean, Carlson School of Management, University of Minnesota, 1987-1988

Acting Dean, Carlson School of Management, University of Minnesota, 1988-1991

Acting Associate Dean for Faculty, Carlson School of Management, University of Minnesota, 1991

Gelco Professor of Finance, Carlson School of Management, University of Minnesota, 1991 -

Chairman, Department of Finance, Carlson School of Management, University of Minnesota, 1995 -1999

Academic Co-Director of the Center for the Financial Systems Industry, Carlson School of Management, University of Minnesota, 1998 -

Faculty Director of the MBA Program, Carlson School of Management, University of Minnesota, 1999 - 2001

Associate Dean For MBA Programs, Carlson School of Management, University of Minnesota, 2001 - 2002

**COURSES TAUGHT:**

Undergraduate Introductory Corporate Finance

Graduate Introductory Corporate Finance

Financial Management for Technology Based Firms

Managerial Finance - Case Method

Quantitative Financial Methods

Testing of Investment Theories

Financial Markets and Interest Rates

MBA Seminar in Corporate Finance

Doctoral Seminar in Theory of Finance

**RESEARCH PUBLICATIONS:**

"Equivalence of Lease and Buy Analyses," Financial Management, Autumn, 1973. Pages 61-65.

"Normalization vs. Flow Through for Utility Companies Using Liberalized Tax Depreciation" (with E.F. Brigham), The Accounting Review, July 1974. Pages 436-447.

"The Cost of Capital as a Weighted Average" (with C. Robert Carlson), Journal of Finance, December 1975. Pages 1343-1355.

"The Effect of Investor Taxes on the Cost of Retained Earnings" (with C. Robert Carlson), Issues in Managerial Finance, edited by E.F. Brigham and R. Johnson. Pages 340-347.

"An Analytical Comparison of Variance and Semivariance Capital Market Theories" (with B. Price), Journal of Financial and Quantitative Analysis, June 1979. Pages 221-242.

"Dividend Reinvestment Plans" (with R. Reilly), Journal of the Midwest Finance Association, 1979. Pages 1-18.

"Analysis of Stock Repurchase with a Random Coefficient Regression Model" (with T. Dielman and R. Wright), Journal of Financial and Quantitative Analysis, March 1980. Pages 175-189.

"Tender Offer Mergers and Stockholders' Wealth: A Random Coefficient Regression Approach" (with T.E. Dielman), American Statistical Association Business and Economics Proceedings, August 1982. Pages 334-339.

"Variance and Lower Partial Moment Measures of Systematic Risk: Some Analytical and Empirical Results" (with K. Price and B. Price), Journal of Finance, June 1982. Pages 843-856.

"Mean-Lower Partial Moment Asset Pricing Model: Some Empirical Evidence" (with K. Price and B. Price), Journal of Financial and Quantitative Analysis, December, 1982. Pages 763-782.

"Tax Effects of Inflation: Depreciation, Debt, and Miller's Equilibrium Tax Rates" (with M. Maher), Journal of Accounting Research, Spring 1983. Pages 329-340.

"Common Stock Returns and Corporate Combinations: The Case of Joint Ventures" (with John J. McConnell), Journal of Finance, June 1985. Pages 519-536.

"The Hidden Financial Cost of Fixed Payment Contracts" (with Lee R. Carlson), Utility Opportunities for New Generation, June 1989. Pages 47-1 to 47-10.

**BOOKS AND SOFTWARE:**

Cases in Managerial Finance, 2nd Edition (with E.F. Brigham and others), Dryden Press, 1974.

Decisions in Financial Management Cases, 2nd Edition (with E.F. Brigham and others), Holt, Rinehart and Winston, 1976.

Impact of Inflation on the Wholesaler-Distributor (with T. Gies and R. Reilly), sponsored by Distribution Research and Education Foundation, 1980.

Time Value of Money Tutorial, Version 1 (with Mark Jankus and Judith Franklin), 1993.

VALUE3 Financial Model, Version 1.0 (with Jim Gahlon), 1992.

VALUE3 Financial Model, Version 1.1 (with John Peasley), 1993.

VALUE3 Financial Model, Version 2.1, 1994.

Time Value of Money Tutorial, Version 1.1 (with Mark Jankus and Judith Franklin), 1995.

VALUE3 Financial Model, Version 2.2, 1995.

Time Value of Money Tutorial, Version 2.0, (with Mark Jankus), in progress.

VALUE3 Financial Model, Version 2.3, 1997.

VALUE4 Financial Model, Version 1.0, 1998.

VALUE4 Financial Model, Version 2.0, 1999.

VALUE4 Financial Model, Version 2.1, 2000.

VALUE4 Financial Model, Version 2.2, 2002

VALUE4 Help Manual, Version 2.2, 2002

**OTHER PAPERS AND PRESENTATIONS:**

"Effect of Stock Repurchase on Price Performance" (with J. Finnerty), Financial Management Association Meetings, 1974.

"Lessor's Pricing Decisions, an Indifference Theorum, and the Evaluation of Lease vs. Buy Algorithms," Eastern Finance Association Meetings, 1974.

"The Rationale for Stock Repurchases, an Additional Dimension" (with J. Finnerty), Eastern Finance Association Meetings, 1974.

"Weighted Average: Maximization of Value vs. Minimization of Cost of Capital" (with C. Robert Carlson), Eastern Finance Association Meetings, 1974.

"Semivariance: Portfolio Theory and Capital Market Theory" (with J.G. Green), Western Finance Association Meetings, 1974.

"Effect of Investor Taxes on the Cost of Retained Earnings" (with C. Robert Carlson), Midwest Finance Association Meetings, 1976.

"The Case for Double Leverage" (with C. Robert Carlson), Southern Finance Association Meetings, 1976.

"An Indifference Axiom and Evaluation of Lease vs. Borrow Decision," Financial Management Association Meetings, 1978.

"Effect of Stock Repurchase on Stockholder's Wealth" (with J. Finnerty), Western Finance Association Meetings, 1978.

"Some Empirical Comparisons of Variance and Lower Partial Moment Measures of Risk" (with B. Price and K. Price), Western Finance Association Meetings, 1980.

"Mean-Lower Partial Moment Asset Pricing Model: Some Empirical Evidence" (with K. Price and B. Price), American Finance Association Meetings, 1980.

"Mergers and Stockholders' Wealth: A Random Coefficient Regression Approach" (with T. Dielman), American Statistical Association Business and Economics Meetings, 1982.

"Joint Ventures--An Alternative to Mergers" (with J. McConnell), Berkeley Seminars in Finance, 1983.

"Note on Free Cash Flow," Teaching Note, Carlson School of Management, University of Minnesota, 1998.

"Note on Financial Planning," Teaching Note, Carlson School of Management, University of Minnesota, 1998.

"Note on EVA", Teaching Note, Carlson School of Management, University of Minnesota, 1999.

## MANAGEMENT EDUCATION:

IBM
Hoover International
Public Utility Executive Program, University of Michigan
Toro Corporation
Northwestern Bell
Honeywell
H.B. Fuller
Northwestern National Life
Dayton-Hudson
Detroit Edison
First Bank of Minneapolis
American National Bank and Trust
Minnesota Executive Program, University of Minnesota
Minnesota Mining and Manufacturing
General Electric
Citibank, South American Investment Banking Division
Norwest, International Banking Division
Carlson Companies

## MANAGEMENT CONSULTING:

Managing Risk of Commercial Loan Portfolios
Selecting Sources of Financing

Setting Financial Objectives
Measuring Financial Performance
Mergers and Acquisitions
Valuing Closely Held Firms
Board Member (Investment Committee), American Hardware Insurance Group, 1987-1991
Chair, Regents' Advisory Committee On Asset & Debt Management, University of Minnesota, 1992-1998

**EXPERT WITNESS:**

Estimating Allowed Rates of Return
Valuing Closely Held Corporations
Impact of Taxes on Interest Rates
Issues Relating to Mergers and Acquisitions
Antitrust Claims
Damages in Commercial Claims
Damages in Securities Fraud Claims
Damages in Employment Discrimination Claims
Damages In Patent Infringement Claims
Damages In Trade Secret Claims

# ATTACHMENT C

## TIMOTHY J. NANTELL
## EXPERT WITNESS TESTIMONY OVER THE LAST FOUR YEARS

I. Robert Hasel and ABCO Research, LLC v. Pulpdent Corporation
   A. Deposition Testimony – January 2003
   B. Plaintiff's Damages Expert in Patent Infringement Case

II. Stein Industries, Inc. v. Display Specialties, Inc.
   A. Trial Testimony – January 2003
   B. Deposition Testimony – Spring 2002
   C. Plaintiff's Damages Expert in Patent Infringement Case

III. Itron, Inc. v. Ralph Benghiat
   A. Trial Testimony – December 2003
   B. Defendant's Damages Expert in Patent Infringement Case

IV. Storage Technology Corporation v. Cisco Systems, Inc.
   A. Deposition Testimony – November 2002
   B. Defendant's Damages Expert in Misappropriation of Trade Secrets Case

V. Marvin v. PPG
   A. Trial Testimony – early 2002
   B. Defendant's Damages Expert in Product Warranty Case

VI. Hexamedics v. Guidant and Intermedics
   A. Deposition Testimony – Fall 2001
   B. Plaintiff's Damages Expert in Contract Dispute

VII. Minnesota Insurance Boards Association Insurance Trust v. Employers Insurance of Wausau
   A. Trial Testimony – Fall 2001
   B. Deposition Testimony – Winter 2000
   C. Plaintiff's Damages Expert in Insurance Recovery Case

VIII. Cargill v. Salt Creek, Inc.
   A. Trial Testimony – Fall 2001
   B. Deposition Testimony – Summer 2001
   C. Plaintiff's Damages Expert in Patent Infringement Case

IX. HomePlus Insurance Agency, Inc. and Securian Financial Group, Inc. v. E.W. Blanch Holding, Inc.
   A. Deposition Testimony – Spring 2001
   B. Damages Expert in Lost Profits Case

X. The Proctor and Gamble Company v. The Brita Products Company
   A. Deposition Testimony – Fall 2000
   B. Plaintiff's Damages Expert in Patent Infringement Case

XI. Superior v. Wright County
   A. Deposition Testimony – Fall 2000
   B. Plaintiff's Damages Expert in Lost Profits Case

XII. Chang v. Alliant Techsystems, Inc.
   A. Deposition Testimony – Winter 1999
   B. Defendant's Damages Expert in Employment Discrimination Case

XIII. Arbus et al. v. Siemens
   A. Deposition Testimony – Summer 1999
   B. Defendant's Damages Expert in Employment Discrimination Case

# ATTACHMENT D

TIMOTHY J. NANTELL
EXPERT WITNESS FEES FOR

TELEPLUS CONSULTING, INC. V. CONSECO SERVICES, LLC

---

Paid On A Per Hour Worked Basis

Hourly Fee: $325

Exhibit W

**From:** <steen@teleplusconsulting.com>
**To:** <cksandberg@locklaw.com>
**Date:** Tue, Oct 30, 2001 5:09 PM
**Subject:** FW: Revised Conseco Deal Construct 5/2

-----Original Message-----
From: Bill Hansen [mailto:billhansen@teleplusconsulting.com]
Sent: Wednesday, May 02, 2001 12:10 PM
To: Mike_W_Sanderson@consecofinance.com; Jim Breakey (E-mail)
Cc: David Steen
Subject: Revised Conseco Deal Construct 5/2

Jim and Mike,
Dave asked me to send this over.
Bill Hansen
Teleplus Consulting, Inc.
952.829.1111

# Conseco Deal Construct
# 4/30/01

**Contract Parameters and Requirements**

1. New OneNet MARC: ~~$26.1~~ 23.0 M Annual Gross commitment
2. Term: New 3 year term
3. Order Parameters:
   The refile must be made in conjunction with the following orders for new service. Commit the following:
   - ~~900 new DSL or Business Dial user commitment. This is an increase of 400 users above the unsigned Business Dial contract in Conseco's hands currently. Revenue commitment included in OneNet MARC.~~
   - ~~$500,000 annual commitment in AT&T Local services via separate national contract. Revenue commitment not included in OneNet MARC.~~
   - ~~6 new E1 facilities to India ordered immediately with annual commit of $1,000,000. Revenue commitment included in OneNet MARC.~~
4. Megacom 800 Interstate rates reduced to $0.030 per minute.
   Dedicated Outbound Interstate rates reduced to $0.030 per minute.
   Readyline 800 Interstate rates reduced to $0.055 per minute.
   Switched Outbound Interstate rates reduced to $0.055 per minute.
5. Rates will not be made effective until the May~~August 1st~~ usage or June ~~September~~ billing cycle.
6. ~~Conseco will offer AT&T Right of First Refusal on all new opportunities until 6/30/2002.~~

**Replacement Revenue Summary**

| | | Annual Value | In Year 2001 |
|---|---|---|---|
| 1. | ~~(6) PRI T1.5 Circuits with M800 and Transfer Connect Service~~ | ~~$ 276,000~~ | ~~$ 161,000~~ |
| 2. | ~~(6) E1 Facilities to India~~ | ~~$ 1,152,000~~ | ~~$ 480,000~~ |
| 3. | ~~Local Service~~ | ~~$ 500,000~~ | ~~$ 125,000~~ |
| 4. | ~~DSL / Business Dial Opportunity~~ | ~~$ 500,000~~ | ~~$ 250,000~~ |

~~**TOTAL Revenue Replacement — $2,428,000 — $ 1,016,000**~~

**The Conseco Business Downturn Clause does not mandate revenue replacement. Extension to new three-year contract provides positive revenue position. However, Conseco will make every reasonable effort to award new opportunities to AT&T whenever AT&T provides a market competitive solution.**

~~**Pricedown Impact**~~

| | | Annual Value | In Year 2001 |
|---|---|---|---|
| 1. | ~~Megacom 800 and Ded outbound @ $0.030 CPM~~ | ~~$2,330,000~~ | ~~$ 777,000~~ |
| 2. | ~~Switched Inbound and outbound @ $0.055 CPM~~ | ~~$ 216,000~~ | ~~$ 72,000~~ |
| ~~**TOTAL Pricedown Impact**~~ | | ~~**$2,546,000**~~ | ~~**$ 849,000**~~ |
| ~~**TOTAL Net Impact**~~ | | ~~**($118,000)**~~ | ~~**$167,000**~~ |

- AT&T will provide best possible Service Level Agreements.
- AT&T will provide best possible Feature Pricing on Transfer Connect and Network based IVR.
- AT&T will provide a Billing Guarantee Clause (120 day maximum liability; exceptions being International, Credit Card and Third Party billing.

- AT&T will assign a Billing Coordinator to resolve ongoing issues.
- AT&T will provide a new tariff with a new Business Downturn clause and a Technology clause that allows for an adjusted MARC due to network optimization resulting from a technology change.

**From:** <steen@teleplusconsulting.com>
**To:** <cksandberg@locklaw.com>
**Date:** Tue, Oct 30, 2001 5:05 PM
**Subject:** FW: AT&T info

-----Original Message-----
From: Mike_W_Sanderson@consecofinance.com
[mailto:Mike_W_Sanderson@consecofinance.com]
Sent: Thursday, May 03, 2001 1:59 PM
To: Jim_Breakey@consecofinance.com
Cc: Curt_Beckerleg@consecofinance.com; David Steen;
Kevin_Wirthwein%Exchange@consecofinance.com
Subject: AT&T info

Jim,

I have had a couple of discussions today with Kevin Wirthwein and here
is
the recommendation on the MARC for AT&T. I think that 23mm is probably
the
best we could do considering the pending sale of the medical division
and
the unknowns on new services awarded to AT&T.

(See attached file: AT&T MARC Analysis.xls)

# AT&T MARC worksheet

| Annual AT&T Commitment Detail in Gross Dollars | | |
|---|---|---|
| AT&T Gross Annual Spend *(based on June 2000 - March 2001 Run Rate)* | $ | 29,183,681 |
| Medical Division Volume *(lost when division is sold)* | $ | (1,166,400) |
| New Business for AT&T (India, ISP, Local Services, etc..) | $ | 500,000 |
| Move Long Distance Services from MCI to AT&T *(retain some with MCI to minimize impact to MCI negotiations)* | $ | 750,000 |
| **New Run Rate** | **$** | **29,267,281** |
| **Consecos Proposed MARC** *(80% of run rate)* | | **23,413,825** |

T2312

From: <steen@teleplusconsulting.com>
To: <cksandberg@locklaw.com>
Date: Tue, Oct 30, 2001 5:10 PM
Subject: FW: Conseco Contract

-----Original Message-----
From: Jim_Breakey@consecofinance.com
[mailto:Jim_Breakey@consecofinance.com]
Sent: Friday, June 15, 2001 2:23 PM
To: David Steen
Subject: Conseco Contract

---------------------- Forwarded by Jim Breakey/HQ/GTFC on 06/15/2001
02:21
PM ---------------------------

Jim Breakey
06/15/2001 12:56 PM

To: Vandorselaer@att.com
cc: ksichau@att.com, Richard Maybin
Subject: Conseco Contract

Steve,
My frustration comes from the fact that we have spent the last week
working
these numbers out with your folks. I've been copied on at least a half
a
dozen red lined versions as they have been passed back and forth. What
I
sent you was your document, not ours! It has two columns. One with
your
version of the numbers and one with ours. As you can see they are very
similar. You may not like the numbers but they are what they are.

This idea you have been pushing lately that maybe there wasn't a
business
downturn is ridiculous. We have sold our leasing business, shut down
our
truck business, sold our Mastercard/Visa portfolio, sold our aircraft
lending business, sold our asset backed lending business, laid off over
2,000 Conseco Finance employees and shut down over 60 sales offices.
This
has had a significant impact on the volume of telecom services that we
use.
In addition, it is public information that Conseco will lay off an
additional 1,000 employees over the next several months. We will also
sell
our Bankmark and Major Medical divisions.

The bottom line here is that we are taking these actions to solidify the
financial performance of our company and to ensure that we will be in a

position to be an excellent telecom customer for years to come. The
difference is that we are simply a smaller customer based on the fact
that
we are a smaller company. As I've said before, I'm getting very weary
of
justifying why we can only give you $25 million a year. I realize we
are
in shortfall but lets not forget that in 1999 we paid you $8 million
over
our commitment. Other companies including IBM, HP and MCI seem to fully
understand the changes we are going through and have worked closely with
us
to adjust services, reduce licenses or do whatever else is necessary
because they know that our success is ultimately in their best interest.
Real soon you are going to have to decide if you want to continue to
push
the MARC issue and lose us as a customer. Remember, our $6 million
Concept
6 contract is up in December and the rest of our contract 17 months
later.

Steve, the deal that was hashed out by your negotiators, Laura Carlisle
and
Rick Francis, and my team well over a month ago remains, in my eyes,
fair
for both companies. A stabilized $.03 rate is above market but fair
considering what we are asking you to do on the rest of the contract. A
MARC of $23 million (90% of our current spend) will give you confidence
that you will actually be receiving between $25 and $26 million while
giving us a small amount of headroom to deal with any additional layoffs
or
downturns that we may experience over the next 36 months. As we go
forward, we trust that you are going to do everything in your power to
correct what have been very serious service issues. In return, you can
be
assured that we will give AT&T every opportunity to bid on new telecom
services that we cannot commit to now but that will likely appear over
the
course of the contract.

Let's get a deal done, now.

Jim

"Van Dorselaer, Steven T, BMSLS" <vandorselaer@att.com> on 06/14/2001
01:58:52 PM

To: "'Jim_Breakey@consecofinance.com'"
<Jim_Breakey@consecofinance.com>
cc:

Subject: RE:

Jim,

As I mentioned in my voice mail to you this morning, I've received a different set of numbers from Laura Carlisle so I don't think these numbers
are agreed on as of yet. Laura will return from vacation on Monday, 6/18
and I'll get to her right away. As I said in my voice message this morning,
since your position is that you cannot fulfill the contract commitment due
to specific business conditions, I would first want to ensure that you haven't placed any orders for any new services with any other Telecom provider during the last 12 months. This would include but is not limited
to the numbers you've switched from AT&T to MCI. Secondly, in the spirit
of
fulfilling your agreement with AT&T, I would ask that you make us aware of
any other Telecom spend you have that could be placed towards our contract.
I don't believe this is "invasive" as you suggested, if the spirit is to fulfill the contract commitment. I'll get the explanation from Laura on Monday and will contact you the beginning of next week.

Regards,

Steve Van Dorselaer

-----Original Message-----
From: Jim_Breakey@consecofinance.com
[mailto:Jim_Breakey@consecofinance.com]
Sent: Wednesday, June 13, 2001 5:29 PM
To: Van Dorselaer, Steven T, BMSLS
Subject:

Steve,
Attached is the table containing the numbers our teams have agreed on as well as those where they do not. I certainly think they are close enough
that they can form the basis for an agreement. I will call you to discuss.
Jim

(See attached file: AT&T Marc Doc.doc)

**From:** <steen@teleplusconsulting.com>
**To:** <cksandberg@locklaw.com>
**Date:** Tue, Oct 30, 2001 5:09 PM
**Subject:** FW: AT&T MARC Offer 6-29 (take 3)

-----Original Message-----
From: Bill Hansen [mailto:billhansen@teleplusconsulting.com]
Sent: Friday, June 29, 2001 10:53 AM
To: Mike_W_Sanderson@consecofinance.com
Cc: David Steen
Subject: AT&T MARC Offer 6-29 (take 3)

Sorry. I didn't like the page break and the columns didn't add up correctly. Here is the latest.

Bill Hansen
Teleplus Consulting, Inc.
952.829.1111

6/27/01

Steve Van Dorselaer
Vice President Global Markets
For AT&T Business Services Sales
23A07
Bridgewater, NJ 08807

Dear Mr. Van Dorselear,
It is Conseco's understanding that through the combined efforts of the two teams we have reached a consensus in the matter of calculating the Conseco MARC.

Sighting areas of complete agreement, both parties acknowledge that the closest possible calculation of Baseline Gross Revenue paid to AT&T by Conseco is $25.8MM.

Both parties agree that Conseco has lost $3.3MM in Revenue Reductions due the sale of business units and the closing of facilities in the CFC system. Conseco contends an additional $300k will be lost with the completion of the final 1,000 announced layoffs. AT&T feels the quantification is yet to be determined.

Both parties agree that Conseco has awarded AT&T an additional $3.7MM in new annual business related to the India initiative. In addition, Conseco has awarded AT&T $789k in temporary services (six months). Significant, but it cannot be included in annual calculations.

Acknowledging the differences, AT&T has forecasted the potential for New Opportunity to be $1MM higher than Conseco, who feels the quantification is yet to be determined.

To Recap:

| | AT&T | Conseco |
|---|---|---|
| **Total Gross Revenue** | | |
| **Total Baseline Components** | **$25,900,858** | **$25,900,858** |
| **Total Revenue Reductions** | **($ 3,330,588)** | **($ 3,630,588)** |
| **Total Revenue Increases** | **$ 3,738,733** | **$ 3,738,733** |
| **Potential Sales Opportunity** | **$ 1,772,968** | **$ 784,000** |
| **Total all Known Components** | **$28,081,971** | **$26,793,003** |
| **Annual Marc @ 90%** | **$25,273,773** | **$24,113,702** |

In conclusion, Conseco is willing to proceed with a combined three year Revenue Commitment of $75MM, subject to rate stability and annual review.

Sincerely,

James R. Breakey
Senior Vice President and CIO
Technology Services
Conseco Finance Corp.

**From:** <steen@teleplusconsulting.com>
**To:** <cksandberg@locklaw.com>
**Date:** Tue, Oct 30, 2001 5:10 PM
**Subject:** FW: Revised MARC analysis

-----Original Message-----
From: Dave Steen [mailto:steen@teleplusconsulting.com]
Sent: Friday, June 29, 2001 12:11 PM
To: jim_breakey@consecofinance.com
Subject: FW: Revised MARC analysis

I think this is what you want.

Dave Steen

-----Original Message-----
From: Mike_W_Sanderson@consecofinance.com
[mailto:Mike_W_Sanderson@consecofinance.com]
Sent: Thursday, June 28, 2001 2:34 PM
To: Kevin_Wirthwein%Exchange@consecofinance.com;
Jim_Breakey@consecofinance.com
Cc: billhansen@teleplusconsulting.com; steen@teleplusconsulting.com
Subject: Revised MARC analysis

Attached is our original MARC analysis that we did with AT&T. Kevin and
I
went through this today in detail. We also talked with Laura Carlisle
and
she agreed that these numbers were "very close". I have highligted
the
document with changes that Kevin and I discussed. It shows a new
proposed
annual MARC. I also added a new "Deal MARC" for a three year term. I
used
the proposed annual MARC and increased it by 2.5% in years 2 and 3 to
arrive at this number.

I think that this would be the basis of our proposal to AT&T. Any
thoughts?
(See attached file: 6-7 MARC Component Discussion 6.doc)

# AT&T and Conseco Marc Analysis June 7th – June 13th 2001

## Analysis of the relevant contributors to developing a MARC

Following are the results of the discussion between the AT&T and Conseco teams between June 7 and June13 2001 on the relevant contributors to developing the MARC.

| MARC COMPONENT | DESCRIPTION | AT&T VIEW | CONSECO VIEW |
|---|---|---|---|
| | **Baseline Gross Revenue Paid to AT&T by CFC** | | |
| MOU and List Rates | Both parties agreed upon using February's usage as the baseline data set. AT&T had included Concept 6 minutes into the Outbound Schedule B volume, as those minutes will be rolled into the new contract. | $21,519,318 | $21,519,318 |
| Data Services Inventory | Both parties agreed upon the gross dollar volume of the Data Services inventory. | $8,631,068 | $8,631,068 |
| PIC Reversal | AT&T's conservative estimate of LD for the switched BTNs that had a PIC change to an OCC was determined to be $355,134. AT&T used 4,000 of the 11,000 BTNs identified at an average cost of $7.39 per line per month. | $355,134 | $355,134 |
| Impact of New List Rates | Based on $0.055 CPM for switched traffic and $0.030 CPM for dedicated traffic. Conseco had incorporated a decrease in the Schedule C list rate to $0.03 that AT&T had not offered. | ($4,604,662) | ($4,604,662) |
| | **Total Baseline Revenue** | $25,900,858 | $25,900,724 |

Conseco Contributors: Mike Sanderson, Terry Austin, Kevin Wirthwein, Chris Mckee, Jim Breakey. AT&T Contributors: Laura Carlisle, Mike Humes, Tim Andrews, Rick Francis,

T2492

# AT&T and Conseco Marc Analysis June 7th – June 13th 2001

Analysis of the relevant contributors to developing a MARC

| | **Additional Gross Revenue Paid to AT&T by CFC** | | |
|---|---|---|---|
| DS3 to Chicago | AT&T has provided the Gross amount for the full DS3 to Conseco. | $720,972 | $720,972 |
| Four E1 circuits to India | Three of these circuits are delivered via satellite and one is terrestrial. Two of the satellite circuits are terminated in Sunnyvale, CA, while the other satellite circuit and the terrestrial circuit terminate in Carmel, IN.<br>AT&T: 3 Satellite half Chan @$58,000 each<br>1 Terrestrial @$73,200<br>4 Local chan (Sunnyvale) @$627.27 each<br>4 Access Connection @$344 each<br>4 Access Coordination @$98.75 each | $3,017,761 | $3,017,761 |
| | **Total Additional Revenue** | $3,738,733 | $3,738,733 |
| | | | |

Conseco Contributors: Mike Sanderson, Terry Austin, Kevin Wirthwein, Chris Mckee, Jim Breakey. AT&T Contributors: Laura Carlisle, Mike Humes, Tim Andrews, Rick Francis,

# AT&T and Conseco Marc Analysis June 7th – June 13th 2001

Analysis of the relevant contributors to developing a MARC

| Gross Revenue Reductions | | | |
|---|---|---|---|
| Tie Line Reduction | AT&T's number is based on the circuit Ids given by Conseco: DHEC883362, DHEC884805, DHEC-23006, DHEC-782269, DHEC-522115, DHEC-144254, that will be removed after the install of the new DS3 from Chicago to Carmel. | ($1,701,798) | ($1,701,798) |
| Various disconnects due to downsizing | Conseco circuits to be disconnected associated with office closings.<br>**PROJECT DESCRIPTION** — **TOTAL**<br>Disc Burlingame, CA 256K PVC and T1 and port — $4571.63<br>Disc Nashville, TN 32K PVC 56K access & port — $582.17<br>Disc T1 Carmel to NY — $10,742.92<br>T1 Disconnect, Irving to Irving TX — $816.65<br>T1 Disconnect, Dallas to Irving TX — $648.89<br>Disc 56K to Highland, IN — $1217.46<br>Frame T1 Access, T1 Port, 1024k & 128k PVC's<br>Disc, Irving TX to Carmel & Rockford — $6647.65<br>Total Various Disconnects Monthly — $25,227.37<br>Annual — $302,728 | ($302,728) | ($302,728) |
| Sale of BankMark | We agree that BankMark has been sold.<br>Total Annual<br>Voice — $304,271<br>DHEC659402 — $20437<br>DHEC429749 — $19297<br>3 Frame AREC Ckts — $13,824<br>DHEC922048 — $14,460<br>DHEC832988 — $11,408<br>DHEC941725 — $10,986<br>TOTAL — $394,683 | ($394,683) | ($394,683) |
| Potential sale of Major Medical | We agree on the potential impact of the sale of Major Medical. | ($931,379) | ($931,379) |
| Potential impact of planned downturn events | Conseco has stated a staff reduction plan that would eliminate 1,000+ additional jobs. The estimated annualized impact is based on the ambient telecom usage of these 1,000 people at $25 per month each. | tbd | ($300,000) |
| | **Total Gross Revenue Reductions** | ($3,330,588) | ($3,630,588) |
| | | | |

Conseco Contributors: Mike Sanderson, Terry Austin, Kevin Wirthwein, Chris Mckee, Jim Breakey. AT&T Contributors: Laura Carlisle, Mike Humes, Tim Andrews, Rick Francis,

# AT&T and Conseco Marc Analysis June 7th – June 13th 2001

Analysis of the relevant contributors to developing a MARC

| NEW OPPORTUNITIES | | | |
|---|---|---|---|
| Additional three E1 circuits to India @ six months | We did not agree on this point. AT&T believes that by disconnecting the seven T1.5 circuits to Sunnyvale, CA, that EXL Services will required additional capacity to support their external customers. AT&T also believes that Conseco Finance will require connectivity to India to support their business plan. Conseco disagrees. Plans for India are still in the works and additional volume cannot be committed at this time. | $851,400 | $284,000 |
| Dial IP contract | Both parties agreed that this is a valid sales opportunity. AT&T believes that no know barriers exist with product or price. Based on the inconsistent availability of DSL, Conseco is unable to make a specific revenue commitment. | $333,333 | $100,000 |
| AT&T Local Service | Both parties agreed that this is a valid sales opportunity. AT&T responded to Conseco's RFP in February 2001. AT&T believes that no know barriers exist with product or price. Conseco would like to move service to AT&T but service issues must be corrected first. | $588,235 | $400,000 |
| Acquisition of EXL Service | We discussed the purchase of EXL Service by Conseco. EXL Service currently supported by Growth markets and has been using an acquisition pricing model to win service at EXL Service. EXL Service is primarily a competitive account. | unknown | unknown |
| | | | |
| | **Total Potential Sales Opportunities** | $1,772,968 | $784,000 |

Conseco Contributors: Mike Sanderson, Terry Austin, Kevin Wirthwein, Chris Mckee, Jim Breakey. AT&T Contributors: Laura Carlisle, Mike Humes, Tim Andrews, Rick Francis,

AT&T and Conseco Marc Analysis June 7th – June 13th 2001

Analysis of the relevant contributors to developing a MARC

| | | | |
|---|---|---|---|
| | **Total Gross Revenue** | | |
| | **Total Baseline Components** | $25,900,858 | $25,900,724 |
| | **Total Revenue Reductions** | ($3,330,588) | ($3,630,588) |
| | Potential Sales Opportunities | $1,772,968 | $784,000 |
| | **Total Revenue Increases** | $3,738,733 | $3,738,733 |
| | **Total all Known Components** | $28,081,971 | $26,792,869 |
| | Annual Marc @ 90% of proposed run rate | $25,273,773 | $24,113,582 |
| | | | |
| | Proposed Deal MARC over 3 years (adjusted annually based on market reviews of rates) | | $74,160,000 |
| | | | |
| | **Short-Term Revenue Paid to AT&T by CFC**<br>Not in Marc but committed to AT&T | | |
| Seven Sunnyvale T1s @ six months. | Both parties agree that these circuits will be installed for a period of approximately 6 months and their gross revenue is $789,600. Conseco feels this should not be included in the MARC analysis since it is already committed to AT&T for the duration of the expected need for the service. | $789,600 | $789,600 |
| | **Total Short-Term Revenue** | $789,600 | $789,600 |
| | | | |

Conseco Contributors: Mike Sanderson, Terry Austin, Kevin Wirthwein, Chris Mckee, Jim Breakey. AT&T Contributors: Laura Carlisle, Mike Humes, Tim Andrews, Rick Francis,

T2496

## Dave Steen

| | |
|---|---|
| **From:** | Mike_W_Sanderson@consecofinance.com |
| **Sent:** | Thursday, July 12, 2001 11:48 AM |
| **To:** | billhansen@teleplusconsulting.com; steen@teleplusconsulting.com |
| **Subject:** | AT&T Counter Proposal |

ATT Deal Sheet 7-11.doc

Attached is the latest AT&T proposal. Please call me to discuss as soon asap.

Thanks,

Mike
---------------------- Forwarded by Mike W Sanderson/BSYS/HQ/GTFC on 07/12/2001 11:46 AM ---------------------------

Jim Breakey
07/12/2001 09:44 AM

To: Mike W Sanderson/BSYS/HQ/GTFC@GTFC
cc:
Subject: AT&T Counter Proposal

Mike,
Please distribute.
Jim
--------------------- Forwarded by Jim Breakey/HQ/GTFC on 07/12/2001 09:43 AM ---------------------------

"Ewing, Larry M, BMSLS" <lewing@att.com> on 07/11/2001 05:02:42 PM

To: Jim_Breakey@consecofinance.com, "Van Dorselaer, Steven T, BMSLS" <vandorselaer@att.com>
cc: "Carlisle, Laura A, BMSLS" <lcarlisle@att.com>
Subject: AT&T Counter Proposal

Jim,

Steve ask me to forward the attached response to Conseco's proposed offer structure forwarded from your office. Although he was out of the office today he wanted to make sure you received AT&T's counter proposal. To assist in identifying where agreements as well as differences reside, we have edited your document with changes we would require.

Steve will follow up to discuss this alternative tomorrow. If I can be of assistance please feel free to contact directly.

Larry Ewing
918-560.5424

<<ATT Deal Sheet 7-11.doc>>

(See attached file: ATT Deal Sheet 7-11.doc)

# Conseco/AT&T Deal Sheet

~~7/1/01~~7/10/01

**Contract Parameters and Requirements**

1. New OneNet MARC: $~~77~~85M Gross ~~contract~~ commitment over the last three years of the contract

   $25M Gross annual commitment for each year

Conseco will agree to 95% exclusivity for all future opportunities for service that will retire the commitment, as defined later in this offer. Exclusivity will not require Conseco to violate any existing agreements, but would require future business to be awarded to AT&T. Conseco will agree no existing contracts with another carrier will be renewed and extended and upon their expiration will move the service to AT&T.

~~Conseco agrees to increase this amount by $2.5M if our Major Medical Division is not sold. We would ask the business downturn language be renewed and further defined to protect against ongoing contention should Conseco be forced further downsize our business.~~

Business downturn language in the existing contract will remain. The current shortfall experienced by Conseco was caused by many factors, one of which was the movement of traffic provided by AT&T to another common carrier. In consideration for pricing provided on the missed commitment and the movement of traffic, a one-time assessment of $750,000 payable by 9/1/2001.

2. Term: ~~New 3 year term~~Extension of existing agreement by 12 months

3. Megacom 800 Interstate rates reduced to $0.030 per minute.
   Dedicated Outbound Interstate rates reduced to $0.030 per minute.
   Readyline 800 Interstate rates reduced to $0.055 per minute.
   Switched Outbound Interstate rates reduced to $0.055 per minute.

   All rates stabilized. Annual market review.

4. ~~Rates will be made effective as of July 1st.~~ Rates will be effective September 1 based upon contract acceptance prior to August 1st.

5. Conseco will offer AT&T Right of First Refusal during the term of the agreement ~~on not less than 80% of~~ on new opportunities ~~until 6/30/02~~ for services AT&T offers at rates and levels of service equal to or better than competitive offers. Bona fide offers to be considered must be from an existing supplier to Conseco with at least 15% share of existing expenditures. Lack of acceptance of any AT&T offer under this section will not relieve Conseco of any commitment under section 1.

6. ~~All AT&T services will count against the MARC.~~

   Include the following services as eligible for retirement of the MAC
   (Service will be "MAC eligible" as individual contracts are consummated)
   - VPN
   - Local Services
   - Separate data contracts - Circuit Term plans

Web Hosting

7. AT&T will schedule, no later than 8/31/01, an executive briefing to discuss opportunities to work together in ways which will increase AT&T's revenue while reducing Conseco's expenses.

8. **Special Conditions:**

New Business Awards

Conseco would agree to order the proposed VPN

Conseco would agree to order local service identified in AT&T's February RFP response

Conseco agrees to convert $450,000 in voice traffic from another supplier

- AT&T will provide ~~best possible~~ all Service Level Agreements available under tariff 1,2, and 4.

~~AT&T will provide best possible Feature Pricing on Transfer Connect and Network based IVR.~~

- AT&T will continue to provide the a Billing Guarantee Clause (120 day maximum liability for Outbound direct dial services; exceptions being International, Credit Card and Third Party billing currently available for AT&T ONENET service. And provided to Conseco.

—AT&T will provide ~~assign a~~ Billing Support ~~Coordinator~~ via the Field Sales Center to resolve ongoing issues at no cost to the customer.

- ~~AT&T will provide a new tariff with a new Business Downturn clause and a Technology clause that allows for an adjusted MARC due to network optimization resulting from a technology change.~~

**Bill Hansen**

**From:** Jim_Breakey@consecofinance.com
**Sent:** Thursday, July 12, 2001 3:43 PM
**To:** Mike_W_Sanderson@consecofinance.com
**Cc:** Bill Hansen; Mike_W_Sanderson@consecofinance.com; Jim Breakey (E-mail); dave steen
**Subject:** Re: Sichau Letter 7-12

sichau 7-12.doc

I like the letter a lot. I will incorporate Mike's comments and make my own and redistribute it while I wait to hear from Maybin.

Mike W Sanderson
07/12/2001 03:10 PM

To: "Bill Hansen" <billhansen@teleplusconsulting.com>
cc: <Mike_W_Sanderson@consecofinance.com>, "Jim Breakey (E-mail)" <jim_breakey@consecofinance.com>, "dave steen" <steen@teleplusconsulting.com>
Subject: Re: Sichau Letter 7-12 (Document link: Jim Breakey)

Here are my thoughts.

I would remove the last sentence of the second paragraph. It is possible that we could pay excessively high rates and meet our committment going forward.

I would add some verbage regarding the business downturn, that did in fact occur, so that we remind Ken why we are talking in the first place. I would also comment on the unfortunate timing of the downturn that coincided with our signing a contract just weeks before voice rates made a major market correction downward. The result of which has allowed AT&T to see un-earned revenue from Conseco for the past 11 months.

We are paying too much for what we get!

"Bill Hansen" <billhansen@teleplusconsulting.com> on 07/12/2001 02:52:50 PM

To: <Mike_W_Sanderson@consecofinance.com>, "Jim Breakey (E-mail)" <jim_breakey@consecofinance.com>
cc: "dave steen" <steen@teleplusconsulting.com>
Subject: Sichau Letter 7-12

Jim and Mike,
Please review and comment.

Bill Hansen
Teleplus Consulting, Inc.
952.829.1111
(See attached file: sichau 7-12.doc)

**Bill Hansen**

**From:** Jim_Breakey@consecofinance.com
**Sent:** Thursday, July 12, 2001 5:08 PM
**To:** Bill Hansen
**Cc:** Mike_W_Sanderson@consecofinance.com; Jim Breakey (E-mail); dave steen
**Subject:** Re: Sichau Letter 7-12

Sichau Letter.doc    sichau 7-12.doc

Some minor revisions.

(See attached file: Sichau Letter.doc)

"Bill Hansen" <billhansen@teleplusconsulting.com> on 07/12/2001 02:52:50 PM

To: <Mike_W_Sanderson@consecofinance.com>, "Jim Breakey (E-mail)" <jim_breakey@consecofinance.com>
cc: "dave steen" <steen@teleplusconsulting.com>
Subject: Sichau Letter 7-12

Jim and Mike,
Please review and comment.

Bill Hansen
Teleplus Consulting, Inc.
952.829.1111
(See attached file: sichau 7-12.doc)

July 12, 2001

AT&T
Mr. Kenneth Sichau
President of AT&T Business Services Sales
23A02
55 Corporate Drive
Bridgewater, NJ 08807

Dear Ken,
I cannot begin to express the level of frustration we are feeling toward AT&T. When we talked, over three months ago, you assured me your team would need a couple of weeks to pull together a new contract we could both live with. That effort has gone nowhere and the relationship has deteriorated to a point that is unworkable.

In mid May, both teams arrived at a compromise price and we all went to work setting a realistic MARC. We ran business models and service projections addressing business downturn issues and new initiatives. We identified over $1.1MM in new business opportunities and we placed these orders with AT&T. Our best calculations reached $26MM annually when calculated at the new pricing. On 6/4, Steve Van Dorselaer called me to say he is now unwilling to re-price the contract, and with the new business he felt Conseco was able to meet the original $34MM commitment.

In late June we agreed to meet in Chicago to work out a deal. My team and I met with Steve Van Dorselear and his team. I thought we agreed to work together and find middle ground. I took the action item to formulate a new deal structure with what Steve described as "win-win" characteristics. I delivered just such a proposal this week that I truly felt I gave every possible concession to AT&T. Van Dorselear's reply was unreasonable to the point of being professionally offensive. It is clear that Van Dorselear and his team have no interest in Conseco as a long-term customer and are only interested in screwing us at every turn. Each month I sign invoices authorizing the payment of millions of dollars to your company and I've had it with the treatment and the service we have been receiving.

Ken, if you have any interest in us as a customer beyond December 2001 when our Concept 6 contract expires and 17 months later when the remainder of our obligation to AT&T is complete, I need you to do two things.

First, I would like you to personally meet with Richard Maybin and me to work out a deal that is acceptable to both organizations before the end of the month.

Second, we are done dealing with our current support team. Van Dorselear, Hoppe, Carlisle and Humes are fired from the Conseco account. Effective immediately, I want the account managed and serviced out of the Minneapolis / St. Paul area. I do not want Steve Van Dorselear, or any member of his team, contacting my staff. Please have local representation contact me as soon as possible.

Please get back to me as soon as possible with your timeframe and plan. We need to work together to get this fixed. The damage to our corporate relationship is very close to irreconcilable.

Sincerely,

James R. Breakey
Senior Vice President and CIO
Technology Services
Conseco Finance Corp.
651.293.5505

**Bill Hansen**

**From:** Mike_W_Sanderson@consecofinance.com
**Sent:** Thursday, July 12, 2001 6:11 PM
**To:** Jim_Breakey@consecofinance.com
**Cc:** Bill Hansen; Mike_W_Sanderson@consecofinance.com; Jim Breakey (E-mail); dave steen
**Subject:** Re: Sichau Letter 7-12

Sichau Letter.doc    sichau 7-12.doc

You sound kinda pissed off in the letter. Looks good.

Jim Breakey
07/12/2001 05:07 PM

To: "Bill Hansen" <billhansen@teleplusconsulting.com>
cc: <Mike_W_Sanderson@consecofinance.com>, "Jim Breakey (E-mail)" <jim_breakey@consecofinance.com>, "dave steen" <steen@teleplusconsulting.com>
Subject: Re: Sichau Letter 7-12 (Document link: Database 'Mike W Sanderson', View '($Inbox)')

Some minor revisions.

(See attached file: Sichau Letter.doc)

"Bill Hansen" <billhansen@teleplusconsulting.com> on 07/12/2001 02:52:50 PM

To: <Mike_W_Sanderson@consecofinance.com>, "Jim Breakey (E-mail)" <jim_breakey@consecofinance.com>
cc: "dave steen" <steen@teleplusconsulting.com>
Subject: Sichau Letter 7-12

Jim and Mike,
Please review and comment.

Bill Hansen
Teleplus Consulting, Inc.
952.829.1111
(See attached file: sichau 7-12.doc)

Exhibit X

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

Teleplus Consulting, Inc.,
Plaintiff,

vs.

Conseco Services, LLC,
Defendant.

Case File No.
02-CV-212 (JRT/SRN)

DEPOSITION OF

JAMES BREAKEY

VOLUME I

August 28, 2002

10:40 a.m.

COPY

REPORTED BY:

KATHY L. SOPER, RPR, CSR

California CSR No. 8519

A. Correct.
Q. Do you have authority to enter into agreements on behalf of Conseco Services, LLC?
A. Yes, I do.
Q. What sort of authority do you have?
A. I have authority to sign contracts for LLC.
Q. Of what size?
A. There isn't a governance limit on it.
Q. I am sorry?
A. There isn't a governance limit outside my normal governance.
Q. What is that, please?
A. Actually, for signing a contract there is no specific limit on the size of the contract.
Q. And do you know how it is that you come to have authority for a company for which you do not work?
A. As -- no, I don't.
Q. Has anyone ever told you why you have authority to sign and bind Conseco Services, LLC?
A. When we were acquired by Conseco and it became important to have an entity, I believe, for -- to allow us to have contracts which we could share across the subsidiaries or across the different companies owned by Conseco, Inc., I believe I was made an officer of the corporation. I know I was granted the capability to sign contracts for them.

seek their approval, necessarily. Certainly their consensus, and then in a situation where it crosses into other subsidiaries, we would do -- follow a similar path.
Q. You used the phrase "business presidents." What does that mean, please?
A. Within Conseco Finance we have a home equity division that does mortgages that has a president, we have a manufactured housing division that does manufactured home financing that has a president over that division, and we have a consumer division that does private label credit cards and home improvement loans and consumer loans and there is a president over that division.
Q. When you said "affect other subsidiaries," what were you referring to, please?
A. If I was going to sign a contract which had impact or was going to be used by CIG or by Banker's Life, either we would get it signed at the Conseco, Inc., level or I would discuss it with them before signing.
Q. And based on our earlier conversations, if it were a contract that were going to be used by CIG or Banker's Life, there would have been involvement by their staff before the contract was ready to be signed; is that right?
A. Absolutely.
Q. Over the last five years, have you signed any contracts

in the name of Conseco Finance Corp.?
A. Yes.
Q. For what, please?
A. Over five years I may have signed a hundred, maybe 200.
Q. Let me try to ask the question in a way that could actually be answered.
Are there certain categories of contracts that you signed in the name of Conseco Finance Corp.?
A. I guess. Could you be more clear? I mean, what --
Q. Well, let me see if I, again, have my facts well in hand. Is it the case that over the last five years you have signed contracts in the name of Conseco Services, LLC?
A. Yes.
Q. And you have signed contracts in the name of Conseco Finance Corp.?
A. Yes.
Q. Is there some pattern to contracts that have gone in the name of one entity versus the other, please?
A. Yes.
Q. Okay. Could you describe that pattern, please.
A. Early on in our relationship we -- in our relationship. After we were acquired by Conseco, Inc., in '98, we began working under a policy where we put all of our contracts under LLC. That was their policy.
Q. That was a Conseco, Inc., policy?

Q. What do you understand Teleplus warranted it would do in this agreement to Conseco?

MR. CATTANACH: Can I have that question read back?

(The record was read by the court reporter.)

THE WITNESS: When you get to areas such as warranties and representations, I tend to be very careful about answering any of it without giving a legal opinion. It tends to be a section that is written more in your language than ours.

BY MR. SANDBERG:

Q. And was this document reviewed by Conseco counsel?

A. I believe it was.

Q. Do you know who?

A. I would have to check with Curt Pelarski to see which person he used for it.

Q. Was there a person that he would normally have gone to for such contracts?

A. We have a -- as you would expect, numerous attorneys on staff. He has a couple that he works with, so I am not sure if we could actually -- if he would even remember exactly.

Q. And are those attorneys employees of Conseco Finance Services or Conseco, Inc.?

A. Conseco -- he would have used one of the Conseco Finance employees.
Q. So it's your belief that this had been reviewed before you got to the point of signing it?
A. I am certain it was.
Q. Certain. Okay. So you have no particular opinion as to what Teleplus may or may not have warranted it would do under this agreement?
MR. CATANAUGH: I will object as vague, calling for a legal conclusion, but you can answer the question.
THE WITNESS: My -- I guess I am answering your previous question. I am sorry. But I might as well, now that I started.
Basically, as I read it, I believe that it warranties that -- they warrant that they will look at all the available information and that they will make a recommendation, but they are not warrantying that their recommendation will be the best recommendation.
BY MR. SANDBERG:
Q. And had you read that paragraph 5 before you signed the contract?
A. I am certain I did.
Q. And had you ever seen a paragraph like paragraph 5 with the warranties and representations made in it in other contracts?

A. Certainly.
Q. And had you ever inquired of counsel the meaning of such paragraphs?
A. I am sure we have had the discussion at some point.
Q. Because you have done this sort of contracting for a number of years in your various jobs?
A. Yes.
Q. This was not a surprise to you to find such a paragraph in a contract?
A. To find warranties and representations?
Q. Yes, sir.
A. No.
Q. And you were comfortable signing the contract, even with paragraph 5 in it?
A. I signed the contract with paragraph 5 in it.
Q. You were not under duress at the time? It's a question.
A. Clearly.
Q. Did you have any discussions with Teleplus during the time you were negotiating this agreement with Teleplus as to your authority to enter into contracts with carriers?
A. I don't recall having conversations. It's not inconceivable that we may have.
Q. Do you recall at any time during your work with Teleplus having told Teleplus about your authority to enter into contracts with carriers?

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Teleplus Consulting, Inc.,

Plaintiff,

v. Case No. 02-CV-212 (JRT/SRN)

Conseco Services, LLC.,

Defendant.

COPY

*****************************************************

DEPOSITION OF
JAMES BREAKEY

VOLUME II

*****************************************************

DATE TAKEN: 11/26/02 REPORTED BY: KELLY HERRICK

was at -- and I don't recall the specific number -- it wasn't enough to worry about. We were confident another carrier would pick it up. They were in no hurry to charge us for it. So it wasn't an issue at that level. At what level it would have become an issue, I don't know.

BY MR. SANDBERG:

Q Did you believe that if you changed carriers, MCI would not enforce the shortfall?

A I believe when you change carriers, probably the instance where carriers will charge a shortfall.

Q But you were prepared to pay that shortfall in order to leave?

A We would have paid it, yeah. I mean, we were prepared to leave them, if we had to. We certainly didn't have to.

Q All right. Turning your attention to AT&T, why was it decided to terminate Teleplus's work?

A As we've discussed prior, we were closest to having agreement, if not -- we were never anywhere near a contract tariff, but we were closest to having a meeting of the minds in April within, I'd say, eight weeks of starting the process. And from that point forward, the negotiations went backwards, and each day that we did not have a new deal, it was costing

Exhibit Y

**H**
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

Court of Appeals of Minnesota.
LOOP CORP., et al., Appellants,
v.
Gary McILCROY, et al., Respondents,
Ernst & Young, Respondent.
**No. A04-362.**

Oct. 5, 2004.
Review Denied Dec. 22, 2004. [FN*]

FN* Page, J., took no part in the consideration or decision of this case.

Hennepin County District Court, File No. CT 02-016448.

Michael J. Broich, Ravich Meyer Kirkman McGrath & Nauman, Minneapolis, MN,; and C. Philip Curley, Robinson Curley & Clayton, P .C., Chicago, IL, for appellants.

Wendy J. Wildung, Jason K. Walbourn, Faegre & Benson LLP, Minneapolis, MN, for respondents McIlroy, et al.

Steven J. Wells, Thomas P. Swigert, F. Matthew Ralph, Dorsey & Whitney LLP, Minneapolis, MN, for respondent Ernst & Young.

Considered and decided by LANSING, Presiding Judge; HARTEN, Judge; and SHUMAKER, Judge.

**UNPUBLISHED OPINION**

GORDON W. SHUMAKER, Judge.

*1 Appellants challenge the denial of their postjudgment motions and the dismissal of their claims. They argue that the district court erred in denying their postjudgment motion to amend their complaint a third time and in dismissing their claims for negligent misrepresentation, violation of the Minnesota Securities Act, and violation of the Minnesota Consumer Fraud Act. We affirm.

**FACTS**

Appellants brought this action as purchasers and holders of common stock of Health Risk Management, Inc. (HRM) against respondents Gary McIlroy, chairman and chief executive officer of HRM, Marlene Travis, president and chief operating officer of HRM, and accountants Ernst Young (EY). Appellant Loop Corp. brought separate claims against respondents pursuant to a master agreement, under which Loop Corp. agreed to provide $6.1 million in funding to HRM.

Appellants assert that, as a result of false financial information relating to medical services payable and related net medical expenses contained in financial statements provided by respondents, they were induced to both purchase and hold HRM stock to their financial detriment. They contend that, as senior managers, McIlroy and Travis had responsibility for the preparation of financial statements at issue. Further, they contend that EY had responsibility as auditor to certify the accuracy of the financial statements.

In an amended complaint, appellants asserted claims for negligent misrepresentation, violation of the Minnesota Securities Act, and violation of the Minnesota Consumer Fraud Act relating to alleged misstatements in the audited financial statements of HRM. Appellant Loop Corp. brought similar claims based on the master agreement. Respondents moved to dismiss. The district court granted respondents motion to dismiss with prejudice claims based on alleged misstatements in HRMs 2000 financial statement. The court also found that the complaint as to the 1998 and 1999 financial statements failed to plead facts with the required particularity, but the court allowed appellants to conduct discovery and replead the remaining claims. The court issued an amended order denying respondents motion to dismiss appellant Loop Corp.s claims.

Appellants then filed a second amended complaint and respondents again moved to dismiss. The district court granted the motion to dismiss with prejudice, and judgment was entered. Appellants then moved to vacate or amend the judgment and for leave to amend the second amended complaint. The district court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

denied the motion, and this appeal followed.

**DECISION**

**I.**

We first address appellants challenge to the district courts postjudgment order denying their motion to amend their complaint. "Generally, the decision to permit or deny amendments to pleadings is within the discretion of the district court and will not be reversed absent a clear abuse of discretion." *Johns v. Harborage I, Ltd.*, 664 N.W.2d 291, 295 (Minn.2003). The construction of a rule of court procedure will be reviewed de novo. *Patterson v. Wu Family Corp.*, 608 N.W.2d 863, 866 (Minn.2000).

*2 After judgment was entered on the second amended complaint, appellants moved to file a third amended complaint. The district court held, in relevant part, that a motion under Minn. R. Civ. P. 15.01 was not proper once judgment was entered, and it denied the motion to amend. Appellants contend that the district court abused its discretion in failing to allow them an opportunity to file a third amended complaint under Minn. R. Civ. P. 15.01.

Under rule 15.01, after a responsive pleading has been served, "a party may amend a pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Minn. R. Civ. P. 15.01. Generally, once judgment is entered, courts will not allow amendment of the complaint. *Johns*, 664 N.W.2d at 295. An exception may arise if the party seeks an amendment to allow it to enforce the judgment against a successor party. *Id.* Because here appellants seek an amendment to challenge the judgment, not to enforce it against a successor party, the district court properly denied the postjudgment motion to amend. Appellants have not shown the district court abused its discretion or erred as a matter of law.

**II.**

In reviewing a dismissal for failure to state a claim on which relief can be granted under Minn. R. Civ. P. 12.02(e), an appellate court will address "whether the complaint sets forth a *legally sufficient* claim for relief." *Elzie v. Commr. of Pub. Safety*, 298 N.W.2d 29, 32 (Minn.1980) (alteration in original) (quotation omitted). The allegations in the complaint will be accepted as true. *Id.* at 33.

Appellants brought negligent misrepresentation claims relating to their purchases of HRM stock in 2000 and 2001 against McIlroy and Travis and against EY, contending that they detrimentally relied on material misstatements and omissions in certain financial statements and audit reports. Appellant Loop Corp. also alleged negligent misrepresentation relating to the $6.1 million Master Agreement on the same grounds. The district court dismissed these claims for lack of particularity under Minn. R. Civ. P. 9.02.

We first address appellants argument that, because the negligent misrepresentation claims do not allege fraud, rule 9.02 does not apply. Minn. R. Civ. P. 9.02 provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

Minnesota law recognizes distinct claims for fraudulent misrepresentation and negligent misrepresentation. *Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn.1986). "Fraud is distinguished from negligence by the element of scienter required." *Id.* (footnote omitted). But a misrepresentation, "whether negligent or fraudulent, constitutes fraud under Minnesota law." *Juster Steel v. Carlson Cos.*, 366 N.W.2d 616, 618 (Minn.App.1985).

*3 Both respondents argue that applying the heightened pleading standards to negligent misrepresentation claims makes sense because fraud and negligent misrepresentation claims contain all the same elements, except for scienter. *See Florenzano*, 387 N.W.2d at 173. Because scienter is the one element of fraud that need not be pleaded with particularity under rule 9.02, it is logical to measure the remaining elements that fraud and negligent misrepresentation have in common against the same heightened pleading standards. We agree that the pleading standards set out in rule 9.02 apply to a claim of negligent misrepresentation. *See Juster*, 366 N.W.2d at 618-19. The district court properly ruled that rule 9.02 applies here and the claim must be pleaded with particularity.

Appellants next argue that even if rule 9.02 applies, their claims were made with sufficient particularity to meet its standards. The district court ruled that the second amended complaint did not meet the heightened pleading standards for the negligent misrepresentation claims required under rule 9.02.

Rule 9.02 requires, but does not define, particularity. *Stubblefield v. Gruenberg*, 426 N.W.2d 912, 914 (Minn.App.1988). "General allegations of fraud are insufficient to meet the requirements of Rule 9.02."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Id.*

As to McIlroy and Travis, the district court concluded that the second amended complaint identifies only inaccuracies, not misrepresentations, as to the financial statements, fails to tie them to the financial statements, and fails to allege with particularity how they could have been responsible for the 2000 statements that were issued after McIlroy and Travis resigned. In addition, the court ruled that the complaint contains insufficient allegations as to what was wrong or how McIlroy and Travis were allegedly negligent. Further, appellants were unable to show how they justifiably relied on the allegedly false statements, where appellants were put on notice that the allegedly false statements were estimates and were not guaranteed. Appellants have failed to show error in the district court rulings.

As to EY, the district court noted that appellants pleaded that EY knew that HRM supplied EYs audit reports to appellants, intending to influence appellants, but failed to provide any basis for the claims. Regarding appellants stock-purchase plans, the court stated that they did not identify any specific transactions in which they purchased HRM stock, how EY knew about those transactions before they took place, or why appellants were intended to be benefited and guided by the audit reports.

First, while appellants cite various facts contained in their third amended complaint in support of their argument, we must review the second amended complaint that was before the court as the subject of the motion to dismiss, not the third.

Next, we address appellants contention that EY owed them a duty to ensure that HRM stated its financial statements completely and accurately and that EY complied with accounting and auditing standards. Appellants contend they relied on the financial statements in purchasing stock.

***4** An accountant may incur liability by supplying "false information for the guidance of others in their business transactions ... if he fails to exercise reasonable care or competence in obtaining or communicating the information." *NorAm Inv. Servs., Inc. v. Stirtz Bernards Boyden Surdel Larter, P.A.*, 611 N.W.2d 372, 374 (Minn.App.2000) (quoting Restatement (Second) of Torts 552 (1977)). Accountants may be liable for negligent misrepresentations to those who, although not themselves foreseen, are members of a limited class whose reliance on the representation is specifically foreseen. *Bonhiver v. Graff*, 311 Minn. 111, 128, 248 N.W.2d 291, 301-02 (1976). The liability is limited to the particular losses suffered:

> (a)by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>
> (b)through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*NorAm*, 611 N.W.2d at 375 (quoting Restatement (Second) of Torts 552).

Appellants argue that they did fall within a limited group of people expected to gain access to the financial statement information, because EY directed audit reports to HRM shareholders and consented to having its reports included in HRMs filings with the SEC, and because EY attended shareholder meetings to answer questions. But accountants are not liable if they "merely know[ ] of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon [an audit], on the part of anyone to whom it may be repeated." *NorAm*, 611 N.W.2d at 375 (quoting Restatement (Second) of Torts 552, cmt. h).

Next, appellant Loop Corp. brought a negligent misrepresentation claim against EY based upon entering into the $6.1 million master agreement. The district court dismissed the claim, ruling that appellants failed to plead how or why EY intended that Loop Corp. would benefit or be guided by the issuance of the 2000 statements or how or why EY would have intended to influence Loop Corp.s financing. Loop Corp. contends that because it was a known user of the 2000 audit financial statements, that was sufficient to state a prima facie cause of action. The district court properly dismissed the claim.

Appellants contend that the district court erred in denying them the opportunity to conduct discovery before dismissing their negligent-misrepresentation claims. A district court has broad discretion to grant or deny discovery requests, and it will not be reversed absent an abuse of discretion. *State by Humphrey v. Philip Morris, Inc.*, 606 N.W.2d 676, 685 (Minn.App.2000), *review denied* (Minn. Apr. 25, 2000). Appellants have failed to show that the district court abused its discretion. *See Elwood v. County of Rice*, 423 N.W.2d 671, 676 (Minn.1988) ("[p]laintiffs cannot expect discovery to provide factual support for conclusory allegations" where particularity is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

required).

### III.

*5 Next, we review appellants argument that Minnesota recognizes common-law claims by stockholders induced to continue holding stock. The district court concluded that Minnesota law does not recognize such a cause of action.

In support of their claim, appellants contend that Minnesota law has recognized that representations that induce a plaintiff to refrain from acting are actionable. *See, e.g., Atcas v. Credit Clearing Corp. of Am.,* 292 Minn. 334, 197 N.W.2d 448 (1972), *overruled on other grounds, Onvoy, Inc. v. SHAL, LLC,* 669 N.W.2d 344, 351 (Minn.2003). Appellants cite language stating that the elements of a misrepresentation claim include a situation in which "plaintiffs took *or refrained from taking action* in reliance on misstatements." *Id.* at 349, 197 N.W.2d at 457 (emphasis added). Appellants alleged that they refrained from selling their shares of stock in direct reliance on the false information provided by respondents.

*Atcas* is distinguishable because it did not involve securities. Instead, the plaintiffs in *Atcas* claimed they were fraudulently induced to agree to an arbitration clause in a franchise agreement. *Id.* at 341-42, 197 N.W.2d at 452-53. While appellants cite foreign law in support of their claim, Minnesota law has not recognized a common-law holding claim related to securities. The district courts ruling was proper.

### IV.

Appellants contend that the district court erred in dismissing their claims under the Minnesota Securities Act. The Minnesota Securities Act makes it unlawful "in connection with the offer, sale or purchase of any security," for any person

(a)to employ any device, scheme, or artifice to defraud;

(b)to make any untrue statement of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(c)to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Minn.Stat. 80A.01 (2002).

Appellants first contend they have a cause of action for stock purchased in 2000 and 2001 based on misrepresentations McIlroy and Travis made in certain financial statements and that EY made in connection with their audits of these statements under Minn.Stat. 80A.01(b), (c). The district court determined that scienter is an element of claims under the Minnesota Securities Act, and because appellants failed to plead it, dismissed the claims with prejudice. Appellants argue that scienter is not required and that allegations of negligence are sufficient.

The Minnesota Securities Act prohibits untrue statements or omissions of material fact "in connection with the offer, sale or purchase of any security, directly or indirectly." Minn.Stat. 80A.01 (2002). This is "Minnesotas counterpart to Rule 10b-5, 17 C .F.R. 240.10b-5." *Foley v. Allard,* 427 N.W.2d 647, 650 (Minn.1988). Rule 10b-5 similarly prohibits fraud "in connection with the purchase or sale of any security." *Id.* at 650 n. 2 (citing 17 C.F.R. 240.10b-5). The legislature expressly stated that the Minnesota act should be construed to coordinate its interpretation with the related federal regulation. Minn.Stat. 80A .31. The Minnesota Securities Act is patterned after rule 10b-5 and should be interpreted consistent with corresponding federal law. *Minneapolis Employees Retirement Fund v. Allison-Williams Co.,* 519 N.W.2d 176, 179 (Minn.1994). Consequently, federal caselaw is considered valued precedent. *Foley,* 427 N.W.2d at 650.

*6 Under federal caselaw, scienter is an "essential element of a Rule 10b-5 claim," requiring at least a showing of recklessness. *Florida State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 653-54 (8th Cir.2001). In *Allison-Williams,* the supreme court, in addressing the issue of whether the plaintiff had to prove scienter for an unsuitability claim brought under the Minnesota Securities Act, looked to the provision of the federal securities law under which the claim would fall. 510 N.W.2d at 180-81. The court expressly rejected the claim that plaintiff need not show fraudulent intent or recklessness to bring an unsuitability claim. *Id.* Although appellants contend this court ruled otherwise in *Sprangers v. Interactive Techs., Inc.,* 394 N.W.2d 498, 503 (Minn.App.1986), *review denied* (Minn. Nov. 19, 1986), we note the supreme court cited *Sprangers* in *Allison-Williams,* 519 N.W.2d at 181. In any event, following the lead of the supreme court in *Allison-Williams* and federal law, we agree with the district court that scienter is required. *See Allison-Williams,* 519 N.W.2d at 181; *Fawcett v. Heimbach,* 591 N.W.2d 516, 522 (Minn.App.1999) (citing federal caselaw stating that one of the essential elements of a rule 10b-5 claim is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

scienter).

Appellants next contend that the district court erred in holding that Minnesota law does not permit claims by shareholders who are induced to continue to hold, rather than sell, securities under various theories.

Under federal law, an action under rule 10b-5 is limited to actual purchasers or sellers. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731, 737-38, 95 S.Ct. 1917, 1923, 1926, 44 L.Ed.2d 539 (1975). Thus, the district court correctly dismissed the holding claim under the Minnesota Securities Act.

**V.**

Finally, we address appellants claims under the Minnesota Consumer Fraud Act. First, the district court concluded that the securities do not constitute "merchandise" for the purchases of the Minnesota Consumer Fraud Act. Appellants argue that the definition of merchandise is broad enough to encompass securities.

Under the Minnesota Consumer Fraud Act, fraud or misrepresentation is prohibited "in connection with the sale of any merchandise." Minn.Stat. 325F.69, subd. 1 (2002). "Merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate, loans, or services." Minn.Stat. 325F.68, subd. 2 (2002). Securities are not expressly included. Further, Minn.Stat. 325F.67, regarding false statements in advertising, differentiates securities from merchandise. The legislature clearly included securities within purview of one portion but chose not to refer to them in sections 325F.68 and 325F.69. This fact, coupled with the fact that the legislature created a separate statutory scheme to address securities violations--Minnesota Securities Act, Minn.Stat. 80A.01--supports the district courts conclusion that securities are not included in the definition of merchandise.

*7 Appellants argue that the district court erred by holding that the Minnesota Consumer Fraud Act, Minn.Stat. 325F.69, subd. 1, required them to plead scienter. We find it unnecessary to reach this issue in light of our decision that securities are not included within the definition of merchandise within the meaning of the act.

Finally, appellants brought a claim under the Minnesota Consumer Fraud Act based on their argument that they were induced to continue to hold stock. It is also unnecessary to reach this issue for the same reason.

The decision of the district court is affirmed.

**Affirmed.**

2004 WL 2221619 (Minn.App.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.