UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Teleplus Consulting, Inc.,

Plaintiff,

v.

Conseco Services, LLC,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Civil File No. 02-CV-212 (JNE/JGL)

**PLAINTIFF'S TRIAL BRIEF**

This case arises from the refusal of Defendant Conseco Services, LLC ("Conseco") to pay Teleplus Consulting, Inc. ("Teleplus") the consulting fee – a percentage of the savings Conseco realized from a new, beneficial contract with AT&T made possible by Teleplus – it had fully earned under the parties' contact.

## THE PARTIES

Telelpus Consulting, Inc. is a Twin Cities-based, locally-owned small business that provides telecom consulting services to large users of communications services. Conseco Services, LLC, is a wholly-owned subsidiary of Conseco, Inc., the holding company for a group of insurance companies operating throughout the United States. As of December 31, 2003, Conseco had $2.8 billion of shareholders' equity and $29.9 billion of assets and for the four months ended December 31, 2003, Conseco had $1,505.5 million of revenues and $96.3 million of net income.

Teleplus' business of advising telecom buyers is valuable to its clients because of the tremendous changes that have taken place in the communications industry in the last 10-15 years. For larger business buyers, telecom services have become both complex and fragmented. A business using significant telecom services can no longer go to a carrier and just buy a "standard package" of services like a suit off the rack. The industry is now like a custom men's clothier: it's all custom work, and the buyer needs expert help to negotiate with the savvy carriers.

That is exactly what Teleplus does: their analysts read and review the thousands of contract tariffs, options, and pricing plans that carriers create every year, looking for packages that could be advantageous to Teleplus' customers. They also keep up to date on the trends and standards of the industry, so they can advise clients when a carrier proposes a particular price or option.

## FACTS

In early 2001, Bill Hansen of Teleplus approached Conseco, and proposed that Teleplus review Conseco's existing carrier contracts. The parties' discussion let to their executing, on February 12, 2001, a Consulting Services Agreement ("the Agreement") under which Teleplus agreed to do four things related to Conseco's existing long-distance telecommunications services:

(1) to review Conseco's present telecommunications contracts and usage;

(2) using the knowledge gained from that review, to review the currently available carrier pricing packages (the "contract tariffs or other options") to see what – if any – better pricing packages there might be for Conseco;

(3) if Teleplus were to find any such advantageous pricing packages, to present Teleplus' recommended contract tariffs or other options (defined in the Agreement as the "New Tariffs") for Conseco's review; and,

(4) if Conseco decided to pursue any of those recommended contract tariffs or other options, to assist in negotiating with the carrier(s) to attempt to secure a new contract acceptable to Conseco.

Teleplus also agreed to analyze currently available contract tariffs or other options that Telelpus believed would help Conseco establish an affiliate/affinity plan for Conseco's constituency.

The parties negotiated the terms under which Teleplus might be paid for its consulting work. For Teleplus to be paid of its work on the long-distance side, two contingencies would have to be met:

(1) Teleplus would have to actually present recommendations on the New Tariffs for Conseco's review, and

(2) Conseco would have to initiate service either under one of the New Tariffs, or initiate service under pricing or other terms substantially similar to the New Tariffs.

For Teleplus to be paid for its work on the affiliate/affinity plan, two contingencies would have to be met:

(1) Teleplus would have to actually present recommendations on an affinity/affiliate program for Conseco's review, and

(2) Conseco would have to initiate service under the affinity/affiliate program recommended by Teleplus, or initiate service under pricing or other terms substantially similar to the affinity/affiliate program recommended by Teleplus.

As soon as Teleplus began reviewing Conseco's existing AT&T agreement, which had only been signed in April of 2000, Teleplus discovered several problems: the prices were above the market rates for a customer of Conseco's size, Conseco was about to incur significant penalties for not using enough of AT&T's services in the first year, and Conseco had promised AT&T a level of future use - $34 million a year – that Conseco's current business could not reach. Teleplus advised Conseco of these problems, and got Conseco's agreement to begin working to fix them.

This was a difficult task, since the AT&T contract was so recent, and had over two years left to run – in fact, AT&T's initial response to a request to meet to negotiate was "no."

Since AT&T did not want to come to the table, Teleplus prepared a strategy for Conseco that DID get AT&T to the table: Teleplus pointed out that there may have been fraud in manner that AT&T got Conseco to sign the 2000 contract. Within days of Conseco making a call to AT&T with Teleplus's script, AT&T agreed to come to the table and re-negotiate prices and penalties.

Teleplus's approach to carrier negotiations is to first get the carrier tied down on the key pricing terms, so the carrier cannot try to use prices throughout the negotiations to "trade" for other terms. Once the prices are set, Teleplus moves on to whatever other

terms the client needs from the carrier. That is exactly what Teleplus did for Conseco. Teleplus started working on the AT&T problems in February , 2001. By March 23, 2001 Teleplus had obtained AT&T's agreement to waive Conseco's $6 million shortfall liability. By April 23, AT&T had agreed to price concessions – amazing work for a client with no bargaining strength at the beginning of the process.

This left the issue of future commitment levels. Conseco and AT&T entered into serious research and discussions about how much traffic Conseco could realistically offer to AT&T, and that process took most of May and June. AT&T held out for a high level of commitment, trying to get Conseco to promise at a level of 95% of its most optimistic projections for usage. Teleplus advised Conseco to work for a lower level, knowing that Conseco would otherwise just be back into the trap of owing AT&T for missing its commitments.

These negotiations hit a roadblock, with AT&T demanding that Conseco commit to $80 million of three years, when Conseco could realistically only make about $25 million per year of volume. To break the logjam, Teleplus proposed to Conseco that the negotiations move to a higher level of authority, and prepared a letter for Conseco's CEO to send to his counterpart at AT&T to try to get things moving again. Conseco's local management agreed with Teleplus and added their own "tweaks" to the language of the letter, and then took the idea to higher management in Carmel, Indiana. Conseco had internal meetings in Indiana in July to which Teleplus was not invited, and Teleplus heard nothing for the next month.

So, Teleplus worked on the MCI contract and on the possible wireless affinity'affiliate, securing offers prepared by MCI and Verizon. Telelpus later learning that Conseco directly contacted each of the carriers and directed them to send the final versions of their contract proposals to Conseco, completely bypassing Teleplus.

In September 2001, Teleplus was surprised to see a filing of a signed contract between Conseco and AT&T, which was based upon the final term sheet that Teleplus had secured for Conseco, but with the higher level of future commitments about which Teleplus had warned Conseco. Teleplus eventually met with Conseco to discuss the AT&T contract, and the local Conseco manager told Telelpus' CEO during that meeting, "don't worry, you'll get paid."

However, when Teleplus prepared and sent an invoice for its initial fee on the AT&T contract, Conseco responded with a letter asserting that Conseco owed Teleplus nothing and directing that Teleplus cease working on the other projects which were still underway for Conseco.

## ARGUMENT

Although Teleplus performed the one activity required of it under the Agreement for Teleplus to be paid, and Conseco took the one action required of it under the Agreement, Conseco unilaterally refused to pay Teleplus, and this civil action followed. All of the arguments advanced by Conseco in response to Teleplus' Complaint have been *post-hoc* rationalization of a decision – made perhaps as early as the time of signing of the Agreement - not to pay Teleplus its earned consulting fee.

## A. **<u>The Reasons Given By Conseco In 2001 For Refund To Pay Teleplus Are Insufficient.</u>**

The simple facts are as set out above: Teleplus performed its consulting services for Conseco as called for in the Agreement, and secured for Conseco three separate carrier offers - AT&T, Worldcom, and Verizon - that all provided tremendous financial benefit for Conseco. At the final step of the negotiation process with each carrier, Conseco pulled the negotiations away from Teleplus and concluded the negotiations while excluding Teleplus from that process.

Defendant asserted in its October 26, 2001, letter that - in the case of AT&T - Teleplus should not be paid because (1) Telelpus did not assume responsibility for all contract negotiations with AT&T, and (2) the contract which Conseco entered into with AT&T had terms different from those recommended by Teleplus. These assertions do not stand up to scrutiny under the parties' agreement or controlling law.

### 1. **<u>Payment does not turn on negotiating</u>.**

There is no requirement in the Agreement that Teleplus take specific actions or activities in negotiating with carriers in order to be paid; rather, payment requires only the **<u>presentation of recommendations</u>**, and the timely execution [1] by Conseco of a contract with "pricing...substantially similar" to the contract tariffs and other option recommended by Teleplus.

---

[1]This is not a theoretical point, since Conseco delayed signing the MCI contract until a year had elapsed, thus evading its obligation to pay Teleplus.

Performance of a contract occurs when a party fulfills its duties in a way that puts an end to its duties by leaving nothing more to be done. *Schutt Realty Co. v. Mullowney*, 10 N.W.2d 273 (Minn. 1943.) Here, the duty imposed on Teleplus to be paid was to present its recommendations based upon the presently-available contract tariffs or other options. Teleplus completed that duty when it made its presentations of recommendations in February and March, 2001.

There is no factual basis for Conseco to assert that Teleplus did not present its recommendations on the state of carrier contract tariffs and other options: the record adduced through discovery contains Teleplus' reports on approximately ten contract tariffs and notes of the meetings between Teleplus and Conseco. During those presentations, Teleplus explained to Conseco that the best rates then available for the services that formed the vast majority (75-85% of Conseco's traffic) were just under $.03 and $.055. Because of the newness of the AT&T contract, Conseco's large outstanding shortfall, and Conseco's lowered level of minutes of use, Teleplus advised Conseco that it was not likely that those rates could be obtained along with a lowered annual commitment.

After hearing Teleplus' recommendations, Conseco gave Teleplus the green light to proceed with carrier negotiations, and to attempt to get rates close to $.03 and $.055, along with lower annual commitments. That presentation of contract tariffs and recommendations - accepted and adopted by Conseco - completely satisfied the first payment condition in the Agreement.

The second condition was satisfied when, six months later, Conseco signed a contract with AT&T that contained pricing terms substantially similar to the prices Teleplus had presented as part of its recommendations in February and March, 2001: prices of $.03 and $.055 for those primary services!

The Agreement requires nothing else for Teleplus to be paid; there are no other duties required under the "Compensation" section of the Agreement. There is a separate provision in the "Scope of Service" section which includes among the things Teleplus will do for Conseco, "assume responsibility for all contract negotiations..." While there is a practical reason why Teleplus would move forward with carrier negotiations - the greatly decreased likelihood that Conseco would enter into a new contract if there were no negotiations towards that contract - the requirements for Teleplus to be paid are quite separate.

The reason for this separation is quite logical: otherwise, a client could obtain Teleplus' expert advice and counsel in the form of Teleplus' recommendations, tell Teleplus it desired nothing more to be done, and immediately use the knowledge it had gained from Teleplus to strike a new deal with a carrier. It is only by making the payment obligation so specific and separate from any other terms of the Agreement that Teleplus is able to avoid subterfuge and claims that it should not be paid.

### 2. <u>The final contract has pricing substantially similar to Teleplus' recommendations.</u>

The AT&T-Conseco contract has terms substantially similar to the recommendations made by Teleplus, and to the agreement points negotiated for Conseco

by Teleplus during the course of Teleplus' work. It contains reduced revenue requirements, reduced per-minute prices, removal of the International and Data sub-requirements, rate stabilization on voice services, reflection of added services in meeting the MARC, and a fourth-year extension to the term of the contract.

The Agreement only requires that there be "pricing **or other terms** substantially similar" to Teleplus' recommendations for Teleplus to be entitled to its full payment. That degree of similarity is clearly present when the prices for the services that constitute over 75% of Conseco's interstate traffic were set at levels virtually identical to Teleplus' recommendations: $.03 and $.055.

**3. Any failure of Teleplus to perform was due to Conseco's actions.**

Given that AT&T did not even want to come back to the bargaining table with Conseco, and that AT&T knew it had the upper hand in any negotiations due to Conseco's huge, looming shortfall penalty, the fact that Teleplus was able to get AT&T to the table, secure concessions, and nail down reduced prices in short order belies any claim that Teleplus did not do enough to achieve positive results for Conseco in the negotiations.

To the extent that Teleplus could be said to not have fulfilled any obligation to participate in the contract negotiations, such a failure was due to Conseco's actions. Every Minnesota contract contains an implied term that each party will not unjustifiably hinder the other from performance. *Zobel & Dahl Construction v. Crotty*, 356 N.W.2d 42 (Minn. 1984.)

Early on, Conseco notified AT&T that its personnel would be the lead negotiators, with Teleplus providing assistance. At all times, Teleplus was subject to Conseco's direction and control over how the negotiations would proceed and what positions would be taken across the table from AT&T. The final irony is that Conseco unilaterally and without **any** notice to Teleplus secretly removed Teleplus from the AT&T negotiations by directing AT&T to send the final version of the carrier's proposed contract directly to Conseco and not to send it *via* Teleplus.

## B. Conseco Clearly Made False Representations To Teleplus.

In retrospect, it seems clear to Teleplus that Conseco took advantage of Teleplus' hard work, took all the benefits that Teleplus secured for Conseco, but has refused to share those benefits. Conseco will save about $9 million dollars over three years on the amended AT&T agreement that Teleplus negotiated; Teleplus' consulting fees under the agreement would be approximately $600K, or less than 7% of the savings.

Regardless of whether Conseco never intended to pay Teleplus from the beginning, or changed its mind partway through the process, Conseco's actions constitute fraudulent misrepresentation. The facts support this claim in that:

- Conseco falsely represented to Teleplus a past or present material fact about which Conseco knew - whether or not Conseco was going to pay Teleplus;
- At the time Conseco made that false representation, Conseco either knew it was false or assert the representation was true when it did not know if it was true or false;

- Conseco intended that Teleplus would rely on the false representation - even after Conseco had gone behind Teleplus' back and directed AT&T to stop working with Teleplus and send materials only to Conseco, Conseco had Telelpus continue to work on the other pieces of the Agreement;
- Teleplus relied and acted upon Conseco's false representation -Teleplus believed Conseco's representation, up to and including the September 2001 statement by the local Conseco manager, "don't worry, you'll get paid."; and,
- Teleplus was harmed as a direct result of replying on Conseco's false representation and continuing to devote time and effort on Conseco's behalf.

*See*, e.g., *Rochester Methodist Hospital v. Traveler's Insurance Co.*, 728 F.2d 1006 (8th. Cir. 1984.)

## CONCLUSION

Telelpus has valid factual and legal bases for its claims, and will demonstrate so at trial.

Dated: June 20, 2005

LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By: s/Christopher K. Sandberg
Christopher K. Sandberg #95485
Darla Jo Boggs #0314912
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: 612-339-6900
Facsimile: 612-339-0981
Attorneys for Plaintiff Teleplus Consulting, Inc.