**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Teleplus Consulting, Inc.,

Plaintiff,

v. Civil File No. 02-CV-212 (JNE/JGL)

Conseco Services, LLC,

Defendant.

# TRIAL BRIEF OF CONSECO SERVICES

## INTRODUCTION

In 2001, the telecommunications markets experienced tremendous growth and increasing competition among carriers for local and long distance business. As a result, rates fell as carriers battled for lucrative business customers. In this environment, telecommunications contracts were frequently renegotiated. Typically telecommunications carriers offered more favorable rates in exchange for long-term commitments.

This case involves the attempted negotiation of three complex telecommunications contracts in 2001 and 2002. Conseco Services, LLC ("Conseco") desperately needed to renegotiate its contract with AT&T in particular. Conseco's business experienced an unexpected decline which produced a decline in Conseco's demand for telecommunication services. Conseco could not meet the minimum revenue commitments it had made to AT&T, resulting in an increasing "shortfall" totaling approximately $6 million dollars by early 2001. Changes in the telecommunications

markets rendered the rates in the existing AT&T contract above available market rates. Conseco faced a smaller shortfall in its WorldCom contract, but that contract was within a year of expiration so ripe for renegotiation.

Although Conseco had always negotiated its contracts on its own, the looming shortfalls made renegotiation much more complicated. Teleplus Consulting, Inc. ("Teleplus") approached Conseco and offered to lead the negotiations with the carriers. Rather than working on a per-hour basis, Teleplus structured its compensation on a contingent fee basis, under which Teleplus would be paid only if it secured new and better contracts for Conseco. If it did, Teleplus would receive a percentage of any savings it obtained for Conseco, which it believed would be more remunerative than straight hourly fees. As further inducement to Conseco, Teleplus represented that it could deliver final contracts with improved rates within weeks.

Unfortunately, Teleplus failed to deliver. The negotiations with Conseco's carriers dragged on for months, with the parties actually moving further apart. It became apparent that Teleplus was not going to be able to produce new contracts as required under its agreement with Conseco. AT&T was again threatening to bill Conseco for the $6 million shortfall. Conseco had to discharge Teleplus and complete the negotiations with the assistance of another consultant.

Teleplus brought this case claiming that despite failing to secure a single contract, Conseco owes Teleplus the full amount of compensation under its Agreement. Conseco disputes that Teleplus is entitled to any payment and has filed a counterclaim based on

the damages Teleplus caused by delaying Conseco's ability to obtain easily available lower rates under its contracts.

## FACTS

Conseco required significant telecommunications resources to communicate with its substantial customer base as well as connect its widely dispersed internal operations. Conseco negotiated a contract in 2000 with AT&T. Although it believed its business would continue to grow and allow it to meet the higher annual revenue commitment ("MARC") contained in the contract, the economy declined and Conseco experienced a dramatic downturn, resulting in a significant shortfall less than a year after the contract was signed. The prospect of paying a multi-million dollar shortfall threatened to put Conseco over the brink. Conseco also very much needed the potential savings from lower rates currently available in the market.

Teleplus represented to Conseco that it had a keen understanding of the changing marketplace, that it could produce the results that Conseco needed, and that it could do so quickly. Based on these representations, Conseco agreed to retain Teleplus to obtain new telecommunications contracts for Conseco.

### A. The Consulting Services Agreement

Teleplus drafted an agreement which Conseco signed after making only a few changes. Teleplus asked for and received a compensation schedule that contained specific performance requirements before Teleplus would be paid. If those requirements were met, Teleplus would be paid handsomely.

### 1. Required Performance

The Consulting Services Agreement divides services that Teleplus was required to perform into two categories. The first, called "Schedule A," addresses the telephone contracts with AT&T and WorldCom, and requires Teleplus to:

> *assume responsibility for all contract negotiations* with the service providers, and make recommendations to Client as to the presently available contract tariff(s) or other options which Teleplus believes will provide Client with appropriate services and facilities at minimum costs.

Consulting Services Agreement at 1 (emphasis added). The second payment provision, concerning the affiliate/affinity program is irrelevant because that program never materialized.[1]

### 2. Prerequisites for Compensation

Under the contingency structure of the Consulting Services Agreement, Teleplus acknowledged that it would not be compensated unless it secured a "new tariff" for Conseco. If it did, Teleplus received substantial compensation: 30% of all savings realized under the new tariff.

---

1 Conseco has filed a Motion in Limine requesting that any claim relating to compensation for an "affiliate" program be removed from consideration at trial given the complete lack of any evidence that such a program ever existed. "Schedule B" addresses the wireless affiliate contract. Schedule B states:

> Teleplus will analyze the presently available contract tariff(s) or other options that Teleplus believes would help Client establish an effective affiliate/affinity program for the constituency of Client. Teleplus agrees to provide management services to help run an affiliate/affinity program.

The Agreement thus contained three conditions precedent that Teleplus had to satisfy before being entitled to any compensation. First, Teleplus would assume responsibility for all negotiations. Then:

> i. Teleplus would present recommended contract tariff(s) or other options to Client; <u>and</u>
>
> ii. Client initiates service, within 12 months of the date on which Teleplus presents its recommendation to Client, under the contract tariff(s) or other options recommended by Teleplus (the "New Tariff(s)"), or under the affiliate/affinity program recommended by Teleplus, or Client initiates service from any carrier within such 12 month period under pricing or other terms substantially similar to the New Tariff(s) or the affiliate/affinity program recommended by Teleplus.

Consulting Services Agreement at 1-2 (emphasis added).

While there may be some room for dispute concerning the extent to which Teleplus actually took responsibility for the negotiations, the remaining two criteria can be evaluated quite objectively. In order to be paid, Teleplus first had to present *and recommend* a binding contract (which is defined as a "contract tariff") offered by a carrier, and second, Conseco had to sign it (or a substantially similar contract) within twelve months.

Upon fulfilling its obligation to lead the negotiation and then meeting the above two conditions precedent, Teleplus' compensation would be calculated as follows:

> Upon occurrence of (i) and (ii) above as full and complete compensation for Teleplus services under this Agreement:
>
> SCHEDULE A:
>
> Client will pay Teleplus based on a percentage of savings consisting of thirty percent (30%) of the savings or credits, subject to a total cap of $200,000 per year on the first

> $2,000,000 dollars of actual annual savings, and two percent (2%) of all additional monthly savings or credits calculated based on the net difference in clients contract rates of January 1, 2001 for voice and data, and the New Tariff rates negotiated by Teleplus on behalf of the client.

Consulting Services Agreement at 2.[2] Conseco believed the significant compensation provided adequate motivation for Teleplus to deliver on its promise of rapid, successful contract negotiations.

**B. Teleplus' Failure To Deliver**

While Teleplus initially provided excerpts from publicly available contracts with other businesses as preliminary context for the contract it ultimately needed to secure for Conseco, and exchanged several tentative drafts of offers and counter offers with AT&T in particular, at no time did Teleplus ever produce a binding contract offer, much less one that Teleplus recommended that Conseco sign. The negotiations with AT&T and WorldCom did not progress at all as projected by Teleplus. Teleplus' confrontational approach in the negotiations quickly soured Conseco's relationship AT&T, and its

---

[2] If Teleplus had also secured an affiliate/affinity program--and there is **absolutely no** evidence to support that conclusion--it will receive further compensation under Schedule B, which provides:

> SCHEDULE B:
>
> If Client accepts the recommended affiliate/affinity program, related to Client's wireless and ISP services, Client will pay to Teleplus, thirty percent (30%) of the credits and/or additional discounts Client received from the carrier(s) arising from the telecommunications services (none of which are encompassed in Schedule A) to members of the affiliate/affinity group, as long as Client receives such credits and/or additional discounts from the carrier(s) to the extent they are a result of Teleplus recommendations under this agreement. There shall be no cap on the amount of these payments and such payments shall continue as long as such credits and/or additional discounts are earned and a New Tariff is in place.

relationship with WorldCom soon thereafter. Rather than producing the new contracts quickly, as promised by Teleplus, the negotiations deteriorated to the point that after several months of dealing with Teleplus, AT&T was offering terms far worse than those it had been willing to discuss initially.

In a last attempt to get the negotiations back on track, Teleplus drafted a letter for Conseco to send AT&T President, Business Service Sales Kenneth Sichau. The Teleplus letter demanded that AT&T management replace its entire negotiating team and essentially start over. That represented a huge step in the wrong direction for Conseco. Not only had precious months passed with no new contract in sight, but Conseco was no closer to (evidence suggests even further away) from a new contract with AT&T. This delay cost Conseco hundreds of thousands of dollars every month that the stalemate continued.

Rather than fire the negotiating team from AT&T with absolutely no guarantee of better results, Conseco realized that it needed to breathe new life into the negotiation process and brought in its own senior executives—who had been monitoring the negotiations and were in a position to step in quickly—to meet directly with AT&T. Conseco also retained a law firm with experience in such negotiations to assist it. After several more weeks (but fortunately not months) of hard work, Conseco was able to obtain a new contract with AT&T. While Conseco allowed Teleplus to continue to attempt to secure new contracts with WorldCom and Verizon for a few more weeks, Teleplus' confrontational approach proved no more productive with these carriers then it

had with AT&T. After failing to secure contracts with either WorldCom or Verizon, Teleplus was relieved of any further responsibility.

## ARGUMENT

In hindsight, it is clear that Teleplus vastly oversold its purported capabilities, particularly its ability to produce new contracts in a relatively quick timeframe. Teleplus knew (or certainly should have known) that the relative leverage that AT&T enjoyed in light of Conseco's significant shortfall did not put Conseco in a position to make the kind of demands that Teleplus was counseling it to make. Indeed, in one e-mail exchange with Teleplus, a senior AT&T executive chided Teleplus for demanding concessions which by virtue of its experience with AT&T, Teleplus knew AT&T would not allow.

As the negotiations grew increasingly contentious, Conseco's business relationship with AT&T and WorldCom deteriorated and the prospect of obtaining any new contracts quickly evaporated.

### A. Conseco Did Not Breach the Consulting Services Agreement

### 1. The Agreement is Governed by Minnesota Law

To prevail on a breach of contract claim in Minnesota, a party must prove: (1) the formation of the contract; (2) that the party performed any conditions precedent to its right to demand performance by the other party; and (3) breach of the contract by the other party. Industrial Rubber Applicators, Inc. v. Eaton Metal Prods. Co., 171 N.W.2d 728, 731 (Minn. 1969) (overruled in part by Standslast v. Reid, 231 N.W.2d 98 (Minn. 1975)); Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc., 943 F. Supp. 1117, 1126 (D. Minn. 1996); In re Health Risk Mgmt., Inc., 319 B.R. 181, 187 (D. Minn. 2005). The

Parties have stipulated to the existence of a valid contract. See Stipulation to Dismiss Unjust Enrichment Claim, filed June 23, 2005. Conseco disputes that Teleplus fulfilled the second required element, because it failed to meet the conditions precedent. Specifically, to receive compensation under the Consulting Services Agreement, Teleplus had to assume responsibility for the negotiations and "present recommended contract tariff(s) or other options to Client." Consulting Services Agreement at 2. That never happened.

Teleplus could never obtain a contract offer from AT&T that Teleplus was prepared to recommend that Conseco sign. The outlines of offers and counter offers exchanged between AT&T and Conseco grew further apart rather than closer together.

Minnesota imposes a duty of good faith and fair dealing in the performance of a contract upon every party. Enviro-Fab Inc. v. Blandin Paper Co., 349 N.W.2d 842, 848 (Minn. Ct. App. 1984); see Restatement (Second) Contracts § 205 (1981). The Restatement (Second) of Contracts defines good faith to include reasonableness in performance. Hence, Teleplus had a duty to perform reasonably under the circumstances. In this case, good faith performance required negotiation of contracts in a manner that would accomplish the essential purposes of the Consulting Services Agreement, which clearly contemplated at least a general timeframe for performance.

Neither the law nor common sense support Teleplus' assertion that it fulfills the necessary elements to prove a breach of contract claim. Not only did the Parties clearly anticipate that Teleplus' performance would be prompt, but the ongoing harm suffered by

Conseco as it continued to labor under the old contracts—a harm Teleplus certainly knew of and appreciated—underscored the need for timely and adequate performance.

**2. The Parties Contemplated Teleplus would procure a Contract Tariff It Recommended Conseco Sign**

Teleplus was obligated to procure telecommunications contracts in good faith and in a reasonable time[3] as a pre-condition to Conseco's performance of the payment provisions of the Consulting Services Agreement. The language of the contract requires that Teleplus procure a new "contract tariff" or "other option" (which in the context of wireless services plainly was understood to be the legal and functional equivalent of a contract tariff). See Consulting Services Agreement at 1-2. The Parties' clearly manifested their mutual understanding that Teleplus would present offers by the various carriers for signature in the many e-mails exchanged between them as well as between Teleplus and AT&T and WorldCom.

To the extent Teleplus now argues that the language establishing exactly what it was obligated to do under its contract with Conseco is ambiguous, any uncertainty must be construed against it. Any uncertainty in the words of a contract must be resolved in favor of the other party. Minnesota law in this subject is quite clear. If a contract is prepared by one of the parties and the language is ambiguous, it should be construed against the drafting party, as read in the sense in which a prudent and reasonable person would have understood it. Turner v. Alpha Phi Sorority House, 276 N.W.2d 63, 66

[3] See Section C, infra.

(Minn. 1979); Hilligoss v. Cargill, Inc., 649 N.W.2d 142, 148 (Minn. 2002); Current Technology Concepts v. IRIE Enterpris., 530 N.W.2d 539, 543 (Minn. 1995).

### 3. Teleplus' Failure to Procure a Contract Tariff For Conseco to Sign Absolves Conseco From Payment to Teleplus

Teleplus asserts that Conseco breached the contract by failing to pay the contingent compensation triggered if Teleplus secured new contracts. As discussed above, Teleplus failed to perform the critical condition precedent required under the contract—securing valid contract offers from Conseco's carriers—before Conseco became obliged to pay any compensation. Therefore, Conseco is excused from performance and there can be no breach of contract or resulting damages. "A condition precedent is an event that must occur before a party is required to perform a certain contractual duty." Minnwest Bank Cent. v. Flagship Props. LLC, 689 N.W.2d 295, 299 (Minn. Ct. App. 2004) ("[N]o particular code words [are] needed to form an express condition." (citing 5 Samuel Williston, Williston on Contracts § 671 (3d ed. 1961)); Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc., 943 F. Supp. 1117, 1126 (D. Minn. 1996); In re Health Risk Mgmt., Inc., 319 B.R. 181, 187 (D. Minn. 2005).

### 4. The Law Assumes A Reasonable Period of Time For Teleplus To Secure Contract Offer

Where a contract is silent about the time of performance, the general rule is that the contract must be performed within a reasonable time. Hill v. Okay Construction Co., 252 N.W.2d 107, 114 (Minn. 1977) ("[W]here a contract is silent as to the time of performance, the general rule is that the contract must be performed within a reasonable time."); William B. Tanner Co. v. Waseca-Owatonna Broadcasting, 549 F. Supp. 411,

414 (D. Minn. 1982). "[W]hat constitutes a reasonable time for the performance of contract obligations is a question of fact or of mixed law and fact to be determined by the jury," unless the facts are conclusive. Henry v. Hutchins, 178 N.W. 807, 809 (Minn. 1920) (judge may decide "reasonable time" as a matter of law given parties' stipulation of relevant facts). Performance of a contract is such a thorough fulfillment of its duties as puts an end to its obligations by leaving nothing more to be done. Schutt Realty Co. v. Mullowney, 10 N.W.2d 273, 275 (Minn. 1943).

There is no dispute that Teleplus understood the importance of obtaining new contracts quickly, especially given the adverse consequences that Conseco was suffering as long as the old contracts remained in place. Teleplus projected it could obtain new contracts within eight weeks of its first solicitation of Conseco's Services, and within approximately 6 weeks of Conseco signing an Agreement with Teleplus. Teleplus was not relieved of its negotiating responsibilities with AT&T until over 5 months had passed; it was given several more months with WorldCom and Verizon. It never produced a signed contract tariff (or in the case of Verizon, "other option") that it recommended that Conseco accept. Conseco afforded Teleplus more than an ample opportunity to perform a task that Teleplus expressly recognized was very time sensitive.

**B. Conseco Did Not Fraudulently Misrepresent Its Intention To Pay Teleplus**

Minnesota law requires a party asserting a fraud claim to prove as an essential element of the claims "that there was a false representation regarding a past or present fact" and that "the representer knew it was false or asserted it as his or her own

knowledge without knowing whether it was true or false." Martens v. Minnesota Mining & Manuf. Co., 616 N.W.2d 732, 747 (Minn. 2000). As such, where a fraud claim is premised on a representation regarding a future event, "an additional element of proof is that the party making the representation had no intention of performing when the promise was made[.]" Id.; C.H. Robinson Worldwide, Inc. v. Ghirardelli Chocolate Co., 2004 WL 1630873, at *4 (D. Minn. 2004) (citing Martens).

"It is a well-settled rule that a representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place." Martens, 616 N.W.2d at 747. Rather, a plaintiff has the burden of making an affirmative demonstration that the defendant had no intention to perform at the time the promise was made. Id. (dismissing plaintiff's fraud claim where complaint was devoid of any specific claim that defendant had no intention of fulfilling representations at the time they were made). See also Retek, Inc. v. Cox, 2003 WL 22037709, at *3 (D. Minn. Aug. 29, 2003) ("it must be made affirmatively to appear that the promisor had no intention to perform at the time the promise was made.").

Plaintiff alleges that Conseco made a fraudulent promise about a future event—that Conseco would pay Plaintiff if Plaintiff performed its obligations as required under the Contract. See Compl. at ¶¶ 43, 46. Accordingly, to establish its fraud claim, Plaintiff is required to prove that Conseco had no intention of paying Plaintiff at the time it signed the Contract, even if Plaintiff fulfilled its own contractual obligations. See Martens, 616 N.W.2d at 747.

Not only has Teleplus failed to produce a scintilla of evidence that Conseco had no intention of fulfilling its obligations to pay Teleplus under the contract, but Teleplus implicitly concedes it cannot satisfy this standard in its Trial Brief to the Court. "Regardless of whether Conseco never intended to pay Teleplus from the beginning *or changed its mind partway through the process*…" Teleplus Trial Brief at 11. The facts show that only after discharging Teleplus for lack of performance did Conseco make the decision not to pay Teleplus a consulting fee it had not earned.

**C. Teleplus' Failure To Perform Under the Contract Damages Conseco.**

**1. Teleplus Breached The Contract**

To prevail on its breach of contract claim, Conseco must prove (1) the formation of the contract; (2) that the party performed any conditions precedent to its right to demand performance by the other party; and (3) breach of the contract by the other party. Industrial Rubber Applicators, Inc. v. Eaton Metal Prods. Co., 171 N.W.2d 728, 731 (Minn. 1969) (overruled in part by Standslast v. Reid, 231 N.W.2d 98 (Minn. 1975)). Teleplus does not dispute formation of the contract. Unlike the case with Teleplus, there was no condition precedent that Conseco had to satisfy. Teleplus' failure to obtain new contracts breached its obligation under the Agreement, and the resulting delay caused Conseco to incur higher rates, and thus damaged Conseco. The Amended Expert Report of Timothy J. Nantell, filed August 4, 2003, contains the calculation of the damages.

A party becomes liable for breach of contract where it is shown that damages resulted from or were caused by that breach**.** Nguyen v. Control Data Corp., 401 N.W.2d 101 (Minn. Ct. App. 1987); see Restatement (Second) of Contracts, § 344(b) (1981). The

evidence will clearly demonstrate that Conseco suffered real damages as a result of Teleplus' failure to perform as promised. The damages are both quantifiable: over $1 million in higher rates and more than $80,000 to hire an alternative consultant to complete the negotiations, and qualitative: significant harm in the business relationships between Conseco and its telecommunications carriers. Conseco seeks compensation for the damage it suffered by Teleplus' lack of timely performance.

**2. Teleplus Negligently Misrepresented Its Expertise and Its Ability to Achieve A Contract**

To sustain a claim for negligent misrepresentation, Conseco must prove that Teleplus: (1) supplied false information to Conseco to guide its business transaction; (2) Teleplus failed to use reasonable care or competence in obtaining the information or communicating it to Conseco; (3) Conseco relied on the information; (4) Conseco was justified in relying on the information; and (5) Conseco was financially harmed by relying on the information. Bonhiver v. Graff, 248 N.W.2d 291, 298-99 (Minn. 1976); Restatement (Second) Torts § 552. Minnesota has adopted the Restatement approach. Noram Investment Servs., Inc. v. Stirtz Bernards Boyden Surdel & Larter, P.A., 611 N.W.2d 372, 375 (Minn. Ct. App. 2000).

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Herbrink v. Farm Bureau Life Ins. Co., 664 N.W.2d 414, 420 (Minn. Ct. App. 2003).

Conseco's primary concern in early 2001 was the looming shortfall exceeding $6 million between AT&T and WorldCom. Teleplus sold itself to Conseco by making explicit representations about its expertise and its fundamental ability to negotiate difficult contracts in a short amount of time.

The correspondence from Teleplus Sales Consultant Bill Hansen prior to the execution of the contract clearly played on Conseco's primary motivation: timing. The schedule proposed by Mr. Hansen represented that Teleplus expected to complete negotiations and present a contract ready for signature to Conseco within eight weeks. The representations made in person and in writing clearly were designed to induce Conseco to hire Teleplus in order to realize Conseco's objectives: quickly securing new rates, and eliminating the exposure to shortfall. Conseco believes the evidence presented at trial will demonstrate that Teleplus presented false information to Conseco concerning Teleplus' capabilities to guide its business transaction with AT&T and WorldCom. Teleplus failed to use reasonable care or competence in representing to Conseco that the negotiations would be concluded quickly and successfully. That Conseco relied on Teleplus' representations is evidenced by its decision to hire them. Given Teleplus' superior knowledge and experience in the field, Conseco was justified in relying on Teleplus' representations. Conseco's expert witness will describe the financial harm suffered by Conseco by relying on the information.

**CONCLUSION**

Conseco respectfully submits that Teleplus cannot sustain a claim of breach of contract or a claim of fraud. Teleplus failed to meet its obligations under the Consulting Services Agreement. That failure caused direct and substantial harm to Conseco.

Dated: June 27 , 2005

DORSEY & WHITNEY LLP

By s/Shannon M. Heim
Robert E. Cattanach (0153734)
Shannon M. Heim (0309771)
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

***Attorneys for Conseco Services, LLC***